**UNITED STATES of America, Plaintiff,**

*v.*

**BOARD OF EDUCATION OF the CITY OF CHICAGO, Defendant.**

**No. 80 C 5124.**

United States District Court,
N.D. Illinois, E.D.

June 8, 1984.

As Amended July 17, 1984.

William Bradford Reynolds, Asst. Atty. Gen., Alexander C. Ross, Civil Rights Div., Dept. of Justice, Washington, D.C., Margaret C. Gordon, Asst. U.S. Atty., Chicago, Ill., for plaintiff.

Robert C. Howard, Robert M. Weissbourd, Hartunian, Futterman & Howard, Chtd., C. Richard Johnson, Reynaldo P. Glover, Hugh R. McCombs, David Narefsky, Isham, Lincoln & Bealee, Chicago, Ill., for defendant.

**138**

## SHADUR, District Judge.

JUNE 8, 1984 OPINION—TABLE OF CONTENTS

| | Pages |
|---|---|
| BACKGROUND | 138-140 |

| I. FINDINGS OF FACT ("Findings") | Findings | |
|---|---|---|
| Adoption and Approval of the Desegregation Plan (the "Plan"), and the Nature of the Plan | 101-61 | 140-157 |
| Consent Decree Negotiations | 101-11 | 140-144 |
| Development of Part I of the Plan, the Educational Components | 112-17 | 144-146 |
| Statements of the United States and this Court Relating to the Educational Components | 118-28 | 146-150 |
| Overview of the Student Assignment Plan | 129-44 | 150-152 |
| Demographics of the City of Chicago and the Chicago Public Schools | 145-61 | 153-157 |
| Propriety and Cost of Programs Proposed for Adequate Implementation of the Plan | 201-72 | 158-180 |
| Board's Financial Affairs and Condition and the Financial Aspects of School Desegregation | 301-76 | 180-196 |
| 1983-84 Incremental Desegregation Expenditures | 301-12 | 180-186 |
| 1983-84 Ancillary Desegregation Expenditures | 313-17 | 186 |
| 1983-84 School Budget—Board Resources and Expenditures | 318-29 | 186-188 |
| 1979-80 Financial Crisis | 330 | 188 |
| Relationship to School Finance Authority | 331-32 | 188-190 |
| Projected Deficits for Future Years | 333-41 | 190-191 |
| Board Efforts To Find Resources | 342-49 | 191-192 |
| Federal and State Funds Received by Board | 350-68 | 192-196 |
| Board's Good Faith Efforts | 369-76 | 196-197 |
| Addendum A to Findings | 301-76 | 197-200 |
| Availability of Federal Funds to Implement the Chicago Desegregation Plan | 401-67 | 200-208 |
| Presently Available Funds | 401-38 | 200-205 |
| Actions by the United States Affecting the Availability of Funds | 439-67 | 205-208 |
| Actions with Respect to the Yates Bill and Weicker Amendment | 501-18 | 208-211 |
| The United States' Non-Compliance With Section 15.1 | 601-09 | 211-212 |

| II. CONCLUSIONS OF LAW ("Conclusions") | Conclusions | Pages |
|---|---|---|
| Law of the Case | 1-9 | 212-214 |
| Standards for Determining the Amount of Funding "Adequate for Implementation of the Plan" | 10-16 | 214-217 |
| Standards for Determining the Share the United States Is Obligated To Attempt To Provide of the Amount "Adequate for Implementation of the Plan" | 17-21 | 217-218 |
| Consideration of Funding Contentions of the United States | 22-35 | 218-220 |
| Propriety of the Programs Proposed by Board for Implementation of the Plan, and Summary as to the Amount of United States' Obligation | 36-38 | 220-221 |
| Verification of the Current Availability of Funds | 39-79 | 221-229 |
| Meaning and Effect of the Yates Bill | 80-88 | 229-231 |
| Meaning and Effect of the Weicker Amendment | 89-119 | 231-237 |
| Additional United States Violations of Section 15.1 and Subsequent Court Orders, and Consequent Remedial Obligations | 120-30 | 237-240 |
| Present Obligations of the United States | 131-43 | 240-243 |
| Separation of Powers: Judicial Consideration of Legislative Activities | 144-57 | 244-245 |
| Means of Enforcement | 158-62 | 245-246 |

This case has tended to be sidetracked by a "false conflict"[1] created by the United States: By creating an artificial limitation on funds otherwise available or potentially available to satisfy the extensive Desegregation Plan needs of Chicago's Board of Education (let alone the varying needs of other claimants of funds), the United States has sought to place the Board (and this Court) into a position as though the Board (and this Court) were choking off deserving educational programs.[2] That is simply not true. It is the United States itself that has created and is perpetuating that regrettable situation.

---

1. In the law that term is most commonly used in choice-of-law problems, reflecting the theory of analysis with which Professor David Currie is most often associated. See, e.g., *In re Air Crash Disaster Near Chicago, Illinois on May 25, 1979,* 644 F.2d 594, 605 & n. 2 (7th Cir.1981).

2. Someone has given the educators in the State of New Hampshire the idea this Court should be appealed to because the New Hampshire affiliate of the National Diffusion Network, funded by the United States Department of Education (the "Department") ran out of funds May 11, 1984. To date, 11 separate letters have come in about the loss of a program that (though this Court is not itself an educator) sounds highly worthwhile. If the United States will not be candid and acknowledge that this baby, and all the other orphans created by the United States' intransigence, must be laid at its doorstep and *not* that of this Court, either this Court or someone else ought to make that clear.

This Court has held,[3] and our Court of Appeals has confirmed,[4] that the United States has broken its word by refusing to keep the promise it made on the day this lawsuit was filed, Consent Decree § 15.1, ("Section 15.1"):[5]

> Each party is obligated to make every good faith effort to find and provide every available form of financial resources adequate for the implementation of the desegregation plan.

In a sense the United States is not like other litigants—because the concerns created by considerations such as separation of powers and sovereign immunity tend to prevent its promises from being fully enforced in precisely the same way as promises of (say) IBM or other private defendants. For that reason this Court has previously been compelled to impose a "freeze" order to avoid the risk its ability to order relief will arguably be frustrated. Because the United States has deliberately violated its original agreement to fund the Chicago Desegregation Plan, this Court has reluctantly found it necessary to prevent the distribution to other possible grantees of United States educational funds, in order to preserve access to all the dollars that would be potentially available to fund the honoring of the United States' freely-undertaken (and then freely-broken) obligation to the Board.

But as this Court has said during the course of hearings on this issue, the United States "has the key to its cell in its own pocket."[6] It could have, in the exercise of its "every good faith effort," assured that all the needed funds would be potentially available to the Board by (1) shifting available dollars to the Board to the fullest extent possible without congressional approval or (2) going to Congress with a request to allow the shifting of dollars that were already available to the Department of Education, but that required reallocation because they were not in fact going to be used for the purposes that had been the subject of the original allocation.[7] It could have done both those things if necessary. Instead the United States has chosen to pit deserving applicants for funds one against the other, and to put the issue before Congress as though the Board and this Court—rather than the United States as the breaker of its own voluntary promise—were the malefactors.

One other related point should be emphasized at the outset. Section 15.1 is part of a consent decree. Like every consent decree, it has a twofold aspect.[8] It is of course a *contract*—and as a contract, it is enforceable to require the contracting parties to perform their voluntarily undertaken duties. Because unlike most contracts the parties have chosen to submit it for the stamp of court approval, it is also a

---

**3.** 567 F.Supp. 272 (N.D.Ill.1983) ("Opinion II"), followed by the contemporaneously issued June 30, 1983 "Order," *id.* at 285.

**4.** 717 F.2d 378 (7th Cir.1983) ("Opinion III").

**5.** More accurately, Section 15.1 is part of Part I of the Consent Decree. For convenience all references in this opinion to the Consent Decree will omit "Part I," and whenever the following Findings and Conclusions refer to "Section—" without identifying a document, the reference is to that section of Part I of the Consent Decree.

**6.** That phrase is one with an honored history in a somewhat different—though this time closely-related—legal context. It is customarily used to describe the situation of the party that, having violated a court order, is sentenced to confinement until he or she complies with that order. *Gompers v. Buck's Stove & Range Co.,* 221 U.S. 418, 442, 31 S.Ct. 492, 498, 55 L.Ed. 797 (1911) ("he carries the keys of his prison in his own

pocket"). Of course the parallel to the present case is too obvious to require spelling out.

**7.** To the extent congressional action was required to free up funds, but might not have been obtained because of competing considerations that Congress might have deemed more important despite a request from the administration, the United States as a litigant could not be faulted or held liable for a violation of Section 15.1. However the United States' conduct has poisoned the well by violating its agreement "to make every good faith effort to find and provide every available form of financial resources," and it cannot therefore excuse itself by pointing to congressional attitudes created by its own flouting of its contractual obligations.

**8.** *United States v. City of Miami,* 664 F.2d 435, 439–40 (5th Cir.1981).

*court order* —and as such, it is enforceable like any other court order, by contempt if need be.[9]

On the sorry record reflected by the matters detailed in this long opinion, a private litigant that did what the United States has done would unquestionably be held in contempt—with the potential for being subjected to a fine or imprisonment as well as to an order for civil compliance. But for the United States a contempt fine is meaningless—after all it is the public interest (and not the injured opposing party) that is vindicated by a fine, with the money going to the United States itself as surrogate for the public. Thus imposition of a fine against the United States would just transfer money from one federal pocket to the other. Similarly imprisonment of the United States as such is impossible, and any possible imprisonment of defiant ranking government officials would be unseemly at best. For those reasons voluntary adherence by the United States to its solemnly undertaken responsibilities becomes all the more important, and its deliberate flouting of those responsibilities becomes all the more unpardonable.

Now the legal rights of the litigants have to be evaluated. This opinion has not been drafted in response to the United States' conduct just referred to, but that conduct may have made the issues more clouded than would otherwise have been the case.

This Court now has before it the evidence developed in extensive hearings on remand from the Court of Appeals' decision ("Opinion III," see n. 4) confirming the United States' violation of Section 15.1. Although the Court of Appeals did that, it also vacated the part of this Court's June 30, 1983 order (the "Order," issued contemporaneously with "Opinion II," see n. 3) that had directed the United States to undertake an affirmative program to preserve the availability of funds potentially available to fulfill its obligations under the Decree. As the Court of Appeals put it (717 F.2d at 384), this Court had "acted with excessive dispatch" in doing so. This

Court of course had shared the respect for separation of powers that underlay the Court of Appeals' opinion. This Court's fault, if it was one, was in a skepticism (grounded in prior conduct by the United States, not in mere surmise) as to whether the United States would in fact "fashion its proposed remedy for past non-compliance, as well as ... show that it intends to comply in the future..." (717 F.2d at 385).

As the following findings of fact ("Findings") and conclusions of law ("Conclusions") will reflect, this Court's anticipatory doubts were unfortunately all too justified. Now the Department of Education has been given the opportunity mandated by the Court of Appeals, and it has failed its charge dismally. In accordance with Fed.R.Civ.P. ("Rule") 52(a), this Court sets forth the Findings and Conclusions that constitute the grounds of its action referred to in this lengthy opinion.

### FINDINGS OF FACT ("Findings")

*Adoption and Approval of the Desegregation Plan (the "Plan"), and the Nature of the Plan*

*Consent Decree Negotiations*

101. Chicago's Board of Education ("Board") operates the third largest public school system in the United States. In the 1980–81 school year Board operated 634 schools, including 495 elementary schools, 66 high schools and 73 special needs schools of various types. In October of that school year Board had 458,497 students, whose racial/ethnic makeup was as follows:

| | | |
|---|---|---|
| White Non-Hispanic | 85,292 | 18.6% |
| Black Non-Hispanic | 278,726 | 60.8% |
| Hispanic | 84,226 | 18.4% |
| Asian/Indian | 10,253 | 2.2% |

At the same time Board employed approximately 43,000 persons, including 29,000 members of the Chicago Teachers Union. Board is the largest employer in Chicago and the second largest in Illinois. (Stip. 101)

---

**9.** *EEOC v. Liberty Trucking Co.,* 695 F.2d 1038, 1043 (7th Cir.1982).

102. After protracted and complex negotiations, the United States and Board entered into a Consent Decree, which was filed with and approved by this Court September 24, 1980. (Stip. 102) Findings 103–04 give the background of the Consent Decree.

103. After desegregation negotiations in 1979 between the former Department of Health Education and Welfare and the former representatives of Board had proved unsuccessful, the United States Department of Justice notified former Interim Superintendent of Schools Caruso on April 21, 1980, that if further negotiations were not successful, the United States would initiate a desegregation lawsuit against Board. (GX1–27 [Government Exhibit 1, June 1983 hearing, Document 27]) Ensuing negotiating sessions between the Department of Justice and former Board representatives primarily addressed whether the parties could agree on specific racial percentages for a student assignment plan and on the specific amount and timing of the Emergency School Aid Act (ESAA) funds that the Board would receive to implement such a plan. (GX1–21,22) Board counsel indicated that if the negotiations failed and litigation commenced, Board would present counterclaims against agencies of the federal government. (GX1–39) There was no significant progress in those negotiations. (GX1–21, GX1–22) (Stip. 103)

104. During those negotiations a new Board was appointed and took office. (GX1–22) That new Board formed a Desegregation Committee (GX1–21) and indicated to the United States it would bring fresh approaches to the negotiations (Id.) Thereafter Board was represented by its new leadership and by new counsel. (GX1–16) Negotiations then progressed rapidly, leading to a draft agreement within a few weeks (GX1–16) and to consummation of the Consent Decree within another six weeks. (GX1–14, 15) That progress resulted from an altogether different focus. Rather than seeking to negotiate the specific terms (or even somewhat more generalized terms) of a student assignment plan, the parties instead agreed to general principles that would guide subsequent development of a plan. (Consent Decree, Part I) Correspondingly with respect to funding, the parties negotiated a general principle applicable to both parties. Those negotiations concerning the general funding provision have been described in a Joint Stipulation of the parties as follows:

At a relatively early stage in the negotiations leading to the Consent Decree, the parties discussed the question of financial support from the United States for the Board's desegregation activities. It was the Government's position that no funding commitment specific as to form and amount could be made in the context of the Consent Decree, because there was no way to anticipate the nature and costs of the Board's Plan, the amount and sources of Government funding, or a variety of other matters. The parties briefly discussed funding possibilities relating not only to the Department of Education (including ESAA and other programs), but also other federal agencies such as the Department of Justice, the Department of Transportation, and the Department of Housing and Urban Development. Thereafter Mr. Ross conveyed to Mr. Howard by telephone brief descriptions (obtained by Mr. Ross from the Department of Education) of some of the types of planning and implementation activities funded in other instances. Mr. Ross also conveyed to Mr. Howard very sketchy information about grant amounts to other cities, but in general it was the position of the Department of Education that it would not disclose such information. These discussions took place approximately two months before the completion and execution of the Consent Decree. It was concluded that the matter of federal financial support would be handled by including general provisions in the Consent Decree, and Section 15.1 was drafted and incorporated into the Decree. Section 15.1 was not designed to incorporate any specific discussions between the parties on this issue, but to establish a general obligation on

the part of both parties which would be interpreted and applied as appropriate in whatever future circumstances might arise.

Section 15.1 provides:

15.1 Each party is obligated to make every good faith effort to find and provide every available form of financial resources adequate for the implementation of the desegregation plan.

Section 15.3 provides:

15.3 The parties recognize that financial cost of implementation does not excuse the failure to develop a desegregation plan consistent with the principles set forth in §§ 2–14, and is not a basis for postponement, cancellation or curtailment of implementation of the plan after it has been finally adopted, but is one legitimate consideration of practicability in meeting the objective stated in § 2.1.

(Stip. 104)

105. On September 24, 1980 four events occurred to make the Consent Decree fully operative:

(a) filing of a Complaint by the United States;

(b) execution and filing of the Consent Decree;

(c) after a hearing and after consideration of the Complaint, the Consent Decree and the United States' Memorandum of Law, approval by the Court of the Consent Decree and its entry by the Court; and

(d) Board's non-filing of any counterclaim against the United States.

(Stip. 105)

106. Among the general principles set forth in the Consent Decree to guide subsequent development of a desegregation plan were the following:

§ 2. *Basic Objectives*

2.1 *Desegregated Schools.* The plan will provide for the establishment of the greatest practicable number of stably desegregated schools, considering all the circumstances in Chicago.

2.2 *Compensatory Programs in Schools Remaining Segregated.* In

order to assure participation by all students in a system-wide remedy and to alleviate the effects of both past and ongoing segregation, the plan shall provide educational and related programs for any Black or Hispanic schools remaining segregated.

2.3 *Participation.* To the greatest extent practicable, the plan will provide for desegregation of all racial and ethnic groups, and in all age and grade levels above kindergarten.

2.4 *Fair Allocation of Burdens.* The plan shall ensure that the burdens of desegregation are not imposed on any racial or ethnic group.

§ 7. *Compensatory Programs in Schools Remaining Segregated.* To accomplish the objective stated in § 2.2, the plan will include specific programs for Black or Hispanic schools remaining segregated, in the following areas among others:

7.1 Remedial and compensatory educational programs.

7.2 Improved curricula and instructional and evaluative techniques (including the utilization of tests that validly measure student achievement) for academic, vocational and alternative educational studies.

7.3 Pre-service and in-service instruction for administrators, principals, teachers and other school personnel.

7.4 Selection, and evaluation of the performance of, principals and supporting leadership staff.

7.5 Testing, counseling, guidance and student welfare.

7.6 Physical facilities, safety and security.

7.7 Supportive relationships between such schools and groups and institutions in the community and in government.

(Stip. 106)

107. Thus in agreeing in Section 15.1 to find and provide financial resources "adequate for implementation of the desegregation plan," the United States was agreeing

to help pay for a plan that would include educational components in racially isolated schools (§ 2.2)[1] covering the subject matter outlined in § 7, in the development of which the Board would exercise discretion (§ 3.1). (Stipulations 101–06)

108. Circumstances surrounding entry of the Consent Decree indicate that a joint and mutual obligation was contemplated. The Consent Decree represents the only instance in which a major urban school system has agreed, without any litigation or determination of liability issues, to develop and implement a system-wide desegregation plan under court supervision. It contemplated that because of the demographics of the Chicago school system, a substantial number of minority children would inevitably remain in racially isolated schools, requiring the extensive and expensive use of compensatory educational remedies to alleviate the effects of past segregation. In 1980 (as now) Board was faced with massive financial deficits, and the joint funding provision of the Consent Decree reflected recognition that Board's finances were such that it could not voluntarily agree to develop, or successfully to implement, an effective desegregation plan of this type unless the federal government were sharing the financial burdens. (Stipulations 101–56; June 1983 Findings and Plan/ADR data on Board finances)

109. Stated simply, the parties had a common and overriding goal of assuring that an effective desegregation plan was developed and implemented in Chicago. This joint purpose, with respect to financing, included a requirement that the parties provide the total amount of funds adequate for implementation of the Plan. In Section 15.1 each party agreed to do everything possible to supply the necessary funding. (Stipulations 101–56; June 1983 Findings

and Plan/ADR data on Board finances) The United States' financial commitment under Section 15.1 was the principal *quid pro quo* for Board's willingness to forego litigation and develop the Plan. In return for that commitment, the United States secured the full result it sought (and may not otherwise have achieved) without the expense and delay of complex litigation. The United States also avoided potential liability for a number of counterclaims that would have been brought against it. (Findings 103, 105)

110. With respect to "what the parties reasonably expected at the time of signing," the parties' Joint Stipulation (Government's Exhibit 2 in the June 1983 hearing) states:

> Section 15.1 was not designed to incorporate any specific discussions between the parties [on the issue of federal financial support], but to establish a general obligation on the part of both parties which would be interpreted and applied as appropriate in whatever future circumstances might arise.

All the extrinsic evidence concerning this issue does not support any notion that there was a recognized specific dollar *limitation* incorporated in Section 15.1, based on the amount of previous ESAA grants or otherwise. Indeed the Joint Stipulation reflects the parties had been discussing "funding possibilities relating not only to the Department of Education (including ESAA and other programs), but also other federal agencies such as the Department of Justice, the Department of Transportation, and the Department of Housing and Urban Development."[2] As this Court has determined previously, the extrinsic evidence points to an obligation to conduct a "universal search" (567 F.Supp. at 282 n. 6), not a limited examination of what ESAA fund-

---

1. As well as in magnet schools (§ 4.1.2) and desegregated schools (§§ 10.1 and 10.4).

2. Moreover, Stipulations 101–02 and the extrinsic evidence offered by the Government, in the form of its correspondence file, reflect that in the spring of 1980, the former counsel representing a former Board were preoccupied with the potential amount of an ESAA grant that

might be generated if the parties could agree on the specific parameters of a student assignment plan. However, after a new Board took office and retained new counsel, the negotiations took a sharply different direction, leading to agreement on a general funding principle not incorporating any previous specific discussions.

ing was theoretically available to Board. (Stipulations 101–06; Government Exhibits 1 and 2 in the June 1983 hearing) This does not of course mean the parties contemplated issuance of a blank check to Board by the United States. But given the circumstances of the negotiations, Board's known financial difficulties, its inability to generate funds without the approval of other governmental agencies, the known major problems (and hence major costs) of implementing a desegregation plan in a school system as large as Chicago's (and with its racial mix), and other relevant factors, the parties' reasonable expectations should certainly have embraced the potential need for the United States regularly "to find and provide" sums of the magnitude represented by Board's proof at the current hearing. Although this Court ruled in limine (prior to the current hearings) certain areas of proof by the United States would be excluded, this Court has nevertheless given full consideration to (a) the United States' offer of proof suggested by this Court as the means to complete the record and (b) Board's post-hearing response to that offer of proof. Even taking that offer of proof fully into account (rather than treating it as excluded) this Court finds nothing in the United States' proof or proposed proof persuasively refutes the reasonableness of the expectations referred to in this Finding. Given the parties' Joint Stipulation that Section 15.1's "general obligation ... would be interpreted and applied as appropriate in whatever future circumstances might arise," this Court finds the current circumstances make the interpretation of that obligation to embrace the Board's current request (as modified by this opinion) to be wholly appropriate for funding by the United States.

111. The Consent Decree in this case is the only instance in which the United States has entered into a desegregation settlement containing the same or substantially similar language to that in Section 15.1. (Stip. 107)

*Development of Part I of the Plan, the Educational Components*

112. To develop the Educational Components of the Plan, Board retained a team of independent, nationally recognized consultants. Dr. Robert L. Green was the Lead Consultant, with principal overall responsibility for the process. Dr. Green (now the President of the University of the District of Columbia) was then Dean of the College of Urban Development, Michigan State University. He was a leading national expert on desegregation plans, especially the aspect of desegregation that emphasizes educational programs to provide equal and effective education for urban and minority children. Dr. Green had participated in many desegregation cases and desegregation plans, traditionally as an expert for the plaintiffs in such litigation, and frequently on behalf of the NAACP. (Stip. 108) In addition to Dr. Green, five other education experts from outside the school system were retained on a full-time basis to work on the Educational Components, along with 24 part-time "national consultants." Professor Ronald Edmonds (who has since died) was the primary national consultant in the area of curriculum. While on the faculty of the Harvard Graduate School of Education, Dr. Edmonds had directed the well-known major research project, *Search for Effective Schools: The Identification and Analysis of City Schools That Are Instructionally Effective for Poor Children.* Professor Edmonds had also implemented his "effective schools" design as the principal instructional officer for the New York City schools, with the title of Senior Assistant for Instruction.

113. Board's complete list of desegregation project consultants is as follows:

Robert L. Green, Ph.D., Lead Consultant
 Dean, College of Urban Development
 Michigan State University
 East Lansing, Michigan

Staff

Nelvia M. Brady, Ph.D., Staff Director
 Professional Associate
 Educational Testing Service
 Evanston, Illinois

Elizabeth Jill Hirt, Ph.D., Staff Associate
 Research Associate
 College of Urban Development
 Michigan State University
 East Lansing, Michigan

Judson Hixson, M.A., Staff Associate
 Educational Director on Leave
 Chicago Urban League
 Chicago, Illinois

Staff

Jodi Martinez-Martin, Ed.D., Consultant
 Teacher Education Specialist
 Illinois State Office of Education
 Springfield, Illinois

Frances S. Thomas, Ph.D., Consultant
 Assistant Professor
 College of Urban Development
 Michigan State University
 East Lansing, Michigan

Primary National Consultants

Curriculum: Professor Ronald Edmonds
Senior Assistant to the Chancellor for Instruction, NYC Public Schools

Staff Development: Dr. Cassandra Simmons
Assistant Professor and Director, Office of Student Affairs
College of Urban Development
Michigan State University
East Lansing, Michigan

Additional Consultants and Resource Persons

Dr. Beatriz Arias
Stanford University
Stanford, CA

Dr. Josue Gonzalez
Office of Education
Washington, DC

Ms. Norma Barnes
Norma Barnes Assoc.
Chicago, IL

Dr. Robert J. Griffore
Michigan State University
East Lansing, MI

Dr. Samuel Betances
Northeastern Illinois University
Chicago, IL

Dr. James Hawkins, Superintendent
Benton Harbor Public Schools
Benton Harbor, MI

Dr. Duane Brown
University of North Carolina
Chapel Hill, NC

Ms. Maureen Larkin
Milwaukee Public Schools
Milwaukee, WI

Dr. Robert Crain
Johns Hopkins University
Baltimore, MD

Dr. Jane Mercer
University of California
Riverside, CA

Ms. Jane Creeden Dore
Freelance Editor/Writer
Chicago, IL

Dr. Margaret Parsons
Michigan State University
East Lansing, MI

Dr. Joseph Darden
Michigan State University
East Lansing, MI

Ms. Rachel Patrick, J.D.
American Bar Association
Chicago, IL

Dr. Harold Dent
Westside Community Mental Health Center
San Francisco, CA

Dr. Diana Pearce
Center for National Policy Review
Washington, D.C.

Dr. Edgar Epps
University of Chicago
Chicago, IL

Mr. Joseph Rosen
Educational Consultant
Chicago, IL

Dr. Reynolds Farley
University of Michigan
Ann Arbor, MI

Dr. Charles Thomas, Supt.
School District #64
North Chicago, IL

Dr. Walter Farrell
University of Wisconsin
Milwaukee, WI

Ms. Rebecca Yarlott
Minneapolis Public Schools
Minneapolis, MN

(Stip. 109)

114. During the development of the Educational Components from November 1980 through March 1981, Board submitted monthly progress reports to the Department of Justice, as required by the Consent Decree. (Stip. 110)

115. Dr. Green submitted his Recommendations on Educational Components to Board April 3, 1981. Two weeks later the Recommendations were adopted by Board as Part I of the Desegregation Plan: Educational Components. Part I's content is summarized by its Table of Contents:

A. Introduction

B. Educational Components

1. Curriculum and Instruction—Elementary Schools
2. Curriculum and Instruction—High Schools
3. Magnet Schools
4. Vocational and Technical High Schools
5. Special Education and Testing
6. Bilingual Education
7. Within-School Segregation
8. Student Discipline

C. Staff Development

D. Other Components

1. Public Participation
2. Metropolitan Initiatives
3. Faculty Desegregation and Affirmative Action
4. Evaluation
5. Monitoring

E. Appendix

(Stip. 111)

116. The following statements about Plan costs appeared at pages 17 and 19 of the "Financial Aspects" section in Part II of the Plan, adopted in April 1981:

1. *Cost and Funding of the Plan.* Due to the relatively short time available under the Consent Decree for development of the desegregation plan, the planning process has been addressed to the formulation of programs that would be desirable to effectuate the purposes of the Decree.

2. It has not yet been possible to determine the financial feasibility of the programs—i.e., the administrative details of the programs, the exact costs associated with the various elements of the plan, the extent to which these costs can be met from existing resources or require new funding, and the availability of such new funding.

\* \* \* \* \* \*

While the exact costs of the educational components are not yet known, the

Board believes that the core level of funding required to make reasonably effective those educational components directed to Black and Hispanic schools remaining racially isolated is $40 million annually in fiscal years 1982 and 1983, and $20 million annually thereafter (although additional funding would be strongly desirable).

(Stip. 112)

117. Before the Consent Decree, Board's desegregation programs were administered by a staff of three persons. Shortly after the initial adoption of the Educational Components, Board created a special Office of Equal Educational Opportunity ("OEEO") to coordinate the implementation of the Plan. OEEO is presently headed by Dr. Nelvia Brady, Associate Superintendent, who was a member of Dr. Green's original desegregation planning staff. OEEO's office staff has expanded continuously since 1981 and presently comprises 53 persons, of whom eight are clerical staff, eight are teachers (who are district-assigned), 13 are school-committee representatives and 24 are teachers (7) and administrators (17) assigned to the central office. Twenty-nine of the 40 education professionals (72.5%) have their principal responsibilities in the area of implementing the Educational Components of the Plan. (Stip. 113)

*Statements of the United States and this Court Relating to the Educational Components*

118. On June 3, 1981 Attorney General William French Smith delivered an address before the American Law Institute. In discussing the policy of the United States as to desegregation remedies, Mr. Smith stated (at 8–9):

All of these considerations [concerning mandatory reassignment] point to the need for more innovative and practical approaches to achieve equal educational opportunity. Mandatory busing is not an effective educational remedy, and in many cases it has also proven counterproductive. But this does not mean that desegregation should not continue or

that improving the quality of public education for all our children cannot be achieved. To do so, however, we must tailor the remedy to the facts of each case in which a constitutional violation has occurred.

Rather than focusing solely on the means by which discrimination has been practiced in the past, it is time we devoted more attention to remedying the resulting harms actually being suffered today. We should emphasize those remedies that actually improve the quality of education. Rather than continuing to insist in court that the only and best remedy for unconstitutional segregation is pupil reassignment through busing, the Department of Justice will henceforward propose remedies that have the best chance of both improving the quality of education in the schools and promoting desegregation.

(Stip. 114)

119. In the Response of the United States to the Desegregation Plan, filed in July 1981, the United States made the following comments about the Educational Components of the Plan:

(a) With respect to the provision of the Consent Decree concerning providing compensatory programs in schools remaining segregated, the United States said (at 5):

This principle is based squarely on common sense and Supreme Court holdings. The method of compliance with this objective is largely within the discretion of the Board, which has the expertise in educational methods.

(b) After a brief summary of the Educational Components, the United States stated (at 22) that "the Government endorses" them.

(c) Finally, in evaluating the Educational Components, the United States said (at 32–33):

The Educational Components have been more fully developed than the student assignment principles. The Board hired an impressive team of nationally known experts and the Plan

reflects the substantial time and effort that has gone into the preparation of the Educational Components. The Board and its planners deserve a great deal of credit for the accomplishment of this task. We expect that when these new educational programs are developed in detail and implemented, they will complement the student assignment principles by enhancing the workability of voluntary desegregation techniques and that they will contribute to bringing about equality of educational opportunity in the one-race schools which remain under the final plan.

(Stip. 115)

120. On August 28, 1981 the United States and Board submitted their Joint Statement to the Court as to the development of the Plan. With respect to the Educational Components, the Joint Statement (at 5) informed the Court that

The Board and the United States are in agreement in these general respects: ... (2) the Educational Components are an integral and necessary aspect of the Board's Plan. They are consistent with the Consent Decree and the Constitution. The United States fully endorses the Educational Components from a legal perspective, although it views the particular educational policy choices as within the Board's discretion.

(Stip. 116)

121. On September 27, 1981 Assistant Attorney General William Bradford Reynolds delivered a speech to the Education Commission of the States, meeting in Chicago. In discussing the policy of the Department of Justice concerning desegregation remedies, Mr. Reynolds stated:

Experience teaches us that blacks in a segregated school environment more often than not receive inferior educational attention. To the extent necessary, their facilities and curriculum must be enhanced to bring them into educational parity with the other public schools in the system. In sum, we must ensure, whatever the ultimate racial composition in the classroom, that all students attending public schools, regardless of race, color, or ethnic background, have an equal opportunity to receive an education. We are concerned, quite frankly, much less with student relocation than we are with student education and our school desegregation plans will be drawn to reflect that predominant concern.

Pursuant to the Department's civil rights policies, we are overseeing the development of a desegregation plan here in Chicago that will be designed to enhance educational opportunities for all students. The public school enrollment in Chicago is approximately 61% black, 18% white, and 21% non-black minorities, mostly Hispanic. The Chicago School Board and the Justice Department recognize that there are schools in the system that will remain racially identifiable under the desegregation plan, and the Board has thus undertaken compensatory programs to enhance the quality of education provided in those schools in order to guarantee equal educational opportunity to all students in the system. To this end, the Board has developed and submitted to the Court, with our enthusiastic approval, detailed plans to enhance educational quality in the schools, and implementation of those plans began this fall.

\* \* \* \* \* \*

By concentrating our attention and resources on teachers and administrators, course offerings, incentives for learning, and other components of education quality, this Administration—with the help and cooperation of civil rights groups, state and local school authorities, and, most importantly, professional educators—can formulate desegregation plans that not only will ensure all public school students, irrespective of race, color or ethnic background, equal educational opportunity, but will do so within an educational environment free from state-enforced attendance barriers. If such a cooperative and united effort can be mounted to rid our Nation's public

schools of the tragic legacy of racial discrimination, I am confident that, in time, we will be able to review that effort against the test of experience, and say with pride "it worked."

(Stip. 117; Bd. Ex. 77)

122. In school year 1981–82 Board submitted quarterly progress reports to the United States and to the Court, detailing the process of implementing the Plan, including the Educational Components. (Stip. 118)

123. In February and March 1982, following the adoption of Board's Comprehensive Student Assignment Plan, the Court entertained briefs concerning the compliance of the total Plan with both constitutional requirements and the Consent Decree. The United States Assessment of the Plan commented on the Educational Components as described in Finding 139. The Chicago Urban League's Assessment of the Plan expressed strong concern about the need to provide significant extra funding for implementation of the Educational Components in racially isolated schools:

The provision of extra funds—and therefore resources—to schools which are to remain racially isolated is a form of compensation intended to make up in part for the system's failure to remedy all manifestations of segregation. This component of the Plan is extraordinarily important because the majority of the system's schools are to remain segregated under the Board's proposal . . . .

The Chicago Urban League believes the notion of compensatory funding requires that racially isolated schools receive extra funding above and beyond what other schools may be receiving . . . .

The Urban League went on to express concern that Board had only committed itself to provide "Milliken II relief" to the extent that funds are available. NAACP's July 1981 memorandum on the Plan stated "we have no specific objection to the content of these programs." NAACP's March 1982 brief did not comment further on the Educational Components. (Stipulations 119, 133)

124. On January 6, 1983 this Court issued its opinion ("Opinion I," 554 F.Supp. 912) approving Board's Plan as being clearly within the broad range of constitutionally acceptable plans. With respect to the Educational Components and funding, Opinion I stated (id. at 926):

*Educational Components.* As already indicated, the Educational Components of the Plan were in definitive form well before the assignment provisions that have occupied the discussion in this opinion, and those Educational Components have not drawn the same heated attention. They were approved early by the United States and found favor with the NAACP as well. To the extent they have been criticized (chiefly by the Hispanic organizations and by Designs for Change), the criticisms did not go to claimed constitutional insufficiency and are therefore not within the province of this Court's overview. Though they of course continue to form a vital part of the purposes and hoped-for impact of the Plan—the constitutional guaranty is after all one of equality of *education*—no more need be said at this time.

*Funding.* Desegregation, like all other aspects of affording quality education to all students in a school system, costs money. In that respect the Board is not master of its own fate. If and to the extent other governmental bodies and agencies that control the pursestrings were to thwart the Board's ability to perform in the way its Plan contemplates and the Constitution requires, this Court would have to examine all appropriate and available remedies. There is no reason to presume at this time that any such delinquency in meeting the mandates of the Constitution, or any such resulting power confrontation, will occur.

(Stip. 120)

125. Board's 1983 Annual Desegregation Review, Part I (filed April 15, 1983) contained a section on "Financial Aspects" at 402–23, which included the following statements:

With regard to expenditures for racially identifiable schools, a brief explanation is in order. The Board's initial commitment (as outlined in the April, 1981 Principles) was to spend $40 million a year in 1981–82 and 1982–83 and $20 million a year thereafter. As described above, spending specifically budgeted for this component of the Desegregation Plan has fallen somewhat short of this originally projected level in the first two years of implementation. As a result, the Board believes it to be appropriate to attempt to make up the difference in subsequent years. Hence, the Board believes to be desirable to spend at least $40 million in 1983–84, as opposed to the $20 million initially prescribed by the Principles. However, the funds needed to provide for this level of expenditure simply are not available from within the Board at this time.

Over and above the level of expenditures for 1983–84 described above, additional resources would also be highly desirable to maximize the effectiveness of the Desegregation Plan. Such additional funding would help to strengthen and enrich the implementation of desegregation in Chicago in a variety of ways: intensified implementation and evaluation of educational components, expansion of magnet schools and programs (including metropolitan schools and scholastic academies), intensified recruitment efforts, improvement in vocational, technical and special educational programs, initiation of interdistrict transfer programs, to name only a few.

*Resources.* The resources necessary to fund desegregation implementation at the levels set forth above unfortunately are not available at this time from within the Board. The Board, for its part, is committed to appropriations for 1983–84 of at least $57 million—a continuation of the amounts it budgeted for the current school year. To the extent additional moneys are made available, the Board will spend them to bring the aggregate levels of expenditures for racially identifiable schools up to $40 million and to

further maximize optimum implementation of this and other aspects of student desegregation.

\* \* \* \* \* \*

Thus, at this time precise estimates of the Board's financial condition for future years are slightly premature. However, it may be fairly stated that for 1983–84 the Board faces budget problems of an extremely serious magnitude. Preliminary projections suggest it is facing a budget deficit in the range of $200 million . . . .

In any event the Board believes that, in the first instance, the obligation to provide these additional resources for the substantial expenditures which full and complete implementation of the Plan entails lies with the federal and state governments.

\* \* \* \* \* \*

On April 13, 1983, the Board adopted a resolution directing its counsel to initiate litigation against the State of Illinois and the United States seeking contribution for the cost of implementing the Desegregation Plan. The Board expects that the initiation of these actions will be forthcoming.

(Stip. 121)

126. Board's statements as to the desired expenditure of at least $40 million on the Educational Components in racially isolated schools and on the desired expenditure of additional amounts for these purposes, including the statements described in Findings 116 and 125, do not reflect any determination by Board either that the expenditure of $40 million would be "adequate" for that aspect of the Plan (in terms of Section 15.1) or that the expenditure of additional amounts for that aspect of the Plan would not materially aid its success or would not be necessary for its full implementation. (Stipulations 101–21; Parts I, II and III of the Plan)

127. In August 1983 Board filed Part II of its 1983 Annual Desegregation Review, a 416 page document that reported in detail on the implementation of the Educational

Components ("ADR II"). After the filing of ADR II this Court provided the United States and the *amici curiae* the opportunity to file comments. Neither the United States nor any of the *amici* filed comments with the Court. (Stip. 122)

128. As the preceding review of the record reflects, the United States (a) strongly supported (indeed, insisted upon the inclusion of) Board's Educational Components as the developmental process moved from the Consent Decree principles to the April 1981 Educational Components Plan to approval by this Court and (b) raised no subsequent objection as Board proceeded to add programmatic details to those initial documents. Only when called upon to fulfill its financial responsibility did the United States begin to renege on its approval. (Stips. 101–22, 133)

*Overview of the Student Assignment Plan*

129. Under the Consent Decree Board agreed to adopt a system-wide desegregation plan with two basic objectives. Section 2.1 called for creating the greatest practicable number of stably desegregated schools, considering all the circumstances in Chicago. As already described, the second objective was to provide educational and related programs for schools that remained racially isolated. (Stip. 123)

130. In January 1982 Board adopted its Comprehensive Student Assignment Plan, which divides all schools in the school system into four broad categories. First of those categories is that of the residentially integrated school (defined as one whose enrollment includes at least 30% white children and 30% minority children, derived principally from residential or other natural attendance patterns). Two basic types of schools come within that category: (a) stably integrated and (b) integrated but with potential for change. There is a third type of school identified in the Plan: currently integrated, but with an enrollment of white

children projected to decline below 30%.[3] As of October 1981 those three types of schools encompassed 67 schools with an enrollment of 52,067 students.[4] (Stip. 124)

131. Next the Plan considers the category of the desegregated school: one whose enrollment includes at least 30% white children and 30% minority children, and which has been established primarily by student assignment techniques under the Plan. That category includes both (a) schools that have previously achieved stably desegregated status through the implementation of various student assignment measures (as of 1981, 42 schools with 20,329 students) and (b) schools that in 1981 were yet to achieve desegregated status, through previously existing and newly adopted student assignment techniques (in 1981, 33 schools with 17,541 students). Such techniques include voluntary transfer programs and magnet and magnet-type programs within schools. (Stip. 125)

132. In addition the Plan describes various magnet-type schools, which are established primarily in minority communities and are designed to promote desegregation by special educational offerings and programs. Each such school has a target enrollment composition, generally 15–35% white, 65–85% minority. In 1981 such schools included 41 magnet schools, scholastic academies and metropolitan high schools, enrolling 28,824 students. (Stip. 126)

133. Finally the Plan also considers schools projected to remain racially identifiable (with an enrollment of greater than 70% minority children, less than 30% white children). In 1981 there were 354 such schools, enrolling 275,794 students. After describing why those schools cannot practicably be desegregated, the Plan describes the compensatory educational arrangements that will be provided for at those

**3.** Two other sub-categories are also identified: (a) stable mixed schools having a small but relatively constant enrollment of white children and (b) schools whose enrollment composition is currently racially mixed but is projected to become racially identifiable.

**4.** All the enrollment data in Findings 130 through 134 excludes pre-school and kindergarten children.

schools and the various voluntary transfer arrangements in which students enrolled at those schools may participate. (Stip. 127)

134. This table summarizes the school types identified in the Plan, and the number and enrollment of the schools:

| Integrated Schools: | Number | 1981 Enr.* |
|---|---|---|
| Stably integrated | 42 | 31,791 |
| Integrated schools stable but projected to become mixed | 11 | 7,697 |
| Integrated schools with potential for change | 14 | 12,579 |
| Subtotal | 67 | 52,067 |
| **Schools Desegregated and To Be Desegregated:** | | |
| Schools presently desegregated | 42 | 20,269 |
| Schools to be desegregated | 33 | 17,541 |
| Magnet schools | 29 | 16,765 |
| Scholastic Academies—1982 | 6 | 2,406 |
| Metropolitan High Schools—1982 | 6 | 9,653 |
| Subtotal | 116 | 66,634 |
| **Predominantly Minority Schools:** | | |
| Stable mixed (15–29% white) | 14 | 11,481 |
| Mixed with potential for racial change | 20 | 14,695 |
| Schools more than 85% minority | 320 | 249,618 |
| Subtotal | 354 | 275,794 |
| **Special Needs/Special Admissions:** | | |
| Physically handicapped, apprentice, adult education, bilingual centers, juvenile detention and pregnant students | 43 | 9,173 |
| Total | 580 | 403,668 |

* All enrollments excluding 39,221 preschool and kindergarten children. Twenty-five child-parent centers omitted.

(Stip. 128)

135. Two mandatory requirements were established by the Plan. One was that every school achieve by October 1983 a minority enrollment of at least 30%. Under the other, by October 1983 the school system as a whole had to achieve a minimum total enrollment in all integrated and desegregated schools (including magnet schools). This latter requirement is generally referred to as the "desegregation index" requirement. (Stip. 129)

136. Additionally the Plan sets forth other student assignment provisions to be applied throughout the school system to provide and maintain the maximum practicable desegregation and to ensure that the Plan will not initiate or authorize any segregative actions. Among such provisions are those concerning school closings, boundary adjustments and within-school segregation. (Stip. 130)

137. In a separate volume, the Student Assignment Plan contains school-by-school analyses for each school in the system. Those analyses describe in summary terms the work and consideration that went into developing a desegregation strategy for each school. They also provide a detailed statement as to why it is not practicable to desegregate a large number of schools remaining racially identifiable. (Stip. 131)

138. Detailed evaluation of the student assignment component of the Plan, including analysis of enrollment composition and prescription of specific actions for over 200 individual schools, is undertaken every year. Each such evaluation is reported on in an Annual Desegregation Review ("ADR"). (Stip. 132)

139. After the adoption of the Comprehensive Student Assignment Plan in January 1982, the United States filed its 33-page Assessment of the Plan. It explained the United States' belief that the Plan is constitutional and consistent with the Consent Decree. In conclusion the United States stated:

> We believe that, for the reasons stated in these comments, once the plan has been thoroughly implemented and the Educational Components completed, the Board will have: (a) provided a system-wide remedy with compensatory programs at remaining segregated schools, (b) established the greatest practicable number of stably desegregated schools, (c) insured that all racial and ethnic groups participate and (d) distributed the benefits and burdens of the plan on a fair basis.

(Stip. 133)

140. In Opinion I (554 F.Supp. 914–15) this Court incorporated the Board's summary of its extensive and effective activities in the 18 months from the entry of the Consent Decree to the adoption of Part III of the Desegregation Plan. This Court further noted it had deferred ruling on the Plan for several months, so that the prom-

ises of the Plan could be "test[ed] in the crucible of reality." In light of the fall 1982 implementation results, this Court found "nothing in the execution of the Plan has been shown to disprove the premises on which it was designed" (*id.* at 915). Finally, having reviewed the Plan in detail, this Court approved it as being "clearly within the broad range of constitutionally acceptable plans" (*id.* at 928). (Stip. 134)

141. In April 1983 the Board's Annual Desegregation Review (Part I, Student Assignment) ("ADR I") showed that (a) implementation of the Plan during school year 1982–83 was a considerable success and (b) to a very significant degree its projections of student assignment outcomes had been realized. ADR I was also candid in its assessment of shortcomings and in adopting measures to address them. (Stip. 135)

142. In its May 1983 response to ADR I, the United States favorably evaluated the Board's substantive implementation process (at 1–2, 4–5):

The Chicago School Board's April 19, 1983, filing on its first Annual Desegregation Review is an extremely well-conceived document and will be a valuable guide for assessing the Board's compliance with the underlying principles established by the Consent Decree and the Court in this case. Like the desegregation plan itself, this document reflects extensive thought, preparation and effort at implementation in a context that is so complex that it often seems incapable of clear description. The review document makes a significant contribution to the clarification, for all involved, of what this plan has meant for the Chicago public schools.

Our first comment is on the review process itself. We know of no other school board, large or small, that has made as comprehensive, detailed and careful examination of what it is doing to implement a desegregation plan.

\* \* \* \* \* \*

We think that the overall plan implementation process has been excellent and that the Board has applied it in good faith at each school .... Should the

Board fail to take the remedial steps recommended in the review or otherwise fail to take the steps necessary to fulfill the plan's promise, the plan's present constitutional sufficiency would suffer. At this point, we have no reason even to suspect that this is a possibility.

(Stip. 135)

143. As Finding 135 reflects, the mandatory requirements of the Student Assignment Plan became applicable as of October 1983. While the formal evaluation of the results of the Plan in the 1983–84 school year is not yet due to be filed, Board filed a Report Concerning Preliminary Fall 1983 Enrollment Data on November 2, 1983, informing this Court that the requirement of 30% minimum minority enrollment in all schools had been met. (Stip. 137)

144. For comparison with Finding 134, the following table shows fall 1983 data as to the number and total enrollment of the various school types identified in the Plan. Those data are comparable with Finding 134, but it should be noted that there has been some recategorization of schools to reflect the experience of the past two years. As in Finding 134, the figures exclude kindergarten students; therefore the total enrollment shown is for grades 1–12, 41,260 students less than systemwide enrollment.

| Integrated Schools: | Number | 1983 Enr.* |
|---|---|---|
| Stably integrated | 47 | 36,569 |
| Integrated schools stable but projected to become mixed | 4 | 2,009 |
| Integrated schools with potential for change | 4 | 5,033 |
| Subtotal | 55 | 43,611 |
| Schools Desegregated and To Be Desegregated: | | |
| Schools presently desegregated | 77 | 42,382 |
| Schools to be desegregated | 0 | |
| Magnet schools | 33 | 19,155 |
| Scholastic Academies | 5 | 3,092 |
| Metropolitan High Schools | 6 | 10,302 |
| Subtotal | 121 | 74,931 |
| Predominantly Minority Schools: | | |
| Stable mixed (15–29% white) | 17 | 12,683 |
| Mixed with potential for racial change | 10 | 8,065 |
| Schools more than 85% minority | 334 | 248,161 |
| Subtotal | 361 | 268,909 |

<table>
<tr><td colspan="3">Special Needs/Special Admissions:</td></tr>
</table>

| Special Needs/Special Admissions: | Number | 1983 Enr.* |
|---|---|---|
| Physically handicapped, apprentice, adult education, bilingual centers, juvenile detention and pregnant students | 43 | 5,331 |
| Total | 580 | 392,782 |

* All enrollments excluding 39,221 preschool and kindergarten children. Twenty-five child-parent centers omitted.

(Stip. 138)

*Demographics of the City of Chicago and the Chicago Public Schools*

145. Extensive demographic information is presented in both the Comprehensive Student Assignment Plan (at 8–39) and in 1983 ADR I (at 20–23). (Stip. 139)

146. Racial composition of the total population of the City of Chicago from 1940 to 1980 is summarized in the following table:

| Year | White No. | % | Non-White No. | % | Total No. |
|---|---|---|---|---|---|
| 1940 | 3,115,000 | 91.7 | 282,000 | 8.3 | 3,397,000 |
| 1970 | 2,208,000 | 65.6 | 1,159,000 | 34.4 | 3,368,000 |
| 1980 | 1,311,000 | 43.7 | 1,694,000 | 56.3 | 3,005,000 |

(Stip. 140)

147. Racial/ethnic composition of the Chicago public schools from 1970 through 1983 is presented in the following table:

Chicago Public Schools

Racial/Ethnic Composition 1970–1983

| Year | Membership | White No. | % | Black No. | % | Other No. | % | Hispanic No. | % |
|---|---|---|---|---|---|---|---|---|---|
| 1970 | 577,679 | 199,669 | 34.6 | 316,711 | 54.8 | 4,925 | .9 | 56,374 | 9.7 |
| 1971 | 574,495 | 188,312 | 32.8 | 320,797 | 55.8 | 5,608 | 1.0 | 59,778 | 10.7 |
| 1972 | 558,825 | 173,143 | 31.0 | 317,975 | 56.9 | 5,729 | 1.0 | 61,978 | 11.1 |
| 1973 | 544,971 | 160,846 | 29.5 | 314,089 | 57.6 | 6,306 | 1.2 | 63,730 | 11.7 |
| 1974 | 536,657 | 151,290 | 28.2 | 310,880 | 57.9 | 6,535 | 1.2 | 67,952 | 12.7 |
| 1975 | 526,716 | 141,264 | 26.8 | 307,549 | 58.4 | 7,589 | 1.5 | 70,314 | 13.4 |
| 1976 | 524,221 | 130,785 | 24.9 | 311,261 | 59.4 | 8,343 | 1.6 | 73,832 | 14.1 |
| 1977 | 512,052 | 118,713 | 23.2 | 306,997 | 59.9 | 9,071 | 1.8 | 77,271 | 15.1 |
| 1978 | 494,988 | 106,581 | 21.5 | 299,590 | 60.5 | 9,191 | 1.9 | 79,526 | 16.1 |
| 1979 | 477,339 | 95,513 | 20.0 | 289,920 | 60.7 | 9,958 | 2.1 | 81,948 | 17.2 |
| 1980 | 458,497 | 85,292 | 18.6 | 278,726 | 60.8 | 10,253 | 2.2 | 84,226 | 18.4 |
| 1981 | 442,889 | 76,112 | 17.2 | 269,019 | 60.7 | 11,003 | 2.5 | 86,755 | 19.6 |
| 1982 | 435,843 | 71,171 | 16.3 | 264,530 | 60.7 | 11,396 | 2.6 | 88,746 | 20.4 |
| 1983 | 434,042 | 67,829 | 15.6 | 263,163 | 60.6 | 11,283 | 2.6 | 91,763 | 21.2 |

(Stip. 141)

148. One principal reason the proportion of minorities is higher among public school students than among the overall city population is that a large number of children (more than half of whom are white) attend nonpublic schools in Chicago, especially the Catholic parochial schools. Their metropolitan-area enrollment of nearly 190,000 students makes the Catholic schools the fifth largest school system of any kind in the United States. Within Chicago the Catholic schools as of 1982 had 226 schools enrolling 114,299 students, of whom 56% were white, 25% black, 16% Hispanic and 3% Asian. (Stip. 142)

149. Total membership in the Chicago public schools has leveled off this year after 15 years of decline that were often characterized by very substantial drops. This year's decline in total membership is only about 1800 (0.4%), compared with almost 19,000 (3.9%) in 1980. As a historic matter, enrollment was 372,278 in 1952. Student membership increased quite dramatically in the 1950s and the 1960s, reaching a peak of 580,292 in 1969. Since then enrollment has declined, generally at the rate of 2–4% per year, with the greatest

declines between 1977–81 (over 15,000 students, or 3–4%, per year). In 1982 the decline was 1.6% (7046 students), as contrasted with the slight drop in 1983. (Stip. 143)

150. Enrollment of white students (now 67,829 or 15.6% systemwide) has declined at a significantly slower rate since adoption of the Plan. From 1977–81 white enrollment declined at 9–11% per year (or 10,000–12,000 students). In 1982 white enrollment declined 6% (4,941 students) and in 1983, 5% (3,342 students). (Stip. 144)

151. Black students now number 263,-163 (60.6% systemwide). As with total enrollment and with white students, 1983 decline in black enrollment of 1,367 students (0.5%) is significantly lower than declines of 2–4% in the preceding five years. (Stip. 145)

152. In contrast to white and black enrollment, Hispanic enrollment in the school system has been increasing steadily since 1970, at the rate of 3–6% annually. Hispanic students now number 91,763 (21.2% systemwide). (Stip. 146)

153. Board's demographers believe the enrollment changes summarized in Findings 149–52 can be attributed to the following factors:

*Demographics:* continued effects of changes in the number of births, in- and out-migration, and the patterns of student distribution among grades.

*Economics:* recent high unemployment rates which have curtailed ability to pay tuition for private schools and reduced job opportunities for potential high school dropouts; high mortgage rates which have slowed down the housing market and, in turn, the rate of suburbanization.

*Educational Initiatives:* smooth implementation of the desegregation plan without busing; development of a variety of program options and specialty schools designed to attract students; an active recruitment program; increases in achievement scores; and greater parental and community involvement through programs such as report card pick-up and Adopt-A-School.

(Stip. 147)

154. During the past two years of relatively stable enrollments, an important factor contributing to changes is the transfer rate between public and nonpublic schools. As the following table reflects, the Chicago public schools have been gaining more students and losing fewer since 1980:

Student Transfers To/From Nonpublic Schools in Chicago

| | 1980 | 1981 | 1982 |
|---|---|---|---|
| Transfers from Nonpublic Schools in Chicago | 6,084 | 7,041 | 7,934 |
| Transfers to Nonpublic Schools in Chicago | 12,919 | 11,648 | 10,177 |
| Net Loss | 6,835 | 4,607 | 2,243 |
| Total Membership | 458,497 | 442,889 | 435,843 |
| Percentage Net Loss | 1.5% | 1.0% | 0.5% |

(Stip. 148)

155. It appears the recent trend of enrollment decline in the Chicago public schools has ended this year. Gradual increases can be expected to begin next year, if the general demographic trends (particularly migration and transfer rates) experienced in the recent past continue in the years to come. Such a development would point to increased demand for teachers and school facilities. As to racial/ethnic composition, the school system is expected to increase in minority enrollment. This is partly because of the greater proportion of whites in the upper grades, combined with continued outflow, and the higher birth rates for minority groups (particularly Hispanics) coupled with continued immigration of Hispanics. (Stip. 149)

156. Racial/ethnic composition of the elementary and secondary levels of the school system as of October 1983 is detailed in the first table following Finding 157. These data are briefly summarized as follows:

| Type of School | Total Students | White | | Black | | Hispanic | | Other | |
|---|---|---|---|---|---|---|---|---|---|
| | | # | % | # | % | # | % | # | % |
| Elementary | 314771 | 44592 | 14.2 | 191163 | 60.7 | 71287 | 22.7 | 7729 | 2.5 |
| Secondary | 111557 | 21216 | 19.0 | 67770 | 60.7 | 19206 | 17.2 | 3365 | 3.1 |
| Special | 7714 | 2021 | 26.2 | 4230 | 54.8 | 1274 | 16.5 | 189 | 2.4 |
| Systemwide | 434042 | 67829 | 15.6 | 263163 | 60.6 | 91767 | 21.2 | 11283 | 2.6 |

(Stip. 150)

157. Racial/ethnic composition of the Chicago public schools by grades is detailed in the second table following this Finding. In brief summary the data reflect higher proportions of minority students in the lower grades. For example, minority enrollment is 75–80% in grades 11 and 12, and 85–86% in first grade and kindergarten. (Stip. 151)

# SUMMARY OF OCTOBER 31, 1983, STUDENT RACIAL/ETHNIC SURVEY
## (By Level and Type of School)

### ELEMENTARY LEVEL

| NO. | TYPE OF SCHOOL | TOTAL STUDENTS | WHITE NON-HISPANIC | | BLACK NON-HISPANIC | | AMERICAN IND. ALASKAN NATIVE | | ASIAN OR PACIFIC ISLANDER | | MEXICAN | | PUERTO RICAN | | CUBAN | | OTHER HISPANIC | | TOTAL HISPANIC | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % |
| 400 | Regular Elementary* | 271,769 | 39,010 | 14.4 | 163,212 | 60.0 | 400 | 0.1 | 6,136 | 2.3 | 38,621 | 14.2 | 20,059 | 7.4 | 696 | 0.3 | 3,635 | 1.3 | 63,011 | 23.2 |
| 19 | Academic Magnet Centers* | 11,715 | 2,653 | 22.6 | 5,910 | 50.4 | 19 | 0.2 | 305 | 2.6 | 1,843 | 15.7 | 735 | 6.3 | 55 | 0.5 | 195 | 1.7 | 2,828 | 24.1 |
| 14 | Community Academies | 11,155 | 112 | 1.0 | 8,635 | 77.4 | 13 | 0.1 | 73 | 0.6 | 1,343 | 12.0 | 903 | 8.0 | 4 | 0.3 | 72 | 0.6 | 2,322 | 20.8 |
| 6 | Scholastic Academies | 3,849 | 1,161 | 30.2 | 1,876 | 48.7 | 22 | 0.6 | 224 | 5.8 | 321 | 8.3 | 169 | 4.4 | 14 | 0.4 | 62 | 1.6 | 566 | 14.7 |
| 6 | Language Academies | 2,445 | 899 | 36.8 | 1,006 | 41.2 | 8 | 0.3 | 66 | 2.7 | 353 | 14.4 | 67 | 2.7 | 3 | 0.1 | 43 | 1.8 | 466 | 19.1 |
| 5 | Classical Schools | 1,209 | 368 | 30.4 | 660 | 54.6 | 6 | 0.5 | 75 | 6.2 | 50 | 4.1 | 36 | 3.0 | — | — | 14 | 1.2 | 100 | 8.3 |
| 6 | Middle Schools | 5,348 | 253 | 4.7 | 4,159 | 77.8 | 33 | 0.6 | 216 | 4.0 | 219 | 4.1 | 404 | 7.6 | 6 | 0.1 | 58 | 1.1 | 687 | 12.9 |
| 4 | Upper Cycles | 2,058 | 93 | 4.5 | 867 | 42.1 | 4 | 0.2 | 107 | 5.2 | 880 | 42.8 | 70 | 3.4 | 7 | 0.3 | 30 | 1.5 | 987 | 48.0 |
| 7 | E V G Centers | 795 | 6 | 0.8 | 718 | 90.3 | — | — | — | — | 21 | 2.6 | 49 | 6.2 | — | — | 1 | 0.1 | 71 | 8.9 |
| 25 | Child Parent Centers | 4,428 | 37 | 0.8 | 4,120 | 93.0 | 3 | 0.1 | 19 | 0.4 | 115 | 2.6 | 127 | 2.9 | — | — | 7 | 0.2 | 249 | 5.6 |
| 492 | **Totals** | 314,771 | 44,592 | 14.2 | 191,163 | 60.7 | 508 | 0.2 | 7,221 | 2.3 | 43,766 | 13.9 | 22,619 | 7.2 | 785 | 0.2 | 4,117 | 1.3 | 71,287 | 22.7 |

\* Includes branches

### SECONDARY LEVEL

| NO. | TYPE OF SCHOOL | TOTAL STUDENTS | WHITE NON-HISPANIC | | BLACK NON-HISPANIC | | AMERICAN IND. ALASKAN NATIVE | | ASIAN OR PACIFIC ISLANDER | | MEXICAN | | PUERTO RICAN | | CUBAN | | OTHER HISPANIC | | TOTAL HISPANIC | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % |
| 44 | General/Technical* | 76,632 | 17,255 | 22.5 | 42,097 | 54.9 | 94 | 0.1 | 2,046 | 2.7 | 7,351 | 9.6 | 6,277 | 8.2 | 230 | 0.3 | 1,282 | 1.7 | 15,140 | 19.8 |
| 9 | Vocational* | 13,970 | 665 | 4.8 | 12,394 | 88.7 | 7 | 0.1 | 57 | 0.4 | 508 | 3.6 | 266 | 1.9 | 10 | 0.1 | 63 | 0.4 | 847 | 6.1 |
| 7 | Metropolitan | 10,332 | 2,414 | 23.4 | 4,967 | 48.0 | 65 | 0.6 | 905 | 8.8 | 1,363 | 13.2 | 311 | 3.0 | 78 | 0.8 | 229 | 2.2 | 1,981 | 19.2 |
| 5 | Academies/Magnet Schools | 10,623 | 882 | 8.3 | 8,312 | 78.2 | 6 | 0.1 | 185 | 1.7 | 1,084 | 10.2 | 118 | 1.1 | 6 | 0.1 | 30 | 0.3 | 1,238 | 11.7 |
| 65 | **Totals** | 111,557 | 21,216 | 19.0 | 67,770 | 60.7 | 172 | 0.2 | 3,193 | 2.9 | 10,306 | 9.2 | 6,972 | 6.3 | 324 | 0.3 | 1,604 | 1.4 | 19,206 | 17.2 |

\* Includes branches

### OTHER SCHOOLS/PROGRAMS

| NO. | TYPE OF SCHOOL | TOTAL STUDENTS | WHITE NON-HISPANIC | | BLACK NON-HISPANIC | | AMERICAN IND. ALASKAN NATIVE | | ASIAN OR PACIFIC ISLANDER | | MEXICAN | | PUERTO RICAN | | CUBAN | | OTHER HISPANIC | | TOTAL HISPANIC | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % |
| 37 | Special Schools** | 7,714 | 2,021 | 26.2 | 4,230 | 54.8 | 18 | 0.2 | 171 | 2.2 | 948 | 12.3 | 237 | 3.1 | 14 | 0.2 | 75 | 1.0 | 1,274 | 16.5 |

** Included are schools for the physically and mentally handicapped, students with special needs, bilingual education, adult education and apprentice programs. Students on elementary, secondary, and post-secondary levels are served.

### CITYWIDE SUMMARY

| NO. | TYPE OF SCHOOL | TOTAL STUDENTS | WHITE NON-HISPANIC | | BLACK NON-HISPANIC | | AMERICAN IND. ALASKAN NATIVE | | ASIAN OR PACIFIC ISLANDER | | MEXICAN | | PUERTO RICAN | | CUBAN | | OTHER HISPANIC | | TOTAL HISPANIC | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % |
| 594 | **Totals** | 434,042 | 67,829 | 15.6 | 263,163 | 60.6 | 698 | 0.2 | 10,585 | 2.4 | 55,020 | 12.7 | 29,828 | 6.9 | 1,123 | 0.3 | 5,796 | 1.3 | 91,767 | 21.2 |

Racial/Ethnic Composition of Chicago Public Schools

by Grades

| GRADE | MEMBERSHIP | % WHITE | % BLACK | % OTHER | % HISPANIC |
|---|---|---|---|---|---|
| Pre-Sch., Sp. Ed. | 1,115 | 22.2 | 57.6 | 1.5 | 18.7 |
| Sp. Ed., Elem. | 10,235 | 16.9 | 68.5 | 0.9 | 13.6 |
| Pre-Kg., Bilingual | 342 | 1.5 | 5.0 | 0.3 | 93.3 |
| Pre-Kindergarten | 4,308 | 3.6 | 84.5 | 1.5 | 10.4 |
| Head Start | 6,174 | 5.7 | 72.9 | 2.6 | 18.8 |
| Kindergarten | 31,121 | 15.6 | 57.4 | 2.1 | 25.0 |
| Grade 1 | 33,896 | 14.2 | 58.6 | 2.4 | 24.9 |
| Grade Pre-2 | 4,691 | 9.7 | 59.3 | 1.8 | 29.3 |
| Grade 2 | 32,838 | 13.3 | 59.0 | 2.3 | 25.4 |
| Grade 3 | 32,333 | 13.4 | 59.4 | 2.4 | 24.9 |
| Grade 4 | 31,106 | 13.5 | 59.7 | 2.6 | 24.1 |
| Grade 5 | 32,430 | 13.9 | 60.9 | 2.7 | 22.6 |
| Grade 6 | 32,953 | 14.2 | 61.9 | 2.7 | 21.3 |
| Grade 7 | 32,073 | 15.7 | 60.7 | 2.8 | 20.8 |
| Grade 8 | 31,952 | 16.6 | 61.1 | 3.1 | 19.2 |
| Grade 9 | 34,874 | 15.8 | 62.3 | 2.5 | 19.4 |
| Grade 10 | 30,849 | 18.7 | 61.5 | 2.8 | 17.1 |
| Grade 11 | 23,998 | 20.7 | 58.3 | 3.8 | 17.2 |
| Grade 12 | 17,540 | 25.3 | 55.4 | 4.1 | 15.3 |
| Sp. Ed., H.S. | 6,623 | 13.3 | 77.8 | 0.7 | 8.2 |
| Non-Graded | 315 | 4.1 | 90.2 | - | 5.7 |
| Satellite | 332 | 3.6 | 85.2 | - | 11.2 |
| Apprentices | 1,944 | 62.9 | 24.7 | 1.7 | 10.5 |
| Total | 434,042 | 15.6 | 60.6 | 2.6 | 21.2 |

158. There are presently 407 schools with enrollments more than 70% black and/or Hispanic (excluding magnet schools):

| % Minority | No. of Schools | Total Enrollment |
|---|---|---|
| 70–80% | 14 | 7,616 |
| 80–90% | 37 | 20,452 |
| 90–95% | 33 | 31,189 |
| 95–99% | 31 | 28,348 |
| 99%+ | 292 | 215,554 |
| | 407 | 303,159 |

Those students are 69.8% of the system-wide enrollment. There are 275,091 students (69.4% of systemwide enrollment) attending schools more than 90% minority. (Stip. 152)

159. Schools with more than 70% black and/or Hispanic enrollment will increase in number in coming years, as a result of the demographic and transfer trends described in Findings 145–57. (Stip. 153)

160. In schools with enrollments more than 90% black and/or Hispanic, 1983–84 total kindergarten and pre-school enrollment is as follows:

| % Minority | K & Pre-school Enrollment |
|---|---|
| 90–95% | 3,130 |
| 95–99% | 3,978 |
| 99%+ | 22,733 |
| | 29,841 |

Such enrollment is projected to be at least as great in school year 1984–85, and will probably increase. Kindergarten students represent approximately two thirds of this total, or 20,000 students. (Stip. 154)

161. In schools with more than 90% black and/or Hispanic enrollment, the number of black and Hispanic children in grades 1–3 in school year 1983–84 is approximately as follows:

| Grade | Black | Hispanic | Total |
|-------|-------|----------|-------|
| 1 | 16,913 | 4,361 | 21,274 |
| Pre-2 | 2,369 | 710 | 3,079 |
| 2 | 16,497 | 4,310 | 20,807 |
| 3 | 15,733 | 4,002 | 19,735 |
| Total | 51,512 | 13,383 | 64,895 |

Those numbers are projected to be at least as great in school year 1984–85, and will probably increase. (Stip. 155)

*Propriety and Cost of Programs Proposed for Adequate Implementation of the Plan*

201. Dr. Nelvia Brady is a qualified expert as to the effects of racial segregation on minority children; the nature and types of desegregation programs that are capable of eliminating or alleviating those effects; the design, development and implementation of the Plan; and the ability of federal Chapter 1 and State Title I eligible programs to alleviate the effects of past segregation. She is presently Associate Superintendent, OEEO, and has primary responsibility for implementation of the Plan. (Brady testimony)

202. Dr. Brady was one of the experts with principal responsibility for drafting the Educational Components of the Plan. (Brady testimony)

203. In April 1981 Board adopted the Recommendations on Educational Components (prepared by its nationally known expert, Dr. Green). Those Recommendations accurately explain the justifications for educational components:

The rationale for this approach lies in the notion that the desegregation of a school system involves much more than the reassignment of students. Too often, desegregation planners have seemed to be concerned only with the movement of students in order to achieve some specified distribution by race and ethnic background. This preoccupation has been matched by a public concern with "busing," as though the question of how a student reached school was more important than what the student received from the school.

Research covering the last thirty years indicates that the physical separation of students by race and ethnic background is almost always accompanied by disparities in the educational services provided to minority and nonminority students, and by significant gaps in the achievement of minority students, particularly those from low-income backgrounds. Stated simply, segregation creates educational deprivation for minority children—black, Hispanic, Asian, and Native American—and also results in attitudinal deprivation for all students.

A desegregation plan must, therefore, address not only the physical desegregation of schools but also the educational desegregation of individual students. The educational disadvantages resulting from past racial/ethnic isolation—or any such isolation that may have to continue—must be remedied. The overriding goal of this plan is to address minority students' educational needs arising from the segregation of the public schools. The method being proposed is through improving achievement in all schools, with particular emphasis on those schools with the greatest needs and attended by children who have been the most disadvantaged.

(Brady testimony)

204. Dr. Brady described elements of the Plan that have been implemented to date and provided an evaluation of Board's efforts in this area. In general that portion of her testimony addressed both the student assignment aspects of the Plan and the elements of the educational components of the Plan as to which implementation has already been initiated. She also discussed the elements Board intends to implement in school year 1984–85 if there is sufficient available funding. More specific testimony as to the implementation status of the Curriculum, Bilingual and Vocational/Technical Education components was provided by Drs. Gerald Heing, Josue Gonzales, and Philip Viso, respectively (Testimony of Brady, Heing, Gonzales and Viso)

205. Dr. Brady showed Board has experienced significant successes in its implementation efforts to date. Her testimony was supported by evaluations performed during the last two years at the 45 racially isolated targeted elementary schools that were first included in the Chicago Effective Schools Project. (Brady testimony)

206. Dr. Brady's testimony described the process by which the Plan was designed and developed. She related how past segregation in the Chicago public schools has affected the basic learning skills achievement levels of children, particularly minority children now attending, or who in the future will attend, racially identifiable minority schools. She explained each component of the Plan is (a) carefully designed to alleviate the effects of past segregation and (b) will substantially further implementation of a successful desegregation plan. She further explained that, given the historic backdrop and the demographics of Chicago, full and successful implementation of the Educational Components is crucial to the success of the Plan. (Brady testimony)

207. In substantial part the Educational Components are intended to eliminate or alleviate the effects of past racial segregation on minority children who will remain in racially identifiable schools under the Student Assignment Plan and who will attend such racially identifiable schools in the future. In pursuit of this goal, the Plan also addresses the need for systematic and institutional changes in the manner in which the school system provides educational services. (Brady testimony)

208. Minority children now attending Chicago public schools suffer, or have been affected by, one or more of the following effects of racial segregation:

(a) reading, math and communication skills one grade or more below the students' current grade levels;

(b) tests and testing procedures with racial, ethnic, or cultural bias;

(c) unequal treatment of minority children in racially identifiable schools by teachers and administrative staff;

(d) less access for minority children to vocational and technical educational programs;

(e) curricula colored by racial, ethnic or cultural bias;

(f) the psychological pressures of attending racially identifiable schools and the resulting loss of self-esteem;

(g) codes governing student conduct that are affected by racial, ethnic or cultural bias;

(h) speech habits that vary from those used in an environment in which they must ultimately compete;

(i) lack of interpersonal learning experiences derived from open association with other students of varying races, cultures and religions;

(j) lack of access to majority culture, which is reflected in the standards that determine success in society.

(Stip. 155, Brady testimony.)

209. This broad spectrum of inequalities and injuries resulting from racial isolation cannot be remedied only by student assignment, even where student assignment is available. It requires other remedies, particularly compensatory educational remedies, where student assignment is unavailable. (Brady testimony)

210. OEEO, in conjunction with other Board departments and units, developed the programs described in Board Ex. 28. OEEO was primarily responsible for developing the following program elements:

a. Effective Schools Project

b. Racially Isolated Schools

c. Magnet Schools

d. Trainers Institute

e. Management Information

f. Affirmative Action

g. Equity Compliance

h. Staff Development

i. Within-School Segregation

Board's Department of Pupil Personnel Services and Special Education was primarily responsible for developing the Special Education and Discipline program ele-

ments. Its Department of Vocational and Technical Education was primarily responsible for developing the Vocational and Technical Education programs elements. Its Department of Curriculum and Instruction was primarily responsible for developing the curriculum program elements. Its Department of International and Multicultural Education was primarily responsible for developing the bilingual program. Its Department of Research and Evaluation was primarily responsible for developing the program to evaluate the results of Plan implementation. (Brady, Viso, Heing and Gonzales testimony)

211. Board's original version of proposed Board Trial Ex. 28 was provided to the United States on or about September 16, 1983. (Response to Board's Second Set of Requests to Admit, No. 28)

212. Dr. Brady reviewed each program in Board Ex. 28 and testified each program was designed to implement the Educational Components of the Plan, would significantly alleviate the effects of past segregation and was necessary for a successful desegregation effort in Chicago. She described how each program element was developed, how each works or is expected to work and how each relates to one or more of the Plan's Educational Components. She testified each of those program elements materially aids successful implementation of the Plan by alleviating the effects of past segregation. Her testimony also explained how the cost of each element was calculated. This Court has considered in detail (a) Board's proof on an item-by-item basis (including all submitted Exhibits and this Court's own notes on all the testimony made during the course of the hearing, supplemented where necessary by review of the transcript), (b) the United States' specific objections (as articulated at the hearing and as filed in a post-hearing memorandum April 20, 1984) and (c) Board's detailed post-hearing response filed April 30. In so doing this Court has applied the standards taught by the *Liddell* and *Arthur* cases discussed in the Conclusions. It has paid close attention to drawing the line between programs that will materially aid successful implementation of the Plan and those that have a more generalized primary focus of improving the quality of general education in the school system. Except to the extent reflected by these Findings and Conclusions, Board's last response to the United States' argument as to "specific failures of proof contained in the Board's presentation" is wholly persuasive, and the objections of the United States are therefore rejected.

213. In school years 1981–82 and 1982–83, implementation of the Plan's Educational Components included the introduction and implementation of Effective Schools Project ("ESP") programs at 45 specially targeted racially identifiable schools and the implementation of certain elements of the ESP program at other racially identifiable schools. The 45 specially targeted schools are:

| District | School |
| --- | --- |
| 3 | Schiller |
| 4 | Hay Branch |
| 5 | Lowell |
| | Morton |
| | Stowe |
| 6 | Anderson |
| | Diego |
| | LaFayette |
| | Moos |
| | Von Humboldt |
| | Yates |
| 7 | Beidler |
| | Douglass Middle |
| | Goldblatt |
| | Melody |
| | Tilton |
| 8 | Chalmers |
| | Komensky |
| 9 | Dett |
| | Dodge |
| | Herbert |
| | Medill Primary |
| | Smyth |
| | Suder |
| 10 | Frazier |
| | Henson |
| | Lawndale |
| 11 | Donoghue |
| | Douglas |
| | Einstein |
| | Williams |

| District | School |
|---|---|
| 12 | Fulton Branch<br>Sherman |
| 13 | Beethoven<br>Burke<br>Colman<br>Farren<br>Hartigan<br>McCorkle<br>Parkman |
| 14 | Oakenwald South<br>Robinson Branch<br>Wadsworth |
| 15 | Raster<br>Raster Branch |

(ADR II; Brady testimony; Board Ex. 112)

214. Those target schools were selected from among all racially identifiable schools in the system on the basis of a comparative need evaluation. First, all racially identifiable schools were ranked lowest to highest based on achievement test scores in reading and math, with a double weighting for reading, over a two-year period. In addition, attendance and student mobility statistics and the extent of racial isolation were taken into consideration in the ranking process. That process produced a ranked list of the lowest-achieving most racially identifiable schools in the system, and the 45 lowest on the list were chosen as target schools. (Brady testimony)

215. For school year 1983–84 the complete ESP program was continued at the 45 target schools and implemented for the first time at the 62 additional racially identifiable schools (including 7 educational vocational guidance centers) listed below:

| District | School |
|---|---|
| 2 | Gale Academy<br>Marti Bilingual Education Center |
| 3 | Byrd Academy<br>Jenner Elementary<br>Mulligan Elementary |
| 4 | Howe Elementary |
| 5 | Avondale Elementary<br>Morton E.V.G.C.<br>Nobel Elementary<br>Piccolo Middle School<br>Ryerson Elementary<br>L. Ward Elementary<br>Wright Elementary |
| 6 | Anderson E.V.G.C<br>Chopin Elementary<br>Koscuiszko Elementary<br>Otis Elementary |
| 7 | M. Clark Middle School<br>DePriest Elementary<br>Ericson Elementary<br>Roetgen E.V.G.C.<br>Spencer Elementary |
| 8 | Bethune Elementary<br>Hammond Elementary<br>Howland Elementary<br>Lathrop Elementary<br>Pope Elementary<br>Spry Elementary |
| 9 | Brown Elementary<br>Grant Elementary<br>Irving Elementary<br>McKinley E.V.G.C.<br>Medill Intermediate & Upper Grades |
| 10 | Gregory Elementary<br>C. Hughes Elementary<br>McCormick Elementary<br>Webster Elementary |
| 11 | Abbott Elementary<br>Drake E.V.G.C.<br>Mayo Elementary |
| 12 | Copernicus Elementary<br>Fulton Elementary |
| 13 | Dyett Middle<br>Hope Community Academy<br>Ross Elementary<br>Terrell Elementary |
| 14 | Dulles Elementary<br>Mollison Elementary<br>Price Elementary<br>Woodson North Elementary |
| 15 | O'Toole Elementary |
| 16 | Bass Elementary<br>Goethals E.V.G.C.<br>Kershaw Elementary<br>Low Upper Cycle |
| 17 | Bryn Mawr Elementary<br>Revere Elementary |
| 19 | J.N. Thorp Elementary<br>J.N. Thorp E.V.G.C. |
| 20 | Aldridge Elementary<br>Carver Middle School<br>Kohn Elementary |

(Board Exs. 30 and 112; Brady testimony)

216. Those 62 additional schools chosen to participate in the full ESP program in school year 1983–84 were selected through the same means initially used to select the 45 target schools. Using the formula stated in Finding 214, all racially identifiable schools in the system were again listed in order in the fall of 1983, with the lowest-achieving most racially identifiable school ranked first. After the 45 targeted schools already participated in the ESP programs were deleted from the list (as automatic continuing participants), the 62 lowest ranking schools remaining on the list were selected for implementation of the full ESP program in school year 1983–84. (Brady testimony)

217. Implementation of the full ESP program at those 62 schools is possible only because of the $20 million appropriation to Board pursuant to the Yates Bill (discussed in later Findings), which provided only a one-year appropriation of funds. Board currently lacks the financial resources to continue the ESP programs at those 62 schools in school year 1984–85. (Brady and Glasper testimony)

218. Board Exs. 28, 31, 32, 110 and 117 accurately describe the full ESP programs implemented at 107 racially identifiable Chicago public schools. Those ESP programs were implemented in school year 1983–84 in accordance with the Plan set forth in Board Ex. 30. (Brady testimony)

219. Implementation of the full ESP program at the 107 schools in school year 1983–84 has not involved duplication of other desegregation programs previously placed in those schools, which Board is continuing to implement. Implementation of the full ESP program at those 107 schools and at an additional 100 racially identifiable Chicago public schools in school year 1984–85 will involve only minor duplication of already existing desegregation programs in those schools. (Brady testimony)

220. Board's essential purpose for its ESP program is to improve instructional effectiveness in racially identifiable schools in order to improve educational outcomes for black and Hispanic children. That means improving achievement levels, attendance, discipline and the likelihood of a student's successfully moving to the next school level or into society in general. This is accomplished by programmatic interventions addressing six major areas: instructional emphasis, including increased time on task; leadership; use of assessment data; parental support and involvement; general school climate; and staff development and training. Among the elements of the ESP program designed to increase a student's time on task are extended-day and extended-year instruction, and full-day kindergarten instruction. (Brady testimony)

221. One of the major goals of the ESP program, as described in Board Exs. 28, 31, 32, 110 and 117, is to reduce the gap in achievement levels between national grade level norms and the achievement levels of minority children now attending, or who will attend, racially identifiable schools in the system. (Brady testimony)

222. "Effective schools" as a concept is based on educational research that suggests if the proper learning conditions are created, all children, regardless of their race and the racial composition of the school they attend, can learn. "Effective schools" as a model is an important structure for ensuring implementation of effective educational remedies at racially identifiable schools. It serves as a primary focus for implementation of the Plan's Educational Components, particularly those in curriculum-related areas. Board's "Effective Schools Project" is derived from and supported by the leading research in "effective schools" learning. (Brady testimony)

223. Board's inservice training component at each ESP school is a local, school-specific program that provides staff with the specialized skills necessary effectively to implement the Plan's educational remedies. Each school's teaching staff is or will be receiving training intended to eliminate unequal treatment of minority pupils by

raising each staff's awareness of its possible racial biases and by modifying any biased attitudes, expectations and behaviors toward the teaching of minority pupils. Each school's teaching staff also is or will be receiving training designed to develop the specialized skills, instructional methods and educational techniques necessary effectively to teach and to increase the academic achievement of minority pupils who must remain in racially identifiable schools. Each ESP school's inservice component is directed toward instructing staff in meeting the particular educational needs of minority pupils and in adapting existing instructional approaches to meet those needs successfully. (Brady testimony)

224. Board's ESP program described in Board Exs. 28, 30, 31, 110 and 117, as implemented in 107 racially identifiable schools in school year 1983–84, materially aids the successful implementation of the Educational Components of the Plan. That ESP program eliminates or alleviates the effects of racial segregation on minority children in that it raises the achievement levels of minority children, ends the unequal treatment of minority children in racially identifiable schools by teachers and administrative staff, and reduces the psychological pressures of attending racially identifiable schools and the resulting loss of self-esteem. (Brady testimony)

225. Implementation of the ESP program in the 45 racially identifiable target schools in school years 1981–82 and 1982–83 has raised the median level achievement scores of minority children as described in Board Exs. 36, 37 and 38 (as substituted and modified by Board Ex. 91). (Brady testimony)

226. To close the existing gap in grade level norms and achievement levels between students in integrated schools and minority students attending racially identifiable schools, it will be necessary to implement the full ESP program in the 45 original target schools for another 3 to 5 years and in the 62 additional racially identifiable schools for another 4 to 6 years. (Brady testimony)

227. With adequate funding, Board would continue to implement the full ESP program in those 107 schools in school year 1984–85. In addition, it would implement the full ESP program in the next 100 lowest ranking schools as determined by the same formula ("Level II schools"). (Brady testimony)

228. Board Ex. 28, as modified by Board Ex. 117 and Dr. Brady's testimony, sets forth the projected cost of implementing a full ESP program in 207 racially identifiable schools for school year 1984–85. Those cost figures are reasonable under the circumstances shown at trial. (Brady testimony; Glasper testimony)

229. Board Ex. 28, as modified by Board Ex. 117 and Dr. Brady's testimony, sets forth the estimated cost in school year 1984–85 of implementing certain components of the ESP program at racially identifiable schools ("Level III schools") not participating in the full ESP program. Those projected cost figures are a reasonable estimate under the circumstances shown at trial. If the estimate of $10 million were to prove inaccurate, the figures could be adjusted by reducing the United States' payment to Board in a subsequent year. (Brady testimony; Glasper testimony)

230. Board Ex. 31 sets forth the amount Board expects to spend in school year 1983–84 for implementing certain components of the ESP program at the 100 Level II racially identifiable schools not currently participating in the full ESP program. Those projected cost figures are reasonable under the circumstances shown at trial. (Brady testimony; Glasper testimony)

231. To implement the Educational Components of the Plan, Board must at a minimum implement certain components of the ESP program at both the 100 Level II schools and the Level III schools. Such components to be implemented at the nonparticipant racially identifiable schools are those that require full-day kindergarten at each of those schools, the use of extended-day and extended-year instruction, and the inservice training of staff at those schools.

For the reasons stated in Finding 224, implementation of those components of the ESP program at racially identifiable schools not participating in the full ESP program will materially aid the successful implementation of the Educational Components of the Plan. (Brady testimony; Glasper testimony; Board Ex. 117)

232. With adequate funding, Board would implement a full ESP program at the 100 Level II schools. Such full implementation would materially aid successful implementation of the Educational Components of the Plan for the reasons stated in Finding 224. Board's cost of such implementation in school year 1984–85 would be as shown on Board Ex. 117 and would be reasonable under the circumstances. Full implementation at those schools would reduce the cost of implementing certain ESP components at racially identifiable schools not participating in the full ESP program to approximately $10 million. (Brady testimony; Board Ex. 117)

233. Board Ex. 28 represents an initial estimate, prepared in August and September of 1983, of the cost and budget breakdown of the program components (and the program elements) designed materially to aid the implementation of the Plan (Brady testimony). Board Ex. 117 was prepared by the OEEO staff, under the direction and supervision of Dr. Brady, in response to requests made by the United States and this Court during the course of this hearing. Board Ex. 117 reflects the cost in school year 1984–85 of implementation of the full ESP program at 207 schools and the partial implementation of the ESP program at all other racially identifiable schools (Brady testimony). It also reflects:

(a) corrections of errors and duplications in Board Ex. 28;

(b) consideration of the fact that the detailed line-by-line budget breakdown by cost category for certain of the program elements differs slightly from that initially set forth in Board Ex. 28;

(c) consideration of the fact certain of the program elements set forth in Board Ex. 28 were funded in part in school year 1983–84 by Board incremental desegregation expenditures and the fact Board is expected to provide $67.7 million for incremental desegregation expenditures in school year 1984–85, thereby enabling Board to provide continued funding for certain of the program elements included in Board Ex. 28;

(d) consideration of the fact certain of the items funded in school year 1983–84 are one-time costs and will not recur in subsequent years.

(Brady testimony) With respect to program components funded in school year 1983–84 with moneys appropriated by the Yates Bill, Board Ex. 117 contains three columns of numbers: *the first* representing the line-by-line budget breakdown of costs as set forth in Board Ex. 28; *the second* representing those portions of program elements actually funded in 1983–84; and *the third* representing the amount required to implement those programs in school year 1984–85. (Brady testimony) With respect to program components funded in school year 1983–84 with incremental Board funds, Board Ex. 117 contains four columns of numbers: *the first* representing the line-by-line breakdown of costs as set forth in Board Ex. 28; *the second* representing those portions of program elements actually funded in school year 1983–84; *the third* representing the amount required to implement those programs in school year 1984–85 (after consideration of non-recurring costs; and *the fourth* representing the amount Board will not be able to fund from its own resources in school year 1984–85, despite its good faith efforts.) (Brady testimony)

234. Board's Trainers Institute program is intended to build within the Chicago public school system the internal capacity to provide inservice training to teachers and staff for implementation of the Student Assignment Plan and the Educational Components, and generally for the education of minority children in racially identifiable schools. That Institute will materially aid

successful implementation of the Plan. It will eliminate or alleviate the effects of racial segregation on minority children in that it will assist the raising of their achievement levels and help end the unequal treatment of minority children in racially identifiable schools by teachers and administrative staff. (Brady testimony)

235. With adequate funding, Board would fully implement the Trainers Institute in school year 1984–85. Board Ex. 117 sets forth the projected cost of implementing the Trainers Institute in 1984–85. That cost is reasonable under the circumstances. (Brady testimony; Glasper testimony)

236. Board's Management Information System is intended to establish and maintain a comprehensive information system to collect, analyze, review and disseminate data related to all desegregation activities under the Educational Components and the Student Assignment Plan. That System materially aids successful implementation of the Plan by tracing and measuring progress in achieving the goals of the Plan. Board Ex. 117 sets forth the projected cost of the System. That cost is reasonable under the circumstances. (Brady testimony; Glasper testimony)

237. Board's Equity Compliance program described in Board Ex. 28 is intended to manage program expenditures, gather OEEO statistical data, carry out desegregation reporting functions, monitor and audit desegregation activities and establish means to measure and assess compliance with the Plan. Each component of that program will materially aid successful implementation of the Educational Components of the Plan. Certain aspects of the program were implemented in school year 1983–84, as detailed in Board Ex. 31 and 117. Its cost of implementation in school year 1984–85, as set forth in Board Ex. 117, is reasonable under the circumstances. (Brady testimony; Glasper testimony)

238. Board's systemwide Staff Development program for racially identifiable schools, described in Board Ex. 28, is intended to provide staff with the information and skills necessary to implement ef-fectively the Plan's educational components. Through twelve major conferences, staff from all racially identifiable schools will receive a general overview in many desegregation-related areas, including the requirements of the Plan, and methods of ensuring equal educational opportunity in a racially identifiable school. Specific topics encompassed in those conferences will address multi-cultural awareness and teaching approaches, effective discipline techniques, classroom management and instructional strategies to raise minority pupils' academic achievement. General staff development provided through the program is intended to introduce staff to problems in implementing the Plan, and to increase staff's effectiveness in dealing with the problems addressed. (Brady testimony)

239. Board's Staff Development program for the racially identifiable schools will materially aid successful implementation of the Plan. It will eliminate or alleviate the effects of racial segregation on minority children in that it will assist teachers in raising the achievement levels of the children and it will help in ending the unequal treatment of minority children in racially identifiable schools by teachers and staff. Its consultant component is required to hire specialists to conduct inservice training conferences. Those consultants are necessary to implement the Staff Development program. Board Ex. 117 sets forth the projected cost of the program for school year 1984–85. That cost is reasonable under the circumstances. (Brady testimony; Glasper testimony)

240. Board's systemwide Staff Development program for Desegregated Schools, described in Board Ex. 28, is intended to provide staff with general information and an overview of skills necessary to effectively implement the Plan's student assignment and educational components. Staff from desegregated schools will receive training in many areas, including the requirements of the Plan, multi-cultural awareness and teaching approaches, effective discipline techniques and classroom management in a desegregated setting.

That program will materially aid the successful implementation of the Plan. It will eliminate or alleviate the past effect of racial segregation on minority children now attending desegregated schools by assisting teachers in raising their achievement levels. It will also assist in the effective implementation of the Plan by raising staff awareness of and eliminating its unequal treatment of minority pupils in desegregated schools. As set forth in Board Exs. 28 and 117, the cost of that program is reasonable under the circumstances. (Brady testimony; Glasper testimony)

241. Board's Within-School Segregation Program is intended to gather information about the racial composition of classrooms and to monitor the assignment of students to classrooms within particular schools. That program will materially aid successful implementation of the Plan. It will eliminate or alleviate the racial segregation of students in classrooms through, for example, forms of "tracking" or "ability grouping." It will accordingly ensure that students are actually taught, insofar as is practicable, in a physically desegregated environment. Board Ex. 117 sets forth the cost of the program for school year 1984–85. That cost is reasonable under the circumstances. (Brady testimony; Glasper testimony)

242. Board's Magnet Schools programs, described in Board Ex. 28, are intended to construct new magnet schools, develop and expand special curriculum offerings at certain racially identifiable schools, and provide inservice training and staff development at 150 magnet schools and magnet programs. Specialized curriculum offerings or magnet programs will be introduced or expanded at racially identifiable "community academies" as part of the special educational improvements and remedies required by the Plan. Staff training and advisory services are necessary and will materially assist staff in planning and developing the expanded curriculum offerings and in successfully introducing them in racially identifiable schools. Except as stated in Finding 243, the Magnet School programs described in Board Ex. 28 will materially aid successful implementation of the Plan. Board Ex. 117 sets forth the cost of those programs for school year 1984–85. That cost is reasonable under the circumstances. (Brady, Glasper, Viso testimony)

243. Board did not demonstrate the proposed Residential Magnet High School would have sufficient marginal utility (on the testimony it would serve only about 200 students), in relation to its more than $9 million cost, so as to justify a finding the school will materially aid successful implementation of the Plan. By way of contrast, although the proposed Agricultural Magnet High School is also challenged by the United States as insufficiently related to the purposes of the Plan, the testimony establishes that school would meet a demonstrated need and serve minority students in a manner that meets the standard stated in Finding 242. That is also true of all the other Magnet School programs.

244. Board's Staff Development Program at the 150 magnet schools and magnet programs, as referred to in Finding 242, is intended to meet school specific needs related to the particular school's curriculum, including maintaining the consistency of the magnet program with system-wide standards, training teachers in instructing students in the special magnet program offering, and planning, developing and refining the magnet program to maintain its quality. That program also will train staff in multicultural awareness, teaching approaches and classroom management in a desegregated school. Its purpose is to enhance the likelihood that magnet schools and magnet programs will develop and maintain the quality curriculum and school climate necessary to attract a desegregated student body. (Brady testimony)

245. Each component of the Staff Development Program referred to in Findings 242 and 244 is directly related to the Plan and will materially aid its successful implementation by raising minority pupil achievement, eliminating unequal treatment of minority pupils, and achieving and

maintaining physical desegregation in school populations. With adequate funding the Board would implement those components of its magnet school program in school year 1984–85. Board Ex. 117 sets forth the cost of implementing those components in school year 1984–85. That cost is reasonable under the circumstances. (Brady testimony; Glasper testimony)

246. Board's Special Education/Testing program described in Board Ex. 28 is intended to implement and, as required by the Plan, to validate procedures designed to ensure non-discriminatory assessment and placement of students in educable mentally handicapped classes. Consultants and inservice programs are necessary to provide Board staff with the skills to evaluate whether its current assessment procedures are accurate and race neutral. In addition the Special Education/Testing program is intended to provide transition services and special educational support for students who were previously placed in mentally handicapped classes, based upon potentially biased assessment instruments, and who are now being returned to the regular classroom. Inservice training is required to provide teachers and other staff with awareness of and the skills to deal with such students' special educational needs during the period of their transition to the regular classroom. (Brady testimony)

247. All components of the program described in Finding 246 will materially aid Board's implementation of the Plan. It will eliminate or alleviate the effects of racial segregation on minority pupils by assisting their return to regular classrooms and thus raising their achievement levels, and it will help end the unequal assessment and placement of minority pupils in special education classes. Its cost for school year 1984–85, as set forth in Board Ex. 117, is reasonable under the circumstances. (Brady testimony; Glasper testimony)

248. Board's Vocational and Technical Education Program, as described in Board Exs. 28 and 116, is intended to provide vocational educational information to staff and students, to recruit minority students for vocational education classes, to provide vocational educational support services for minority students, and to expand and adapt vocational education program offerings to increase the opportunity for minority students to participate in vocational education programs. Inservice training and consultant services are required to acquaint teachers with vocational education opportunities open to minority pupils, to improve the staff's skills and capabilities effectively to provide vocational education services to minority students, and to assist staff in planning, developing and effectively providing additional vocational program offerings to students. These inservice and consulting components are directly related to the Plan and will materially assist in implementing its Vocational and Technical Education program. (Brady testimony; Viso testimony)

249. Except as stated in Finding 250, the components of the Vocational and Technical Education program will materially assist the Board in implementing the Plan. They will alleviate or eliminate the effects of past segregation in vocational and technical education programs by various activities intended to end the unequal participation of minority students in these programs. Their respective costs for school year 1984–85, as set forth in Board Ex. 117, are reasonable under the circumstances. (Brady testimony; Viso testimony; Glasper testimony)

250. One component of the Vocational and Technical Education program testified to by Dr. Viso (the Handicapped component) cannot fairly be included in the cost of the Plan for current purposes. On the present record it lacks a sufficient nexus to the purposes of the Plan—as compared with the general goal of improving the overall quality of education. Though in its post-hearing submission Board stated that blacks represent a higher percentage of EMH students in the system (about 81%) than their percentage of total school enrollment (about 61%), no testimony established what percentage EMH students were of the total "Handicapped" group that could be assisted by the program. Thus the test

of materiality is not satisfied. This is simply a matter of inadequacy of proof, and to the extent such proof may be sharpened in subsequent years the item may perhaps be allowable. This Court of course recognizes that most of the other Vocational and Technical Education components also involve estimates, but each of those estimates is sufficiently reasonable (and not effectively challenged by the United States) to satisfy Board's burden of proof. In any case Board will be fully accountable for its use of funds, and to the extent there may prove to be any over-allocation as to any item based on actual experience, adjustments in the United States' payments to Board can be made in future years.

251. Board's Department of Curriculum activities related to its Plan needs, as described in Board Exs. 28 and 114, are intended to ensure that curriculum offerings are consistent with the goals of the educational components and modified and refined to meet those goals. Desegregation-related activities in the Department of Curriculum will include planning, developing and implementing the special curriculum improvements required by the Plan's Educational Components, coordinating those improvements and monitoring their consistency with systemwide educational goals, maintaining the curriculum and course quality of the special educational programs required by the Educational Components. All inservice and advisory components of those programs are necessary to provide Board staff with the information and skills to plan and provide effectively the various curriculum development and implementation activities necessary to achieve the overall goals of the educational components. (Brady testimony; Heing Testimony)

252. Except as stated in Finding 253, the components of the Curriculum and Instruction program will materially assist the Board in implementing the Plan by raising the achievement levels of minority students and maintaining or enhancing the quality of curriculum designed to raise the achievement of minority students. Board Ex. 117 sets forth the cost of implementing these curriculum and instruction activities in school year 1984–85. That cost is reasonable under the circumstances. (Brady testimony; Heing testimony; Glasper testimony)

253. "High School Renaissance," as described in Dr. Heing's testimony, was not sufficiently distinguished from Board's ordinary goals of system-upgrading to justify inclusion of that program in Plan costs. Dr. Heing referred to providing a "strengthened diploma"—of course a commendable goal, but one that appears clearly on the other side of what is admittedly not always a bright line distinction between (a) Plan implementation and (b) general benefits to educational goals of the school system as a whole.

254. Board's Student Discipline program, described in Board Ex. 28, is intended to provide discipline managers in schools who will enforce the Uniform Discipline Code, provide training to staff in the provisions of the Code and behavior modification techniques, develop and operate in-school suspension and behavior improvement programs as an alternative to suspension, and monitor and report on disciplinary infractions. That program will materially assist the Board in implementing the Plan by eliminating or alleviating unequal disciplinary treatment of minority pupils. Its cost for school year 1984–85, as set forth in Board Ex. 117, is reasonable under the circumstances. (Brady testimony; Glasper testimony)

255. Board's Bilingual Education programs, as described in Board Ex. 28, are intended to assist in achieving the national origin desegregation required by the Plan. Activities that would be undertaken include establishing special "immersion" educational programs to instruct pupils in their native languages until they can make the transition to regular classrooms, developing a special curriculum responsive to the needs of bilingual students, performing research on the educational needs of bilingual and limited English proficient students, and recruiting qualified bilingual

teachers. Inservice training and consulting activities are necessary to provide staff with the skills to conduct research, plan and develop bilingual and limited English proficient education programs, and effectively to instruct bilingual and limited English proficient students. (Brady testimony; Gonzales testimony)

256. Except for Statewide Network (which was withdrawn by Board), each component of the Bilingual Education program will materially assist Board in implementing the Plan. Each will alleviate or eliminate the effects of segregation on bilingual or limited English proficient students in that it will assist the raising of their academic achievement and help end the unequal treatment of and unequal educational opportunities available to those children. Each component's cost for school year 1984–85, as set forth in Board Ex. 117, is reasonable under the circumstances. (Brady testimony; Gonzales testimony; Glasper testimony)

257. Board's Evaluation program described in Board Ex. 28 is intended to permit OEEO to collect, analyze and evaluate information to determine the overall effects of the Plan, as implemented, and to indicate areas where programs must be refined or modified to achieve the Plan's goals. Consultant and inservice programs are necessary to provide staff with the skills to conduct this research and evaluate the effects of the Plan. This Program will materially aid the successful implementation of the Plan by providing information necessary to continue and correct implementation of the plan and to reach the Plan's goals. Board Ex. 117 sets forth the costs of the Evaluation Program for school year 1984–85. That cost is reasonable under the circumstances. (Brady testimony; Glasper testimony)

258. Inservice training and staff development programs described in various of Findings 223–57 do not duplicate each other and do not duplicate other inservice training provided by Board. Each program-related training or staff development activity will address specific needs and topics related to the program it will assist in implementing. Those program-specific needs will not be addressed to the extent required effectively to implement the programs in the Educational Components in the general, systemwide desegregation related staff development programs operated by OEEO, nor in any other of Board's ongoing staff development activities. (Brady testimony)

259. All costs (with reference both to the total amount and to the amount Board is unable to fund despite its every good faith effort) of the program elements set forth in Board Ex. 117 are reasonable estimates of the amounts needed to implement such programs. (Testimony of Brady, Viso, Heing, Gonzalez and Glasper) Those costs represent appropriate modifications, where required, of costs originally reflected in Board Ex. 28. In turn, the cost attributable to each program element of Board Ex. 28 was included therein after consultation between the Budget Office, OEEO and central office administrative personal responsible for the preparation thereof. (Brady and Glasper testimony) Those projected costs were reviewed and verified by Board's Office of Budget and Financial Planning. (Glasper testimony)

260. Of the $108 million in program components identified by Board Ex. 28, approximately $6 million is being funded by Board resources in school year 1983–84. (Glasper testimony)

261. Another $20 million, appropriated by the Yates Bill, is being devoted to Board Ex. 28 program components during the second half of the 1983–84 school year. (Brady testimony) Board Ex. 31 sets forth those elements of the Educational Components of the Plan that are being funded by the $20 million appropriated by the Yates Bill. (Brady testimony)

262. Board Exs. 31, 35, 41 and 113 accurately describe the desegregation programs and anticipated expenditures of Board during school year 1983–84. Those include the approximately $57 million in expenditures for programs continued from school year 1982–83, the planned approximately $10

million increase in desegregation expenditures for school year 1983–84 (further described in Board Exs. 35 and 113), and the $20 million in anticipated expenditures resulting from by the Yates Bill (further described in Board Ex. 31). Each of the programs described in those Exhibits is necessary for adequate implementation of the Plan and materially aids in the implementation of the Plan. (Glasper testimony; Brady testimony)

263. Neither Board Ex. 28 nor Board Ex. 117 makes any provision for increases in employee compensation over and above the levels in effect for the 1982–83 school year. They do not, for example, take account of the 5% salary increase agreed to by Board and the Chicago Teachers' Union for the 1983–84 school year or of any such future salary increases that may be negotiated between Board and its employees. (Glasper testimony)

264. Set forth after Finding 265 is a chart that reflects the adjustments to Board Ex. 28 made by Board Ex. 117 (as described in Finding 233) and that reflects the 5% salary increase [5] implemented in school year 1983–84 referred to in Finding 263. Set forth on the following seven pages are individual charts that reflect such adjustments made for each of the program components for which there is more than one program element: Staff Development, Magnet Schools, Special Education/Testing, Vocational/Technical Education, Curriculum, Bilingual Educational and Evaluation (Brady and Glasper testimony).

265. As reflected by the attached charts, the level of funding adequate for full implementation of the Plan in school year 1984–85 (as modified to reflect Findings 243, 250 and 253) is approximately $171.631 million. Of that amount, Board has been able to budget approximately $67.773 million, leaving an increment of approximately $103.858 million that Board, despite its best efforts, will not be able to fund. For planning purposes, it can reasonably be assumed that approximately $171.631 million will be necessary for adequate implementation of the Plan in subsequent school years. (Brady testimony)

5. To reflect this increase, an appropriate adjustment was made in the teacher salary and career service salary cost categories set forth in the budget sheets included in Board Ex. 117.

| Program | As Shown on Page 1 of Exhibit 28 | As Revised to Reflect the Term of the Costs Set Forth in the Program Sheets Included in Exhibit 28 | As Revised by Exhibit 117 to Reflect Correction of Errors and Duplications | As Revised by Exhibit 117 to Reflect (A) Full Implementation of the Effective Schools Project, at Level I and Level II Schools (B) Partial Implementation at Level III Schools (C) Consideration of Non-Recurring Costs and (D) Assumed Continuation of Incremental Board Funding in 1984-85 | As Revised to Reflect the Effect of the 5% Salary Increase Implemented in 1983-84 |
|---|---|---|---|---|---|
| Effective Schools | | | | | |
| Level I | $ 20,841,218 | $ 20,841,218 | $ 21,741,218 | $ 22,408,163 | $ 23,269,602 |
| Level II | | | | ~~$ 24,176,273~~ 20,288,726 | ~~$ 25,037,712~~ 21,093,741 |
| Trainers Institute | 563,678 | 563,678 | 567,678 | 144,599 | 167,211 |
| Racially Identifiable Schools - Level II | 17,000,000 | 17,000,000 | 17,000,000 | ——— | ——— |
| Level III | ——— | ——— | ——— | 10,000,000 | 10,000,000 |
| Management Information | 371,230 | 371,230 | 371,230 | 46,230 | 48,079 |
| Affirmative Action | 364,475 | 364,475 | 364,475 | 136,666 | 136,666 |
| Equity Compliance | 564,808 | 564,808 | 564,808 | 406,562 | 416,107 |
| Staff Development | 2,760,495 | 2,760,495 | 1,847,519 | ~~1,474,819~~ 1,288,390 | ~~1,535,761~~ 1,359,021 |
| Within School Segregation | 134,425 | 134,425 | 134,425 | 134,425 | 139,592 |
| Magnet Schools | 19,678,850 | 19,407,350 | 19,407,350 | ~~19,407,350~~ 17,967,350 | ~~19,607,395~~ 8,916,895 |
| Special Education/Testing | 2,017,870 | 2,017,870 | 2,017,870 | 563,608*** | 606,613 |
| Vocational/Tech Education | 25,991,634 | 24,423,954 | 22,648,444 ~~24,468,599*·*~~ | ~~24,018,639*****~~ 22,197,484**** | ~~24,018,639~~ 21,547,987 |
| Curriculum | 6,280,433 | 6,280,433 | 6,280,433 | 4,604,339 | ~~4,796,478~~ 3,883,289 |

| Program | As Shown on Page 1 of Exhibit 28 | As Revised to Reflect the Term of the Costs Set Forth in the Program Sheets Included in Exhibit 28 | As Revised by Exhibit 117 to Reflect Correction of Errors and Duplications | As Revised by Exhibit 117 to Reflect (A) Full Implementation of the Effective Schools Project, at Level I and Level II Schools (B) Partial Implementation at Level III Schools (C) Consideration of Non-Recurring Costs and (D) Assumed Continuation of Incremental Board Funding in 1984-85 | As Revised to Reflect the Effect of the 5% Salary Increase Implemented in 1983-84 |
|---|---|---|---|---|---|
| Student Discipline | $6,963,390 | $6,963,390 | $6,963,390 | $6,963,390 | $7,233,940 |
| Bilingual Education | 4,514,215 | 4,483,257 | 4,478,257 | ~~4,296,153~~ $4,136,703 | ~~4,486,323~~ $4,321,386 |
| Evaluation | 738,747 | 738,747 | 738,747 | 701,226 | 718,513 |
| Total | $108,785,468 | $106,915,330 | $106,945,999 | ~~$117,362,545~~ $111,987,861 | ~~$120,043,270~~ $103,858,642 |

\* With regard to the Magnet Schools, Vocational/Technical Education and Bilingual Education components, the amount shown on p. 1 of Exhibit 28 does not equal the sum of the costs shown for each of the program elements included therein. This column reflects the projected total costs for these program elements, as reflected by the program budget sheets included in Exhibit 28.

\*\* As revised by Exhibit 116 with respect to the Vocational Assessment program element (Viso Testimony) and Board Post-Trial Brief.

\*\*\* Reflects consideration of $222,655 of incremental Board funds available for other purposes (Special Education—Reassessment Validation) and assumes this amount will be used to fund other elements of the Special Education component.

\*\*\*\* See accompanying chart for Vocational Education program elements.

| Program | As Reflected in the Budget Sheets Set Forth in Exhibit 28 | As Revised by Exhibit 117 to Reflect the Correction of Errors and Duplications | As Revised by Exhibit 117 to Reflect the Consideration of Non-Recurring Costs and the Assumed Continuation of Incremental Board Funding in 1984–85 | As Revised to Reflect the Effect of 5% Salary Increase Implemented in 1983–84 |
|---|---|---|---|---|
| **Staff Development** | | | | |
| Racially Identifiable School | $2,181,470 | $1,268,494 | ~~$ 895,294~~ $ 709,365 | ~~$ 932,012~~ $ 755,263 |
| Staff Development—100 Schools | 579,025 | 579,025 | 579,025 | 603,749 |
| Total | $2,760,495 | $1,847,519 | ~~$1,474,319~~ $1,288,390 | ~~$1,535,761~~ $1,359,021 |

| Program | As Reflected in the Budget Sheets Set Forth in Exhibit 28 | As Revised by Exhibit 117 to Reflect the Correction of Errors and Duplications | As Revised by Exhibit 117 to Reflect the Consideration of Non-Recurring Costs and the Assumed Continuation of Incremental Board Funding in 1984–85 | As Revised to Reflect the Effect of 5% Salary Increase Implemented in 1983–84 |
|---|---|---|---|---|
| **Magnet Schools** | | | | |
| Residential High School | $ 9,251,000 | $ 9,251,000 | $ 9,251,000 | ~~$ 9,251,000~~ -0- |
| School for Agricultural Sciences | 3,000,000 | 3,000,000 | 3,000,000 | 3,006,152 |
| Program Expansion | 3,001,600 | 3,001,600 | 3,001,600 | 3,079,480 |
| Staff Development | 2,017,500 | 2,017,500 | ~~2,017,500~~ 577,500 | ~~2,028,375~~ 588,375 |
| Centralized Enrollment | 121,250 | 121,500 | 121,500 | 126,088 |
| Bus Aides | 2,016,000 | 2,016,000 | 2,016,000 | 2,116,800 |
| Total | $19,407,350 | $19,407,350 | ~~$19,407,350~~ $17,967,350 | ~~$19,607,895~~ $8,916,895 |

| Program | As Reflected in the Budget Sheets Set Forth in Exhibit 28 | As Revised by Exhibit 117 to Reflect the Correction of Errors and Duplications | As Revised by Exhibit 117 to Reflect the Consideration of Non-Recurring Costs and the Assumed Continuation of Incremental Board Funding in 1984-85 | As Revised to Reflect the Effect of 5% Salary Increase Implemented in 1983-84 |
|---|---|---|---|---|
| Special Education/Testing | | | | |
| Special Ed/Testing/Transition | $1,452,870 | $1,452,870 | $786,263 | $818,963 |
| Assessment Techniques | 565,000 | 565,000 | -222,655 | -212,350 |
| Total | $2,017,870 | $2,017,870 | $563,608 | $606,613 |

| Program | As Reflected in the Budget Sheets Set Forth in Exhibit 28 | As Revised by Exhibit 117 to Reflect the Correction of Errors and Duplications | As Revised by Exhibit 117 to Reflect the Consideration of Non-Recurring Costs and the Assumed Continuation of Incremental Board Funding in 1984-85 | As Revised to Reflect the Effect of 5% Salary Increase Implemented in 1983-84 |
|---|---|---|---|---|
| **Vocational/Tech Education** | | | | |
| Community Resource Data Bank | $ 311,750 | $ 311,750 | ~~$ 306,017~~ $ 305,543 | ~~$ 306,017~~ $ 305,543 |
| Washburne Trade School | 14,125,000 | 14,125,000 | ~~13,865,251~~ 13,843,753 | ~~13,865,251~~ 13,843,753 |
| Maximizing Training Levels | 30,000 | 30,000 | ~~29,448~~ 29,403 | ~~29,448~~ 29,403 |
| Vocational Articulation | 955,660 | 955,660 | ~~938,086~~ 936,632 | ~~938,086~~ 936,632 |
| Handicapped Component | 662,692 | 662,692 | ~~650,505~~ 649,497 | ~~650,505~~ -0- |
| Limited English Proficient Component | 989,020 | 989,020 | ~~970,832~~ 969,327 | ~~970,832~~ 969,327 |
| Student Service Corporation | 771,902 | 771,902 | ~~757,707~~ 756,532 | ~~757,707~~ 756,532 |
| Vocational Assessment | 6,577,930 | 6,623,575** / 4,802,420* | ~~6,500,793~~ 4,706,798 | ~~6,500,793~~ 4,706,798 |
| **Total** | $24,423,954 | $22,648,444 | ~~$24,018,639***~~ 22,197,484 | ~~$24,018,639****~~ $21,547,987***** |

\* As revised by Ex. 116. (Viso Testimony) and Post-Trial Brief.

\** All items funded in 1983-84 are considered non-recurring costs. (Brady Testimony) Unfunded recurring costs for 1984-85 are allocated proportionately among program elements.

\*** No revision is made to reflect 5% salary increase as a result of the pro rata allocation of "unfunded recurring" costs among program elements.

| Program | As Reflected in the Budget Sheets Set Forth in Exhibit 28 | As Revised by Exhibit 117 to Reflect the Correction of Errors and Duplications | As Revised by Exhibit 117 to Reflect the Consideration of Non-Recurring Costs and the Assumed Continuation of Incremental Board Funding in 1984–85 | As Revised to Reflect the Effect of 5% Salary Increase Implemented in 1983–84 |
|---|---|---|---|---|
| Curriculum | | | | |
| Staff—Program Planning | $ 144,688 | $ 144,688 | $ 387,856* | $ 387,856** |
| Computer System | 15,230 | 15,230 | * | ** |
| Staff—Program Review | 198,244 | 198,244 | 198,244 | 201,944 |
| High School Renaissance Program | 1,213,839 | 1,213,839 | 867,849 | ~~913,189~~ -0- |
| Staff—Implementation | 527,481 | 527,481 | * | ** |
| Summer Curriculum Writing Teams | 196,380 | 196,380 | 196,380 | 206,174 |
| Bureau of Language Arts | 385,831 | 385,831 | 385,831 | 399,162 |
| Intensive Writing Improvement Program | 1,823,820 | 1,823,820 | 1,823,820 | 1,908,195 |
| Staff—Coordination of New Programs | 586,361 | 586,361 | * | *, |
| CMLMP Handbook | 47,822 | 47,822 | 47,822 | 50,135 |
| Paideia Programs | 998,352 | 998,352 | 554,152 | 583,219 |
| Assistants—Bureau of Language Arts | 142,385 | 142,385 | 142,385 | 146,604 |
| Total | $6,280,433 | $6,280,433 | $4,604,339 | ~~$4,796,478~~ $3,883,289 |

* With respect to funding provided in 1983–84, these four program elements have been aggregated. The amount of $387,856 reflected in this column represents the total "unfunded recurring" costs for all four program elements.

** No revision is made to reflect 5% salary increase for these four program elements.

| Program | As Reflected in the Budget Sheets Set Forth in Exhibit 28 | As Revised by Exhibit 117 to Reflect the Correction of Errors and Duplications | As Revised by Exhibit 117 to Reflect the Consideration of Non-Recurring Costs and the Assumed Continuation of Incremental Board Funding in 1984–85 | | As Revised to Reflect the Effect of 5% Salary Increase Implemented in 1983–84 | |
|---|---|---|---|---|---|---|
| **Bilingual Education** | | | | | | |
| Immersion Programs | $ 358,041 | $ 358,041 | $ 358,041 | | $ 372,144 | |
| Evaluation Activities | 697,270 | 697,270 | 697,270 | 537,894 | 721,599 | 556,662 |
| Recruitment | 86,972 | 86,972 | 47,668 | | 50,668 | |
| Statewide Network | 5,000 | ------ | ------ | | ------ | |
| Advisory Council | 3,000 | 3,000 | 3,000 | | 3,000 | |
| Public Involvement | 390,781 | 390,781 | 390,781 | | 406,412 | |
| Translation Activities | 154,544 | 154,544 | 103,781 | 103,707 | 109,611 | |
| Parent Institute | 36,500 | 36,500 | 36,500 | | 36,500 | |
| Instructional Materials | 350,000 | 350,000 | 297,453 | | 297,963 | |
| Staff Development | 204,365 | 204,365 | 168,699 | | 192,346 | |
| Gifted Programs | 155,610 | 155,610 | 155,610 | | 159,386 | |
| Haitian Bilingual Center | 60,306 | 60,306 | 56,556 | | 57,756 | |
| Curriculum Development | 1,935,132 | 1,935,132 | 1,935,132 | | 2,081,889 | |
| Training of Teachers | 45,736 | 45,736 | 45,736 | | 47,049 | |
| Total | $4,483,257 | $4,478,257 | $4,296,153 | $4,136,703 | $4,486,323 | $4,321,386 |

| Program | As Reflected in the Budget Sheets Set Forth in Exhibit 28 | As Revised by Exhibit 117 to Reflect the Correction of Errors and Duplications | As Revised by Exhibit 117 to Reflect the Consideration of Non-Recurring Costs and the Assumed Continuation of Incremental Board Funding in 1984–85 | As Revised to Reflect the Effect of 5% Salary Increase Implemented in 1983–84 |
|---|---|---|---|---|
| Evaluation | | | | |
| Native Language Assessment | $ 36,684 | $ 36,684 | $ 36,684 | $ 38,112 |
| Local School Development Program | 678,596 | 678,596 | 641,075 | 656,634 |
| ESEA Title VII Bilingual Desegregation Support | 23,467 | 23,467 | 23,467 | 23,767 |
| Total | $ 738,747 | $ 738,747 | $701,226 | $718,513 |

266. Each of the various programmatic elements that, in their entirety, make up the Student Assignment and Educational Components of the Plan materially aids in

the desegregation of the Chicago public schools. (Testimony of Brady, Viso, Heing and Gonzales) Those programs work together with ongoing programs first implemented in earlier school years to achieve the goals of the Plan's Educational Components. (Brady testimony)

267. Prior to school year 1983–84, only certain elements of the Educational Components had been implemented at the vast majority of racially identifiable schools and, as a result, achievement of the Plan's overall objectives has been limited. Even with the implementation of additional elements this school year because of the increased Board budget for desegregation and the appropriation in the Yates Bill, many other elements have yet to be implemented. (Brady testimony)

268. At this point, school year 1984–85 is the first in which full implementation of the Plan could occur. In the months that followed the June 1983 hearing, Board had anticipated that the resources necessary to implement fully the various components of the Plan would be made available by the United States for the 1983–84 school year, so as to make it the first year of full implementation. As a result, Board Ex. 28 was prepared under the assumption that each of the various program elements would be initially implemented in 1983–84. However, only $26 million in new financial resources became available, allowing for only limited implementation of these program elements. (Brady and Glasper testimony)

269. Because of the passage of time, full implementation became impossible in school year 1983–84. Given both the schedule of these proceedings (including the possibility of an appeal by the United States) and the nature of the school year calendar, additional resources could not be received and properly devoted to implementation of the programs before the beginning of school year 1984–85. It is accordingly necessary to treat school year 1984–85 as the first year of full implementation. (Brady testimony)

270. Educational Components of the Plan were intended to supplement Chapter I programs in racially identifiable schools where such programs are in effect. If Chapter I funds were used for desegregation programs, the aggregate effects of low income status and racial segregation would not be addressed, and low income minority students would receive less compensatory programming than contemplated by Chapter I and the Plan. (Brady testimony; Fagan cross-examination testimony)

271. There are a substantial number of racially identifiable schools not eligible for Chapter I programs, and even in those schools eligible for Chapter I programs a significant number of minority students are not qualified to participate because their achievement levels, while below grade level, are not low enough. In short, the latter group of minority children, and those now attending or who will attend racially identifiable schools ineligible for Chapter I programs, would be foreclosed from critical remedial programs designed to alleviate the educational impact of past segregation that affects each of them, even if Chapter I funds were used for funding for the Plan. (Fagan cross-examination testimony)

272. Diverting Chapter 1 funds to Desegregation Plan costs would divest low income, educationally deprived students of the benefits of Chapter 1 ECIA programs in order to provide minority students the benefit of the Plan's Educational Components. That would offset or neutralize the benefit of the desegregation remedy and would diminish the aggregate impact of the compensatory and desegregation programs provided by Chapter 1 and the Consent Decree. (Brady testimony; Fagan cross-examination testimony)

*Board's Financial Affairs and Condition, and the Financial Aspects of School Desegregation*

*1983–84 Incremental Desegregation Expenditures*

301. As of September 1983 the Chicago public school system comprised 70 high schools, 442 elementary schools and 25

branches, 25 child-parent centers and a small number of schools of other types (such as special education facilities, apprentice and trade schools, adult schools and bilingual-bicultural schools). Enrollment for the 1983–84 academic year is approximately 434,000 students. As of June 1983 Board employed nearly 40,000 persons, of whom approximately 27,400 were represented by the Chicago Teachers' Union and approximately 9,500 were members of other unions and employee groups that negotiate with Board. (Stip. 201)

302. Board's budget for school year 1983–84 provides for appropriations of approximately $1.455 billion for operating expenditures. (Stip. 202)

303. As part of the $1.455 billion budgeted for operating expenditures in school year 1983–84, Board budgeted approximately $67.7 million for incremental desegregation expenditures. After receiving the $20 million appropriated by the Yates Bill, Board increased that amount to approximately $87.7 million. (Stip. 203)

304. Incremental desegregation expenditures refers to those desegregation expenditures which are budgeted and accounted for by Board by specific three-digit codes. Those three-digit project codes identify appropriations and expenditures by their source or purpose. (Stip. 204)

305. In 1980–81, the year in which the Consent Decree was entered, incremental desegregation expenditures consisted of certain student assignment programs accounted for under Project Code 512 (as described in Finding 306). As Board expanded implementation of the Plan in each subsequent school year, additional project codes were established to account for the various programs that constituted the components of such expansion. (Stip. 205)

306. Incremental desegregation expenditures are budgeted and accounted for by reference to the following three-digit project codes:

(a) Project Code 512 appropriations and expenditures refer to components of the Plan consisting of those initial elements of the Options for Knowledge student assignment programs that were initiated before the Consent Decree and are sometimes referred to as the continued "Access to Excellence" programs. Generally those are magnet schools and programs and voluntary transfer programs.

(b) Project Code 163 appropriations and expenditures refer to components of the Plan initially established in school year 1981–82, primarily relating to implementation of the Plan's Educational Components at racially isolated schools (and in part in 1981–82 to certain student assignment programs established in that year).

(c) Project Code 946 appropriations and expenditures refer to components of the Plan that relate to implementation of the Educational Components at racially isolated schools, also initially established in school year 1981–82 and funded by a supplementary allocation of State Title I funds.[6]

(d) Project Code 536 appropriations and expenditures refer to components of the Plan funded under Title VII of the Elementary and Secondary Education Act of 1965 ("ESEA") to implement certain elements of the bilingual education aspects of the Plan, beginning in school year 1981–82.

(e) Project Code 576 appropriations and expenditures refer to components of the Plan funded under ECIA Chapter 2 and relate to the salaries of central office and support staff engaged in inservice training, recruitment, evaluation and management of the Plan. Those federal funds were first received in school year 1981–82 as a grant under ESAA.

---

**6.** Part of the money budgeted by Board for incremental desegregation expenditures is attributable to State Title I school aid. State Title I aid constitutes that portion of Common School Fund State Aid (or general state distributive aid) distributed to Illinois school districts based on the number of economically disadvantaged or "Title I eligible" students enrolled in each district. Addendum A attached to these Findings (following Finding 376) describes the relationship between State Title I school aid and desegregation expenditures. (Bacchus Testimony)

(f) Project Code 065 appropriations and expenditures refer to components of the Plan initially established in school year 1982–83 to implement new and expanded elements of the Options for Knowledge student assignment programs and related transportation costs.

(g) Project Code 496 appropriations and expenditures refer to components of the Plan funded by the $10 million increase in Board resources for desegregation implementation in school year 1983–84.

(h) Project Code 400 appropriations and expenditures refer to components of the Plan funded by the $20 million appropriated by the Yates Bill and relating to expansion of the implementation of Educational Components at racially isolated schools. (Stip. 206)

307. Set forth on the following pages are incremental desegregation appropriations and expenditures, identified by project codes, for school years 1980–81 through 1982–83 and incremental desegregation expenditures of $87.7 million, also identified by project codes, Board has budgeted for school year 1983–84. (Stip. 207; Glasper testimony; Board Ex. 41)

FOUR-YEAR DESEGREGATION ANALYSIS SUMMARY

| | 1980–81 | | 1981–82 | | 1982–83 | | 1983–84 |
|---|---|---|---|---|---|---|---|
| | Budget | Expenditures | Budget | Expenditures | Budget | Expenditures | Budget |
| **512** | | | | | | | |
| Salaries/Benefits | 2,235,246 | 2,356,958 | 3,764,333 | 3,601,101 | 3,539,343 | 3,752,259 | 4,035,843 |
| Supplies | 13,461 | 11,209 | 19,001 | 11,470 | 12,002 | 8,286 | 16,002 |
| Rentals | 170,595 | 114,300 | 87,492 | 87,492 | 78,039 | 78,030 | 72,000 |
| Repairs | 48,641 | 33,338 | 60,411 | 59,071 | 71,363 | 71,078 | 126,576 |
| Trans. of Students | 7,341,895 | 6,963,492 | 9,177,200 | 9,225,468 | 5,265,320 | 6,551,234 | 5,395,000 |
| Carfare | 163,800 | 304,804 | 506,304 | 503,693 | 1,368,184 | 803,698 | 975,000 |
| Other | 17,387 | 10,698 | 200,130 | 1,313 | 25,887 | 2,651,671 | 1,584 |
| TOTAL: | 9,991,025 | 9,794,799 | 13,814,871 | 13,489,608 | 10,360,138 | 13,916,256 | 10,622,005 |
| **163** | | | | | | | |
| Salaries/Benefits | -0- | 34,810 | 9,205,834 | 6,872,280 | 9,636,899 | 10,310,833 | 10,846,644 |
| Supplies | -0- | -0- | 600,000 | 555,463 | 10,000 | 9,086 | 10,500 |
| Prof. Services | -0- | -0- | 200,000 | 212,945 | 178,000 | 82,694 | 403,000 |
| Printing | -0- | -0- | 25,000 | 26,213 | 44,200 | 31,543 | 54,200 |
| Auto Reimb. | -0- | -0- | 18,200 | 10,681 | 10,578 | 10,570 | 10,146 |
| Trans. of Students | -0- | -0- | 25,000 | 22,399 | -0- | -0- | -0- |
| Miscellaneous | -0- | -0- | 850,328 | 461,605 | -0- | -0- | 644,117 |
| Other | -0- | -0- | 5,097 | 2,318 | 10,340 | 9,903 | 31,393 |
| TOTAL: | -0- | 34,810 | 10,929,459 | 8,163,904 | 9,890,017 | 10,454,629 | 12,000,000 |
| **946–947** | | | | | | | |
| Salaries/Benefits | -0- | -0- | 12,774,889 | 10,614,838 | 9,256,002 | 11,674,698 | 8,984,764 |
| Textbooks | -0- | -0- | 1,943,460 | 1,813,482 | 2,797,806 | 1,949,908 | 1,168,137 |
| Supplies | -0- | -0- | 524,647 | 1,816,377 | -0- | 523,624 | -0- |
| Miscellaneous | -0- | -0- | 2,184,030 | 257,276 | 4,373,701 | -0- | 5,177,156 |
| Equipment | -0- | -0- | -0- | -0- | -0- | 579,139 | -0- |
| Other | -0- | -0- | -0- | -0- | -0- | 42,054 | 78 |
| TOTAL: | -0- | -0- | 17,427,026 | 14,501,973 | 16,427,509 | 14,769,423 | 15,380,135 |

FOUR–YEAR DESEGREGATION ANALYSIS SUMMARY

| | 1980–81 | | 1981–82 | | 1982–83 | | 1983–84 |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Budget | Expenditures | Budget | Expenditures | Budget | Expenditures | Budget |
| **536/Title VII** | | | | | | | |
| Salaries/Benefits | -0- | -0- | 488,143 | 477,562 | 280,503 | 206,941 | 487,329 |
| Prof. Svcs. | -0- | -0- | 35,395 | 15,472 | 47,075 | 32,357 | 25,169 |
| Auto Reimb. | -0- | -0- | 5,589 | 2,443 | 7,433 | 5,139 | 3,489 |
| Textbooks | -0- | -0- | 26,080 | 11,400 | 34,687 | 23,982 | 7,976 |
| Printing | -0- | -0- | 72,653 | 31,758 | 96,628 | 66,807 | 262 |
| Supplies | -0- | -0- | 39,121 | 17,100 | 52,030 | 35,973 | 3,050 |
| Other | -0- | -0- | 7,451 | 3,259 | 9,911 | 6,851 | 4,718 |
| TOTAL: | -0- | -0- | 674,432 | 558,994 | 528,267 | 378,250 | 581,993 |
| **576/Chap. II Grant** | | | | | | | |
| Salaries/Benefits | -0- | -0- | 1,298,172 | 1,475,802 | 1,286,714 | 1,124,569 | 1,425,791 |
| Prof. Svcs. | -0- | -0- | 211,090 | 146,417 | 215,788 | 131,020 | 52,603 |
| Equipment | -0- | -0- | 66,930 | 46,425 | 68,420 | 41,543 | 6,000 |
| Travel | -0- | -0- | 36,040 | 24,998 | 36,842 | 22,370 | 135,000 |
| Printing | -0- | -0- | 5,149 | 3,571 | 5,263 | 3,196 | 17,000 |
| Textbooks | -0- | -0- | 82,376 | 57,138 | 84,210 | 51,130 | 270 |
| Other | -0- | -0- | 113,268 | 78,565 | 115,788 | 70,304 | 83,148 |
| TOTAL: | -0- | -0- | 1,813,025 | 1,882,916 | 1,813,025 | 1,444,182 | 1,719,812 |

## FOUR–YEAR DESEGREGATION ANALYSIS SUMMARY

| | 1980–81 Budget | 1980–81 Expenditures | 1981–82 Budget | 1981–82 Expenditures | 1982–83 Budget | 1982–83 Expenditures | 1983–84 Budget |
|---|---|---|---|---|---|---|---|
| **065–067** | | | | | | | |
| Salaries/Benefits | -0- | -0- | -0- | -0- | 10,588,555 | 5,063,462 | 6,997,005 |
| Textbooks | -0- | -0- | -0- | -0- | 210,400 | 350,087 | 1,492,445 |
| Trans. of Students | -0- | -0- | -0- | -0- | 5,805,000 | 5,104,707 | 8,880,000 |
| Supplies | -0- | -0- | -0- | -0- | 350,400 | 372,293 | 95,000 |
| Equipment | -0- | -0- | -0- | -0- | 869,845 | 1,358,831 | 97,180 |
| Other | -0- | -0- | -0- | -0- | 61,800 | 43,230 | 7,696 |
| TOTAL: | -0- | -0- | -0- | -0- | 17,886,000 | 12,292,560 | 17,569,326 |
| **496/Deseg. Expan.-Board Funds** | | | | | | | |
| Salaries | -0- | -0- | -0- | -0- | -0- | -0- | 2,000,000 |
| Trans. of Students | -0- | -0- | -0- | -0- | -0- | -0- | 2,000,000 |
| Expan. of Program Elements of Educational Components | -0- | -0- | -0- | -0- | -0- | -0- | 6,000,000 |
| TOTAL: | -0- | -0- | -0- | -0- | -0- | -0- | 10,000,000 |
| **400/Deseg. Expan.-Yates Bill** | | | | | | | |
| Salaries | -0- | -0- | -0- | -0- | -0- | -0- | 14,060,346 |
| Textbooks | -0- | -0- | -0- | -0- | -0- | -0- | 1,444,060 |
| Supplies | -0- | -0- | -0- | -0- | -0- | -0- | 1,220,521 |
| Prof. Svcs. | -0- | -0- | -0- | -0- | -0- | -0- | 733,928 |
| Repairs | -0- | -0- | -0- | -0- | -0- | -0- | 1,374,797 |
| Trans. of Students | -0- | -0- | -0- | -0- | -0- | -0- | 365,220 |
| Equipment | -0- | -0- | -0- | -0- | -0- | -0- | 725,095 |
| Other | -0- | -0- | -0- | -0- | -0- | -0- | 76,033 |
| TOTAL: | -0- | -0- | -0- | -0- | -0- | -0- | 20,000,000 |
| GRAND TOTALS: | 9,991,025 | 9,829,609 | 44,658,813 | 38,547,395 | 56,904,956 | 53,255,250 | 87,773,271 |

308. Board budgeted and spent approximately $57 million for "incremental desegregation expenditures" in school year 1982–83. Of that amount approximately

$2.3 million was derived from federal resources: approximately $.5 million in funds under Title VII of ESEA to implement certain aspects of the Plan's bilingual education components, and approximately $1.8 million in funds received by Board under Chapter 2 of ECIA. This latter $1.8 million was equal to the amount of ESAA funds Board had received before the repeal of ESAA and the enactment of ECIA and thus constituted that portion of the ECIA Chapter 2 block grant Board determined to allocate to implementation of the Plan. All the remaining approximately $54.5 million was derived from Board resources. (Glasper testimony)

309. Resources for the $87.7 million in incremental desegregation expenditures budgeted for school year 1983–84 are being provided as follows: approximately $65.4 million from local resources and approximately $22.3 million from federal resources. (Stip. 208)

310. Of the $22.3 million in federal resources provided to fund Board desegregation expenditures, $20 million derives from the Yates Bill, $1.8 million derives from ECIA Chapter 2 funds and approximately $.5 million derives from ESEA Title VII. (Stip. 209)

311. With respect to incremental desegregation expenditures, Board resources budgeted for desegregation implementation increased by $10 million (or approximately 18%) from the level budgeted for the 1982–83 school year. Desegregation implementation was the most significant area of programmatic expansion undertaken by Board for school year 1983–84. (Stip. 211; Glasper testimony; Bacchus testimony)

312. All the increase in federal resources received by Board in school year 1983–84 for desegregation implementation is attributable solely to the $20 million appropriated by the Yates Bill. (Stip. 212)

*1983–84 Ancillary Desegregation Expenditures*

313. Incremental desegregation expenditures do not include expenditures, referred to as ancillary desegregation expenditures, that are made by Board to implement the desegregation plan but are not identified by specific project codes and not included in the $87.7 million amount set forth in Finding 307. Included within ancillary desegregation expenditures are the costs of all "quota" or "formula" teachers at magnet and magnet-type schools. For school year 1983–84 the cost of such teachers is approximately $20 million. Also included in ancillary desegregation expenditures are the costs of providing the basic systemwide (or "formula") level of supplies and instructional equipment at magnet schools, scholastic academies and metropolitan high schools. (Glasper testimony)

314. Also included in ancillary desegregation expenditures are the costs related to student transportation for the Disney Magnet School. This cost is approximately $1.6 million for school year 1983–84.

315. Also included in ancillary desegregation expenditures are various central office and field administrative expenditures relating to the implementation of the Plan. (Brady testimony; Glasper testimony)

316. Ancillary desegregation expenditures are expected to continue at approximately the 1983–84 level in future school years. (Brady testimony; Glasper testimony)

317. Board does not contend that (a) these ancillary costs should be included in the calculation of the amount required for full implementation of the Plan or (b) the United States should be responsible for funding all or a portion of such costs. However, these costs further emphasize that Board has devoted a substantial amount of its total resources to the implementation of the Plan.

*1983–84 School Budget—Board Resources and Expenditures*

318. Evidence as to Board's present and projected financial condition was presented through the testimony of Board's chief financial and business officers (J. Maxey Bacchus, Board's Business Manager, and Rufus Glasper, its Director of Budgeting and Financial Planning) as well as through various Board budget documents.

319. Board Ex. 43 is the Board's annual school budget for 1983–84, which contains summary tables of Board revenue and expenditures for the 1983–84 school year budget. (Stip. 216)

320. Board's four primary sources of operating revenue are local property taxes (34.6%), state school aid (45.6%), federal educational assistance (13.8%), personal property replacement taxes (3.8%) and miscellaneous (2.2%). (Stip. 217)

321. Rates at which Board can levy taxes for its four general operating funds (education, building, textbook and playground) are prescribed by the Illinois School Code (Ill.Rev.Stat. ch. 122, ¶¶ 34–1 et seq.) and determined by the Illinois General Assembly and not Board. Board is presently levying taxes for those funds at the maximum rates authorized by the General Assembly. (Stip. 218)

322. State school aid received by Board is determined by various formulae prescribed by the School Code, as determined by the Illinois General Assembly and not Board. (Stip. 219)

323. Federal educational assistance received by Board is determined by (a) the amounts appropriated by Congress for various educational programs and (b) the manner in which the Department of Education and, in certain instances, the Illinois State Board of Education determine to allocate these resources. Board does not have control over these determinations; its role is limited to making applications and seeking to meet applicable eligibility and competition requirements. (Stip. 220)

324. Personal property replacement tax revenues are generated through an income tax on corporations, an income tax on partnerships and a tax on the invested capital on certain public utilities. Those tax revenues are collected by the State of Illinois and distributed to local taxing districts, including Board. (Stip. 221)

325. Personal property replacement tax revenue collections are a function of the rates in effect for such taxes, as prescribed by the Illinois General Assembly. Personal property replacement tax revenues distributed to Board are determined pursuant to a formula prescribed by the General Assembly. Board does not have control over those decisions. (Stip. 222)

326. In sum, as this Court said in Opinion I, Board "is not the master of its own fate". 554 F.Supp. 912, 926. Except for its own tax levy, which has no available increment, Board's revenues are wholly determined by other governmental bodies and agencies, particularly the State of Illinois and the United States. To the extent Board has limited discretion over the amount of its revenues, such as the discretion to levy taxes up to a maximum amount permitted by state statute, Board has exercised such discretion to maximize its revenues. (Stip. 216–22; Bacchus testimony; Board Ex. 155))

327. While Board has a limited ability to generate new resources, the United States, by sharp contrast, has the full capability of generating new resources or increasing existing resources. However the United States has not done so (and has in fact taken extensive steps to limit the availability of funds for desegregation implementation). (Board Ex. 57; Findings 401–67)

328. Of $1.455 billion in total Board operating expenditures budgeted for school year 1983–84, approximately $1.162 billion (or approximately 75%) is budgeted for employee compensation, including pension and fringe benefits. All elements of employee compensation are subject to negotiation between Board and the various employee groups with which it engages in collective bargaining, including the Chicago Teachers' Union. Employee compensation levels cannot be determined unilaterally by Board. (Stip. 223)

329. Of the same $1.455 billion, approximately $91 million is budgeted for food and utilities, approximately $33 million for repair and rehabilitation of school buildings and approximately $23 million for payment of tuition for handicapped children who cannot be served in the public schools. That tuition rate is set by the State Board of Education, not Board. In the aggregate

the various expenditure components described in Findings 328–29 represent approximately $1.309 billion, or 90% of Board's budgeted operating expenditures for school year 1983–84. (Stip. 224)

*1979–80 Financial Crisis*

330. Board suffered an acute financial crisis in November 1979. Its causes were the subject of various studies and commentaries, in particular a report of the Illinois General Assembly Joint House and Senate Chicago Board of Education Investigation Committee. Its most immediate cause, however, was Board's inability to engage in short-term borrowing. As a result it suffered a severe cash shortfall. It was forced to decide which of its obligations would be paid in timely fashion and which would of necessity be delayed in payment. By the latter part of December 1979 Board was virtually without any available cash. Governor Thompson convened a meeting in Springfield in early January 1980 to address Board's financial crisis. Participants at that meeting agreed to a multi-faceted plan, including (a) adoption of the School Finance Authority Act (the "Act"), leading to the creation of the Chicago School Finance Authority ("Authority"); (b) a three-phased financing plan to provide funds for Board (which plan was fully implemented during 1980); and (c) imposition of certain financial, legal and structural changes upon Board, including (i) the reduction in Board's educational fund tax rate from 2.11% to 1.61% of equalized assessed valuation, (ii) the appointment of a chief financial officer who has responsibility for preparing and supervising Board's budget and financial plan and who reports directly to Board and (iii) the expiration on April 30, 1980 of the terms of office of all Board members who held office on January 16, 1980. (Stip. 225)

*Relationship to School Finance Authority*

331. Authority is a five-member body whose members are appointed by the Mayor and Governor and are not subject to approval by the General Assembly. It was created to serve two basic functions: (a) to exercise financial oversight and control over Board; and (b) to issue bonds and notes to provide financing for Board. It is to remain in existence until one year after the date that all bonds and notes it has issued are paid in full. It is currently anticipated Authority's obligations will not be fully paid until 2009, so that it will remain in existence until 2010. However, as discussed in the last paragraph of this Finding, it is likely many of its powers will be suspended before that time.

*Financial Control and Oversight Powers.* The most significant powers and responsibilities (and the corresponding duties imposed upon Board) are in the following areas:

(A) *Budgets:* Authority must approve or reject Board's annual budget for each fiscal year. Each budget must contain such information and detail as Authority may prescribe and must be based upon the revenue estimates Authority approves or prepares. Board must submit its budget to Authority at least 45 days before the beginning of the fiscal year to which the budget relates, and Authority is required to approve or reject Board's budget within 30 days of its receipt. Standards are established by the Act for Authority's review of the budget. It states Authority shall approve any budget it believes to be complete, reasonably capable of being achieved and consistent with the Financial Plan then in effect. Under the Act Authority does not have line-item veto powers over the budget—it must either accept or reject the budget in its entirety. Following the adoption of a budget for a fiscal year, Board must notify Authority of any material change in its revenue or expenditure estimates for that year. Based on such changes Board may submit, or Authority may require Board to submit, a supplemental budget, or Authority may require Board to take other actions.

(B) *Balanced Budget:* Board is required to have a balanced budget in accordance with the accounting system and procedures Authority prescribes. Authority has promulgated regulations to govern Board's

preparation of its annual budget and provide a framework for the determination of what constitutes a "balanced budget."

(C) *Financial Plan:* Authority has the power to approve or reject Board's Financial Plans. Each Financial Plan must cover a period of at least three fiscal years. It must contain a description of revenues and expenditures, provision for debt service, cash resources and uses, and capital improvements for each fiscal year covered. Authority has promulgated regulations setting forth the type of information and detail that must be contained in each Financial Plan. In connection with approving each Financial Plan, Authority must approve, reject or amend Board's revenue estimates. It may also review Board's operations and obtain budgetary data and financial statements. In general, Authority has a right of access to all information in Board's possession that it deems relevant. Authority also may issue recommendations or directives to Board to assure compliance with Financial Plans and may require Board to submit modified Financial Plans based upon revised revenue or expenditure estimates or for any other good reason. In the absence of a budget and Financial Plan that Authority has approved, the Act prohibits Board from making any expenditures other than for payment of its debt service obligations. Authority's regulations, as amended, require Board to submit each Financial Plan to Authority on or before the May 1 before the first fiscal year to which the plan relates. Thus the Financial Plan for fiscal years 1984–85 through 1986–87 was due May 1, 1984.

(D) *Contracts:* Authority has the power to adopt and amend regulations identifying categories and types of contracts and other obligations of Board that shall be subject to Authority's approval and the procedures for submitting contracts for approval. Authority shall approve those contracts if, in its judgment, the information required to be submitted is complete and the contract is consistent with Board's budget and Financial Plan then in effect. Authority has adopted regulations setting forth the types of contracts for which its approval will be required. They include collective bargaining agreements, contracts involving an amount in excess of $10 million, contracts in excess of $1 million involving the disposition of real property and contracts creating an obligation to repay borrowed money.

(E) *Chief Financial Officer:* Authority has the power to approve the appointment of and to remove Board's Chief Financial Officer.

(F) *Accounting and Auditing:* Authority may direct Board to reorganize its financial accounts, management and budgetary systems in whatever manner Authority deems appropriate to achieve greater financial responsibility and efficiency. Authority also has the power annually to approve Board's appointment of certified public accountants to audit Board's financial statements.

(G) *Cash Management:* Authority is authorized to require Board to establish and maintain separate cash accounts and separate bank accounts in accordance with such rules, standards and procedures as Authority may prescribe. Authority also may assume exclusive administration of Board's cash accounts and bank accounts and withdraw funds from such accounts for Board's lawful expenditures.

*Duration of Powers:* Authority will retain the power to approve or reject Board's budget and the power to examine its business records and audit its accounts for as long as Authority remains in existence. However, other powers of Authority set forth above (including without limitation the power to review and approve Financial Plans and contracts and to require Board to appoint a Chief Financial Officer) become suspended upon certification to the Mayor and Governor that Board has completed three successive fiscal years with a budget balanced in accordance with standards prescribed by Authority. But the Act also provides the suspended powers will be restored upon Authority's certification that Board has failed to adopt a balanced budget or failed to achieve a bal-

anced budget for two successive fiscal years. It is generally thought Board's fiscal year ended August 31, 1982 was the first fiscal year to qualify under this statutory definition, so that Board has now achieved two successive years of a "balanced budget." (Stip. 226; Board Ex. 115)

332. Authority has approved Board's budget for school year 1983–84 as complete, reasonably capable of being achieved and balanced in accordance with accounting systems and procedures prescribed by Authority. (Stip. 227)

*Projected Deficits for Future Years*

333. Board has adopted, and in December 1983, Authority approved Board's Financial Plan for fiscal years 1984–86. That Financial Plan is Board Ex. 51. (Stip. 228) It projects the following deficits: for fiscal year 1984–85—$146.7 million; for fiscal year 1985–86—$71.9 million. (Stip. 229)

334. Board's projected deficit for fiscal year 1984–85 is based on projected expenditures of approximately $1.490 billion and projected revenues of approximately $1.343 billion. Board's projected deficit for fiscal year 1985–86 is based on projected expenditures of approximately $1.532 billion and projected revenues of approximately $1.460 billion. (Stip. 230) Those projections are based on a series of assumptions set forth at pages 3–1 through 3–8 of the 1984–86 Financial Plan. (Stip. 231)

335. Among the assumptions upon which the 1984–86 Financial Plan is based are (a) no increases in employee salaries over the level in effect for school year 1983–84 (except for longevity or "step" increases relating to increased years of service); (b) certain percentage increases in federal funding; (c) no expansion of educational programs funded by general Board resources (as opposed to state-mandated or federally-funded programs); (d) continued funding for incremental desegregation expenditures of approximately $67.7 million (that represents a continuation of desegregation programs budgeted from Board funds for school year 1983–84, but without the $20 million one-time appropriation from the Yates Bill); and (e) increases in expenditures to address the impact of inflation in certain areas, such as utilities. (Stip. 232; Bacchus testimony; Glasper testimony)

336. As regards federal funds, Board's revenue estimates for 1984–85 (as set forth in its Financial Plan) reflect a net decrease of approximately $13 million resulting from (a) a decrease of $20 million (reflecting the one-time nature of the funds appropriated by the Yates Bill) and (b) a net increase of approximately $7 million in various other federal funds received by Board, including ECIA, Chapter I funds.

337. In June 1983 the Illinois General Assembly restored to 2.11% the maximum rate at which Board could levy taxes for its educational fund. It also adopted legislation that provided educational fund taxes could be extended at the 2.11% rate beginning in calendar year 1983. Absent this additional amendment, the extension rate for calendar 1983 would have remained at 1.61%, and Board would not have received an increase in cash receipts resulting from the tax rate increase until its 1984–85 fiscal year. In essence the "extension rate" increase allowed Board to take immediate advantage of the educational fund tax rate increase described above by collecting taxes that had been levied in the prior calendar year but could not otherwise have been collected. (Stip. 233)

338. Board's projected deficits for fiscal years 1984–85 and 1985–86 included in the 1984–86 Financial Plan derive in part from an Authority directive that Board project educational fund taxes will be collected in calendar year 1984 at a rate lower than 2.11% of equalized assessed valuation. Board believes Authority's position is incorrect because the 2.11% rate should and will be applicable to calendar year 1984 educational fund tax collections. In summary the nature and significance of the disagreement between Board and Authority on this issue is as follows:

(a) Due to the complex nature of Board's tax levy and collection process, there is a lag between the time Board's taxes are levied and the time they are collected. As a result of this lag, certain

of Board's taxes cannot be collected until two years after their levy. Amounts of those "levied but unbilled" taxes vary from fund to fund.[7]

(b) In the educational fund, the amount of levied but unbilled taxes was sufficient to permit a "speed-up" of tax collections, authorized by the "extension rate" amendment, of approximately $100 million over and above the amount originally projected for fiscal year 1983–84.[8] As a result of the "speed-up," educational fund taxes are essentially on a cash-current basis. In other words, substantially all taxes levied for that fund in a calendar year (for the fiscal year that begins that year) will be collected in the following calendar year.

(c) During its consideration of Board's current Financial Plan, Authority took the position the "extension rate" amendment did not authorize the extension of educational fund taxes at the 2.11% in calendar year 1984, but rather mandated a lower maximum extension rate. Under the view expressed by Authority, Board's cash receipts for fiscal year 1984–85 would be approximately $65 million less than what would be generated if the 2.11% extension rate were applicable. Board was required to take Authority's view into account when projecting its receipts for fiscal year 1984–85. As a result, Board's current Financial Plan projects a deficit of approximately $146 million for fiscal year 1984–85 as opposed to the approximately $81 million initially projected by Board.

(d) Board and its counsel are of the view 2.11% is clearly the applicable extension rate for calendar year 1984 and subsequent years. However Board may choose to seek the enactment of confirmatory legislation to address any misunderstanding or confusion that may be thought to exist on this subject. Such legislation would be required before the mailing of the second-half calendar year 1984 tax bill. (Stip. 234)

339. Board and Authority agree that if Board's position as to the applicable educational fund tax collection rate is correct, Board's Financial Plan would still project operating deficits of approximately $81 million for school year 1984–85 and approximately $91 million for school year 1985–86. (Stip. 235)

340. Board does not have sufficient revenues from present sources to cure the projected deficits for school years 1984–85 and 1985–86 (which are based on the assumptions set forth in Finding 335). In fact, it may be virtually impossible for Board to avoid annual financial crises or attain long-term financial stability in the near future. (Bacchus testimony)

341. Because Board's budget and financial affairs are subject to Authority's review and oversight, and because of the intensive and rigorous scrutiny and financial oversight provided by Authority, Board's projections as to operating deficits in future fiscal years are entitled to particular weight and reliability. (Stips. 226–27; Bacchus testimony; Glasper testimony; Board Ex. 115)

*Board Efforts to Find Resources*

342. In June 1983 Board projected a budget deficit for fiscal year 1983–84 of approximately $200 million. That projected deficit was eliminated, in part, as a result of Board's receipt of additional revenues. (Stip. 236)

343. Most significant of the revenue increases that contributed to the elimination

---

7. In recent fiscal years Board has taken a series of actions to place its taxes on a more "cash-current" basis and reduce the amount of "levied but unbilled" taxes. Those actions have played a significant role in reducing or eliminating budget deficits originally projected for those fiscal years.

8. Regulations promulgated by the Authority regarding the definition and determination of a "balanced budget" essentially require that Board's proposed expenditures be supported on a cash basis. Thus the "extension rate" amendment—which generated approximately $100 million in additional cash receipts for fiscal year 1983–84—had a significant impact on eliminating Board's originally projected budget deficit for this year.

of Board's projected deficit for school year 1983–84 were (a) an increase of approximately $100 million in educational fund taxes and (b) an "increase" of approximately $65 million in State distributive fund aid. In fact, almost all of this so-called "increase" represented no more than a restoration of State aid to the level in effect for the prior school year. Also contributing to the elimination of this projected deficit were small increases in miscellaneous revenues and various expenditure reductions effectuated by Board. (Stip. 237; Board Ex. 115)

344. Those increases in educational fund taxes and state distributive fund aid resulted from actions taken by the Illinois General Assembly to (a) increase the maximum tax rate for Board's educational fund and (b) increase the State income tax. (Stip. 238)

345. Board lobbied vigorously in support of both of the legislative measures described in Finding 344. Its lobbying activities included meetings among the General Superintendent, Board members, and members of the General Assembly, and the Governor and his staff. Board also organized rallies and public displays of support for those legislative measures and drafted appropriate amendments to the School Code, which enabled Board to take immediate advantage of the increase in educational fund tax rates. (Bacchus testimony)

346. Board's commitment to increase expenditures for incremental desegregation programs by $10 million is an assumption upon which the projected deficit of $200 million for fiscal year 1983–84 was based. Therefore, Board's efforts to increase its revenues for fiscal year 1983–84 were taken in part to fulfill its commitment to increase its incremental desegregation expenditures. (Bacchus testimony)

347. Since the entry of the Consent Decree, Board has repeatedly sought to obtain funding for desegregation from the State of Illinois. As a part of its efforts, Board has drafted and proposed legislation that would provide desegregation funding for Chicago. Such legislation is also included as a part of Board's legislative program for 1984. To date Board's efforts in this regard have been unsuccessful. (Bacchus testimony)

348. Board's budget for school year 1983–84, as approved by Authority, was balanced only after approximately $23.6 million in expenditure reductions from Board's original proposal (including at least approximately $12.2 million in reductions from the expenditure level for the 1982–83 school year). Proposed desegregation expenditures were not reduced. (Bacchus testimony; Glasper testimony)

349. In the summer and fall of 1983, Board encountered a prolonged dispute with the collective bargaining representatives of its employees, including the Chicago Teachers' Union. This included a three-week strike of Board employees, whose principal demand was for increased compensation. Board employee groups specifically and consistently demanded that Board delete its proposed $10 million increase in desegregation expenditures and devote those funds to increased employee compensation. Board successfully resisted that demand and preserved the proposed increase in desegregation expenditures for its 1983–84 school year budget, thereby complying with Board's previously made commitment and determination as to its level of desegregation expenditures in 1983–84. (Bacchus testimony)

*Federal and State Funds Received by Board*

350. Board submitted applications for an ESAA grant in fiscal 1981 and for Title IV grants in fiscal years 1980 and 1981 as part of those programs' regular grant review process. Board's 1981 ESAA application was for approximately $23.8 million, and the amount of the grant was $1.8 million. Board's awards of $422,800 in fiscal 1980 and $298,639 in fiscal year 1981 were the largest awards to local educational agencies for race desegregation assistance under Title IV in those years. (Stip. 335)

351. In fiscal year 1983 Board submitted two applications for $9 million and

$13 million for funds from the Secretary's Discretionary Fund. Those applications were ranked by the Department of Education 13th and 28th, respectively, out of 34 applications received in the priority area for which they were filed. Only 10 programs were funded. (Stip. 337)

352. ECIA Chapter 2 consolidates, on a block grant basis, several programs for which Board previously received funds on a categorical basis. Among the programs consolidated are: Basic Skills (ESEA Title II); Instructional Materials and School Library Resources (ESEA Title IV–B); Improvement in Local Educational Practice (ESEA Title IV–C); Emergency School Aid (ESAA Title VI); and Teacher Corps (Higher Education Act. Title V–A). As a result, Board receives approximately $5.5 to $6 million annually in block grant funds (allocated and distributed by the State Board of Education) appropriated to finance a variety of educational programs, some of which are continuations of previously funded categorical programs and some of which are newly implemented and established programs. Board is allocating approximately $1.8 million—an amount equal to what it received under ESAA prior to its repeal—of its Chapter 2 block grant to desegregation purposes in fiscal year 1983–84. (Stip. 210; Bacchus testimony; Glasper testimony)

353. Board received federal assistance before the Consent Decree, and continues to receive such assistance today, under the various federal programs referred to by the United States. Together those funds, including ECIA Chapter I, encompass the categorical federal educational assistance received by all school districts in the United States, including Board, for essential basic educational programs. Those funds have been and continue to be received by Board on the basis of criteria that are unrelated to and do not take into account either the Consent Decree or the costs of implementing the Plan. (Glasper testimony; Bacchus testimony; Fagan testimony)

354. Studies and congressional documents reflect the following conclusions as to the impact of the ECIA legislation on urban desegregation:[9]

(a) ECIA Chapter 2 has caused a substantial shift of federal education funding away from urban school districts with high percentages of minority students. In particular, urban school districts implementing voluntary or court-ordered desegregation plans have experienced severe losses in federal aid due to the consolidation of ESAA in Chapter 2 block grants. Those school districts have frequently been unable to find other sources to compensate for these losses and, as a result, desegregation efforts have been significantly hindered. H.R. Rep. No. 98–581, 98th Cong. 1st Sess. (1983); Rand Corporation, "The New Federalism in Education" at 52–53, 81–82 (1983) (report prepared for the Department of Education). *See also,* American Association of School Administrators, "The Impact of Chapter 2 of the Education Consolidation and Improvement Act on Local Agencies," at 18–19 (1983); The Council of Great City Schools, "Trends in Federal Funding to Urban Schools" (1983).

(b) Effects of ECIA Chapter 2 on urban school districts with large percentages of minority students are well known to the Secretary of Education. Among the many instances when this matter was called to the Secretary's attention are:

(i) the November 30, 1983 Report by the House Committee on Government Operations, recommending that ESAA be reauthorized as a categorical program. H.R.Rep. No. 98–581, 98th Cong. 1st Sess. (1983);

(ii) the September 29, 1983 hearings before a House subcommittee of the Committee on Government Operations addressing the topic, "Federal Education Assistance: Are Block Grants Meeting the Need?", noted *passim* in H.R.Rep. No. 98–581;

9. All references are to documents in Board Ex. 118.

(iii) the July 1983 "Statement on the fiscal year 1984 Education Budget" by the United States Commission on Civil Rights, concluding that "the cutting of ... funds and the placement of ESAA in a block grant in fiscal year 1982 has limited the nation's efforts to provide equality of educational opportunity for all students." (Statement at 45, reprinted in H.R.Rep. No. 98–581, at 16);

(iv) the June 28, 1983 letter from Senators Eagleton and Stafford, requesting the Department's position on S.1256, a bill "to authorize special assistance for desegregation activities," and noting several reports discussing the damaging effects of Chapter 2 on school districts undergoing desegregation;

(v) the February 1983 report prepared by the Rand Corporation for the Department of Education entitled "The New Federalism in Education; "

(vi) the August 20, 1982 letter from John Hope, Staff Director of the Civil Rights Commission, to the Secretary, expressing concern that the Department's approval of States' allocation formulas without adequate standards would "drain funds from inner-city schools where minority children are concentrated, and drastically reduce support for voluntary desegregation effort." (Reprinted in H.R.Rep. No. 98–581 at 21);

(vii) the July 2, 1982 letter from the Council of Great City Schools and the Lawyers' Committee from Civil Rights Under Law to the Secretary, expressing concern that the Department's decisions with regard to state formulas were contrary to Congressional intent and were resulting in inadequate funding to urban school districts, particularly those undergoing desegregation. Reprinted with the statement of Samuel Husk at the House Subcommittee on Civil and Constitutional Rights Hearing on Civil Rights Implication of the Education Block Grant Program, 97th Cong., 1st Sess. (1982).

(c) ECIA requires that the Secretary approve the criteria used by States to develop formulas to distribute funds to LEA's only when these criteria "are reasonably calculated to produce an equitable distribution of funds" with reference to the adjustment factors for high-cost children. 20 U.S.C. § 3815. Despite his knowledge of the effects of Chapter 2 of the ECIA on urban school districts undergoing desegregation, the Secretary has not attempted to assure the equitability of distribution formulas. He has refused to provide SEA's with standards for developing their formulas by defining the term "equitable" by regulation and has intervened to change formulas only to prevent allocation plans weighted for desegregation funding. See H.R.Rep. No. 98–581, at 20.

355. Despite knowledge of the harmful impact of Chapter 2 of the ECIA on urban school districts undergoing desegregation (and in particular Chicago), the Secretary has opposed efforts to re-enact ESAA or otherwise authorize special assistance for desegregation activities. (Secretary Bell's letter to Sen. Hatch, October 18, 1983, in Board Ex. 118)

356. Amounts received by Board in school years 1978–79 through 1983–84 from the Department of Education under Chapter 1 of the ECIA and the antecedent program to Chapter 1 (Title I of the Elementary and Secondary Education Act of 1965) are as follows:

| School Year | Amount (millions) |
| --- | --- |
| 1978–79 | $56.096 |
| 1979–80 | 67.332 |
| 1980–81 | 63.650 |
| 1981–82 | 59.912 |
| 1982–83 | |
| 1983–84 | 73.247 |

(Stip. 338)

357. It is not the United States' contention that it was the "reasonable expectation of the parties at the time of signing the Consent Decree" that Chapter 1 (formerly ESEA Title I) funds to which Board was already entitled would constitute all or part of the United States' contribution to funding the Plan. There was no consideration

or discussion of this subject at that time. (United States' Answers to Board's Sixth Interrogatories, No. 1.) No basis exists for finding such an expectation.

358. Chapter 1 is intended to serve the lowest-achieving children within a particular attendance area. Its statutory scheme is race neutral. It is a scheme that targets funds to schools with the highest concentration of low income children who are Chapter 1 eligible. Within a school eligible for Chapter 1 funding, however, the selection of children to be served by Chapter 1 programs is determined by achievement level, regardless of an individual child's poverty. (Fagan testimony)

359. In educators' terms an educationally deprived child is a child whose achievement is below the average achievement level for children of the same age. For children like those attending the Chicago public schools, whose achievement is measured by the Iowa Testing Battery, educational deprivation refers to achievement scores below the 50th percentile. Black and Hispanic children are generally lower achieving than their white counterparts when they enter the educational system. That means a greater preponderance of Black and Hispanic children are below the 50th percentile when they enter the educational system, and the preponderance does not change as they progress through the system. (Fagan testimony)

360. It is a goal of the Chapter 1 statutory scheme to move a low achieving child toward grade level and sustain those gains. Removing a child from a Chapter 1 Program would threaten any existing achievement level gains. Removing a child from a Chapter 1 program for the summer could threaten any gains that occurred during the preceding school year. (Fagan testimony)

361. All of the approximately 40% of children in racially identifiable schools who are served by Chapter 1 programs were or are projected to fall further behind grade level achievement norms as they progress through the system. They start first grade significantly behind majority and minority children of the same age who are attending the same or other schools. Chapter 1 programs are intended to start those below-grade level minority children closer to other children, and to keep them from falling further behind as they move through the system. (Brady testimony and inference from Fagan testimony)

362. Of the original 45 ESP schools 40 are served by Chapter 1 programs. (Fagan testimony) Of the 62 schools where the full ESP program was implemented in the 1983–84 school year, 55 are served by Chapter 1 programs. Of the 100 schools receiving Level II intervention in school year 1983–84, 42 are *not* served by Chapter 1 programs. (Based on U.S. Ex. 23 and Stip. 151 with accompanying tables)

363. Board's 107 Level I ESP schools have a total enrollment of 80,099, of which 23,048 are served by Chapter 1 programs. Board's 100 Level II ESP schools have a total enrollment of 67,029, of which 10,866 are served by Chapter 1 programs. (Based on U.S. Exs. 23 and 37 and Stip. 151 with accompanying tables)

364. Certain of Board's Educational Components are not eligible for Chapter 1 funding because they are not designed to meet the special educational needs of educationally deprived children, do not serve low-income schools or are central or system-wide in character. (Fagan testimony)

365. Chapter 1 programs and Board's ESP program could work together to provide an extra benefit to Chapter 1 eligible children in terms of closing the achievement gap between Black and Hispanic children and the average achievement level for all children of the same age. (Fagan testimony)

366. Test results demonstrate the Chapter 1 and State Title I programs have only marginally narrowed the initial achievement gap for segregated minority children who begin first grade in racially identifiable schools, and have done no more than marginally reduce the rate by which they fall further behind grade level. (Brady testimony)

367. State Title I funds received by Board as part of its general State aid, including both the systemwide and targeted portions of such funds, are intended to provide resources to Board for the higher costs of providing basic and compensatory education to low income, educationally deprived children. Those funds were already being received by Board at the time the Consent Decree was signed. Consent Decree § 2.2 was intended to provide supplemental educational programs, rather than merely to maintain programs then in existence. Simply to shift money from State Title I programs to pay for desegregation programs would eliminate any supplemental character of the desegregation remedy. (Bacchus testimony)

368. Among other goals, the Educational Components were designed (a) to give minority children an opportunity for an equal start after decades of segregation and (b) to assist those already in the system who are behind and falling further behind to catch up. That achievement gap is an obvious pernicious effect of segregation, which any constitutional plan must address with viable programs. Simply to shift money from Chapter 1 and State Title I programs to pay for desegregation programs would eliminate any supplemental character of the desegregation remedy. (Based on Bacchus, Brady testimony)

*Board's Good Faith Efforts*

369. As of June 30, 1983 Board had already expended approximately $120 million in its efforts to implement fully the various elements and components of the Plan, and had appropriated approximately $67 million for this purpose in school year 1983–84. Those actions were taken at a time when Board was suffering severe financial constraints and projecting a budget deficit for the 1983–84 school year of approximately $200 million. Moreover, implementation of the Plan had been the most significant area of program expansion in recent school years. In light of these facts, this Court found in Opinion II that from September 24, 1980 to June 30, 1983 Board had made every good faith effort to find and provide every available form of financial resources adequate to pay the costs of full implementation of the Plan. (Findings 3–7, 567 F.Supp. at 274).

370. During the same time period (as of June 30, 1983, when Board had expended $120 million) the United States provided only about $2.5 million in direct desegregation assistance (almost all in fiscal 1981), despite the fact it had substantial additional funds available that it could have provided to Board had it made every good faith effort. (Glasper and Bacchus testimony)

371. Board's good faith compliance with the Consent Decree in its allocation of resources among competing needs has been determined as a factual matter in Opinion II, Finding 3, 567 F.Supp. at 274. That determination was not appealed, and it is the law of the case. Comparable decisions made by Board in its allocation of available resources since June 30, 1983 and for the future also constitute every good faith effort. (Glasper, Brady and Bacchus testimony)

372. In light of the fact the Educational Components of the Plan were intended to provide a supplemental remedy for minority students attending racially isolated schools, Board has sought, from both the United States and the State of Illinois, new resources for the Plan that are supplemental to those already being provided. As an example, Board has succeeded in obtaining a restoration of previously unavailable taxing authority from the State of Illinois. To the extent Board is unable to obtain new resources, however, Board faces a Hobson's choice between (a) inability to implement the Plan and (b) allocating funds to implement the Plan by shifting existing resources or revenue increments from other educational obligations and priorities. In exercising its narrow areas of choice, Board has made every good faith effort to provide funds, in compliance with the Consent Decree. (Bacchus testimony; Glasper Testimony)

373. Consent Decree § 15.1's good faith obligation does not require Board to reallocate unlimited amounts of its general reve-

nues away from basic educational programs to the Plan. Board is in full compliance with the Consent Decree without doing so. Nor does the good faith obligation of the Consent Decree require Board to reallocate more State Title I funds to pay desegregation expenses. Board is in full compliance with the Consent Decree without doing so.

374. Board's decision to allocate approximately $1.8 million of its 1983–84 ECIA Chapter 2 block grant to incremental desegregation expenditures constitutes "good faith efforts" under Section 15.1. (Bacchus testimony)

375. Board's decision to budget approximately $67.7 million of its 1983–84 operating revenues (excluding the moneys appropriated by the Yates Bill) for incremental desegregation expenditures constitutes "every good faith effort" under Section 15.1. Under the present circumstances, a decision to budget such amount of operating revenues for incremental desegregation expenditures would also constitute "every good faith effort" for the 1984–85 school year. (Bacchus testimony; Glasper testimony)

376. In light of Findings 301–75, Board has continued since June 30, 1983 to make every good faith effort to find and provide every available form of financial resources adequate to pay the costs of full implementation of the Plan.

*Addendum A to Findings 301–76*
*State Title I Overview*

To understand the relationship between desegregation expenditures and State Title I school aid, an overview of State aid to education in general and of State Title I funding in particular is necessary. Board receives Common School Fund State Aid (often called "general State aid" or "State distributive fund aid"), distributed by the State Board of Education through the Cook County Regional Superintendent of Schools. Amounts so distributed to Board (as well as to other school districts in Illinois) are determined by a mathematical formula set forth in Section 18–8 of the School Code, Ill.Rev.Stat. ch. 122, ¶ 18–8. That formula computes the level of State aid to school districts on the basis of each pupil counted in a district's "average daily attendance." Average daily attendance is defined as (a) the sum of all student attendance days reported over certain periods during each academic year divided by (b) the number of days of instruction held during such periods. In computing the amount of such distribution, the State multiplies the average daily attendance of all pupils in grades 9 through 12 by 1.25.

In addition, the formula provides a portion of the Common School Fund State Aid distributed to Illinois school districts is to be based on the number of economically disadvantaged children enrolled in each district. That portion is identified as State Title I aid and is based on the number of "Title I eligible" students in the district, "Title I eligible" being defined pursuant to Chapter 1 of ECIA (the Education Consolidation and Improvement Act of 1981), formerly Title I of ESEA (the Elementary and Secondary Education Act of 1965). In essence a "weighting" factor is assigned to each Title I eligible student counted in a school district's average daily attendance so that each Title I eligible student "counts" as more than one student for purposes of the average daily attendance formula described above. Ill.Rev.Stat. ch. 122, ¶ 18–8.1(n)

State Title I aid (and other forms of financial assistance similar in nature and purpose to State Title I aid) has been received by Board since approximately 1968. Before the 1979–80 school year, however, Board was not required to direct or "target" State Title I funds in relation to the enrollment of State Title I eligible children. Rather those funds were included as part of Board's general resource base and were expended with other resources (primarily local property taxes and Common School Fund State Aid) to fund system-wide educational programs and services.

In the late 1970s School Code § 18–8.-6(i)(1) (Ill.Rev.Stat. ch. 122, ¶ 18–8.6(i)(1)) was amended to provide that a certain por-

tion (the "targeted" portion) of State Title I aid received by Board was to be allocated to schools in proportion to the number of Title I eligible pupils enrolled, while the remainder (the "non-targeted" portion) was to be allocated to schools in proportion to their total student enrollment. Though these proportions are subject to some minor fluctuation from year to year, the targeted portion of State Title I aid is approximately 55% of the total and the non-targeted portion approximately 45%.

That statutory requirement for targeting State Title I aid was initially implemented for the 1979–80 school year and was applicable to one-third of the State Title I aid received that year. Targeting was applicable to two-thirds of State Title I aid received in school year 1980–81 and became fully applicable to all State Title I aid received in school year 1981–82 (and every subsequent year).

To demonstrate compliance with the statutory targeting requirements, Board annually submitted (and continues to submit) to the State Board of Education a plan indicating the distribution of State Title I aid among all schools in the district and the purposes for which such aid was to be used. In other words, for each school receiving targeted State Title I aid, Board indicated the amount of such aid and the programs eligible to receive funding from such aid. All those programs were required to be "State Title I eligible programs," as determined by regulations promulgated by the State Board of Education.

In substantially all instances (except as described below for certain desegregation programs initiated in school year 1981–82), the programs enumerated as "Title I eligible" were programs previously established by Board and previously funded from its

general resource base (which included local resources and Common School Fund State Aid, including State Title I aid). They were not, by and large, new programs established after the implementation of the statutory targeting requirement. Stated another way, for purposes of complying with the State Title I targeting requirements, Board "attributed" certain of its ongoing educational programs, previously funded from Board's general resource base, as being funded from State Title I aid.[10]

For school years 1979–80 and 1980–81 Board was able to comply with the statutory targeting requirement without any reallocation of State Title I aid among schools within the district. However, in school year 1981–82 Board was required to "reallocate" approximately $17 million of State Title I aid to ensure that a sufficient amount was distributed to schools in proportion to the number of Title I eligible pupils enrolled (i.e., to ensure that the statutory targeting requirement was complied with). That reallocation resulted in the identification of new programs at those schools that received the "supplementary allocation" of State Title I aid.

### Board Desegregation Expenditures

As Finding 306 reflects, incremental desegregation expenditures are budgeted and accounted by use of three-digit project codes. Those having relevance to State Title I expenditures are "946" and "512".

*Project Code 946.* As described above, a reallocation[11] of certain amounts of State Title I aid received by Board for school year 1981–82 caused certain schools to receive a larger amount of State Title I funds than they had received in prior years. Schools that received the supplementary allocation of State Title I aid were certain

---

10. In fact the initial funding source for such programs was and is generally not determinable. Prior to the imposition of the State Title I targeting requirement, all Common School Fund State Aid, including State Title I aid, was included without differentiation in Board's general resource base.

11. Certain 946/947 expenditures are considered to have been funded from "reallocated" State Title I resources in the sense that, as of the 1981–82 school year, such resources would not have been required, pursuant to revised or modified Board staffing formulae, to have been spent at the schools receiving such resources even if such schools had received such funding or portions thereof in prior school years.

of the schools classified as racially isolated schools pursuant to the Plan.

Board used those "reallocated" State Title I funds in school year 1981–82 to provide one source of funding for programs initially implemented in that year as part of the Plan's Educational Components at those racially isolated schools.[12] Board was not required to use the supplemental allocation of State Title I aid to fund desegregation purposes at these schools. To the contrary, such funds could have been used to implement any one or more of a myriad of "State Title I eligible" programs. However Board, in seeking to provide the necessary funds to implement at least a portion of the program elements of the Plan's Educational Components, chose to use the supplemental allocation of State Title I aid to fund certain of its desegregation programs.

Appropriations and expenditures attributable to that supplemental allocation of State Title I funds are designated by project codes 946/947 (946 referring to employee salaries and related expenses and 947 referring to expenses for instructional materials).

Board has continued, in schools years 1982–83 and 1983–84, to use that supplemental allocation of State Title I aid to fund a portion of the Plan's Educational Components. Again the decision to use such funds to support desegregation programs is made by Board, not as required by State law or regulation. As a result of (a) fluctuations in the amount of State appropriations for education, (b) changes in the Common School Fund State Aid formula and (c) changes in the number and attendance area of "Title I eligible" children, the total amount of the supplemental allo-

cation has varied between $15 and $17 million per year (with the amount allocated to each school also changing annually to some extent).[13]

*Project Code 512.* Desegregation expenditures attributable to Project Code 512[14] are those that relate to components of the Plan initiated during and carried over from Access to Excellence—Board's prior desegregation program. When Access to Excellence was initiated in school year 1978–79, expenditures made under that program were designated as "512" in order to account for them separately.

At its inception, Access to Excellence was a new program—an increment to Board's previously existing level of appropriations and expenditures. Moneys to fund the program were provided from Board's general resource base. Stated another way, the cost of implementing the desegregation programs initiated under Access to Excellence was met by an increase in Board's overall resource base, a reduction in expenditures for other programs or a combination of the two in school year 1978–79—the year in which implementation was initiated.

When the "targeting requirements" for State Title I aid were implemented beginning in school year 1979–80, Board attributed the funding for various of its previously established and already existing educational programs to State Title I aid. That was done to demonstrate State Title I aid was in fact being used to support programs designed to meet the "educational needs of disadvantaged children." However the imposition of the targeting requirement did not require that new programs be established. Instead Board was

12. Board's other source of funding for those programs was a portion—approximately $10 million—of other general Board resources. Those funds and related programs are identified by "Project Code 163".

13. In addition, Board, in school years 1982–83 and 1983–84, has continued to fund implementation of a portion of the Educational Components with approximately $10 million per year of other general Board resources (identified, as described above, by "Project Code 163"). More-

over, in school year 1983–84, Board increased its incremental desegregation appropriations by $10 million (identified by "Project Code 496")—with approximately $8 million of that amount being used to expand the implementation of the Plan's Educational Components.

14. 512 refers to employee salaries and related expenses and 513 refers to expenses for instructional materials. For convenience, these Findings lump the expenditures collectively as "512".

required to demonstrate that it was providing a sufficient amount of educational services that the State Board of Education considered as "Title I eligible." Among the programs included in those attributable to "State Title I" aid were the desegregation programs previously initiated under Access to Excellence.

But such attribution was no more than a record-keeping matter. It did not result in the implementation or initiation of new programs. Board merely treated the Access to Excellence programs as being funded from State Title I aid, whereas it had previously made no effort to identify the source of funding for this program. Again the attribution process was undertaken simply to comply with the statutory targeting requirement established for State Title I aid.

In other words, State Title I aid funds attributed to (a) Project Code 512 desegregation programs and (b) other components of Board's general resource base are fungible. Board is simply under a statutory obligation to demonstrate it is providing the requisite amount of "State Title I funded" services at all schools in the system. It may comply with that requirement by attributing the cost of previously established programs to State Title I aid if those programs are considered by the State to be eligible.

Attribution of the funding for those desegregation programs (identified by Project Code 512) to State Title I aid has continued to the current school year. What is significant, however, is that even if those programs were hypothetically eliminated by Board, it is most likely that another previously established and funded program would then be attributed to State Title I aid, so that the funds presently budgeted for those desegregation programs would be available to Board for other purposes.

In summary, the only significance of the relationship between "Project Code 512" desegregation expenditures and the State Title I program is that all desegregation appropriations designated as "512" appropriations are also considered as "State Title I eligible" programs.

*Summary*

Project Code 512 and 946 expenditures are the only desegregation expenditures that are in some way "attributable" to State Title I aid, as described above. Such "attribution" of "512" expenditures to State Title I funds is simply an accounting or bookkeeping concept used in connection with the need to demonstrate compliance with the statutory targeting requirements. All desegregation expenditures (other than those funded from federal sources) are appropriately attributable to general Board resources. (Board Ans. to U.S. Second Set of Interrogatories; Bacchus testimony)

*Availability of Federal Funds To Implement the Chicago Desegregation Plan*

*Presently Available Funds*

401. In fiscal year 1984 Congress appropriated $47,447,000 for five subaccounts within Secretary's Special Programs and Populations account, including the Title IV subaccount. (P.L. 98–139, Title III, 97 Stat. 888; United States' Response to Board's Second Request to Admit, No. 17)

402. In each of fiscal years 1983 and 1984 Secretary allocated $24 million to provide grants through Title IV of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000c–2— 2000c–4. (Opinion II Finding of Fact No. 34, 567 F.Supp. at 277; Stip. 305)

403. There is no duty imposed on Secretary to provide fiscal year 1984 Title IV funds for awards to continuing grantees under multi-year grant contracts. (United States' Response to Board's Second Request to Admit No. 18; Stip. 305).

404. All multi-year awards of Title IV funds are subject to Secretary's regulations at 34 C.F.R. § 75.253, which state continuation of these grants is contingent upon Secretary's finding that sufficient program funds are available for these grants and that it is in the best interest of the United States to provide these continuation awards.

405. All fiscal year 1984 funds allocated for the Title IV program are currently unobligated. Secretary has notified all appli-

cants for (and his selected recipients of) 1984 Title IV funds that all grant awards are contingent upon the outcome of the present litigation. (48 Fed.Reg. 56254, 56255, December 20, 1983)

406. For fiscal year 1982 and subsequent years, the Department of Education determined the appropriation available under Title IV of the Civil Rights Act of 1964 would be used for desegregation assistance centers (DACs) and state education agencies (SEAs), rather than direct grants to local education agencies and training institutes. (Stip. 336)

407. In fiscal year 1983 Secretary provided no Title IV funds directly to local educational agencies through the grant program authorized at 42 U.S.C. § 2000c–4. (Harrison Dep. 26, 35–36; United States' Response to Board's First Request to Admit, No. 15; Christensen testimony)

408. Many of the inservice and advisory programs in Board's Educational Components were (with regard to federal fiscal year 1983 funds) and are (with regard to federal fiscal year 1984 funds) and are (with regard to federal fiscal year 1984 funds) eligible for Title IV race and national origin desegregation assistance through the program authorized at 42 U.S.C. § 2000c–4. (42 U.S.C. § 2000c; 34 C.F.R. §§ 270.03; 270.04, 270.06; inference from Harrison Dep. 65–66; Brady testimony.)

409. Secretary has approved advisory, staff development and inservice training programs for Title IV funds where they contribute, develop or disseminate information or skills that materially assist in the effective implementation of a desegregation plan. Secretary has approved training, staff development and advisory services for Title IV funds where he finds they are related to and materially assist in implementing a desegregation plan. (Board Ex. 72, Decision Memoranda Nos. 137, 123, 114, 90, 49, 15; Board Ex. 72, Decision Memoranda Nos. 137, 123, 114, 90, 49, 15; Board Ex. 75, Technical Review of Board's 1981 Application for Title IV Assistance; Board Exs. 104, 105, 106, Technical Review of Board's 1980 Application for Title IV Assistance)

410. Secretary has approved inservice training and advisory activities for Title IV funding in connection with programs designed to raise minority pupils' academic achievement where these programs were required educational remedies in a court-approved desegregation plan and were supplemental to a school district's pre-existing compensatory education or basic skills programs. (Harrison Dep. at 66)

411. Secretary has also approved for Title IV funding inservice training and advisory activities in connection with programs designed to raise minority pupils' academic achievement, where the inservice and advisory activities were specifically directed toward educational techniques or instructional strategies to teach minority pupils effectively. (Harrison Dep. 65)

412. Secretary's 1981 Decision Memoranda, which constitute his notices of the amount and purposes for which Title IV grant awards were made to local educational agencies, accurately describe the types of programs or activities for which Secretary makes Title IV funds available. (Board Ex. 72)

413. In fiscal years 1980 and 1981 Board applied for and received Title IV grants in the amounts of $422,800 and $298,639, respectively. Secretary approved those grants, based upon the inservice and advisory programs described in Board's applications, for activities in connection with the planning and initial implementation of Board's Educational Components. In both fiscal years 1980 and 1981 Secretary found that all inservice and advisory programs for which Board sought Title IV funds, as described by Board in its applications, were activities authorized for Title IV assistance. (Board Exs. 73, 74, Board's 1980 and 1981 Applications for Title IV Application; Board Ex. 75, Review of Board's 1981 Application for Title IV Assistance; Board Exs. 104, 105, 106, Review of Board's 1980 Application for Title IV Assistance; 1980 Decision Memoranda No. 37)

414. In providing Title IV grants to local educational agencies through the program authorized by 42 U.S.C. § 2000c–4, Secretary has not since 1978 held grant award competitions. (43 Fed.Reg. 111676, 11677 and 11686, March 20, 1978; 43 Fed. Reg. 32372, 32379, July 26, 1978). Instead Secretary has made Title IV assistance available at various times throughout each such fiscal year on an application-by-application basis. (*Id.;* 34 C.F.R. § 270.74(a)) Funding decisions with respect to individual applications for Title IV funds were made as applications were received. (*Id.;* Harrison Dep. 61) No numerical criteria were used to evaluate individual applications, and no rank ordering of applications was made. Secretary made only a recommendation to accept or reject a particular application for Title IV funds on the basis of the selection criteria specified at 34 C.F.R. § 270.74(b)(1)–(5). (*Id.;* Harrison Dep. 61, 63; Board Ex. 75, Technical Review of Board's 1981 Application; Board Exs. 104, 105, 106, Technical Review of Board's 1980 Application)

415. Secretary has in the past promulgated Title IV regulations pursuant to his statutory authority to consider "other relevant factors" in awarding Title IV funds, 42 U.S.C. § 2000c–4. (See *e.g.,* 40 Fed.Reg. 12346, 12350, § 180.44, March 17, 1975)

416. Certain provisions of Secretary's Education Department General Administrative Regulations ("EDGAR"), including the provisions at 34 C.F.R. § 75.105 that permit him to establish program priorities, competitive preferences and absolute preferences, apply to the Title IV grant program. (34 C.F.R. § 75.1; 75.2, 270.02(e))

417. In each of fiscal years 1983 and 1984 Congress appropriated $28,765,000 for Secretary's Discretionary Fund, 20 U.S.C. § 3851. (Stip. 309; United States' Response to Board's First Request to Admit Nos. 29, 31; United States' Response to Board's Second Request to Admit No. 23; P.L. 98–139, Title III, 97 Stat. 888) Of this sum, Secretary is required to use $10,725,-000 to fund the statutorily mandated programs specified in 20 U.S.C. § 3851(b).

(United States' Response to Board's Second Request to Admit No. 11) Secretary was authorized in fiscal years 1983 and 1984 to spend the remaining $18,040,000 reserved for Secretary's Discretionary Fund for the purposes or programs specified in 20 U.S.C. § 3851(a). (Christensen testimony)

418. That sum of $18,040,000 appropriated to Secretary's Discretionary Fund in fiscal year 1984 is currently unobligated. Secretary has notified all applicants for (and his selected recipients of) those funds that their availability to finance grant awards is contingent upon the outcome of the present litigation. (49 Fed.Reg. 7551, February 29, 1984; 49 Fed.Reg. 2462, January 19, 1984; 48 Fed.Reg. 50919, November 4, 1983; Board Ex. 76, Letter from William Hopkins to Robert McErath)

419. As indicated in the grant contracts, all multi-year awards of discretionary funds are subject to Secretary's regulations at 34 C.F.R. § 75.253, which state that continuation of these grants is contingent upon Secretary's findings that program funds are available for these grants and that it is in the best interest of the United States to make these continuation awards. (Board Ex. 107, exemplary grant contracts)

420. Secretary usually applies the EDGAR provisions relating to the selection of projects for funding after a rank ordering of all applications for grants from the Discretionary Fund. However, Secretary makes the final selection of those applications for funding, and he may change the order in which applications will be funded based upon any information in the application, any other information he deems relevant to the program criteria and any priorities he has established to set aside or otherwise use his discretionary funds. Moreover, Secretary's authority to create preferences and priorities subsumes those "competitive" selection procedures. He may. use those preferences and priorities to create a program for a single applicant, reserve discretionary moneys for that applicant without regard to the EDGAR competitive selection criteria. (34 C.F.R. § 75.-

105(e)(3); 34 C.F.R. § 75.217(d)–(e); Christensen testimony)

421. Secretary has acknowledged he is not required to use his Discretionary Funds to finance programs as to which reports of House or Senate Appropriations Committees "recommend" or "encourage" such financing. (Board Ex. 60 at 2).

422. Of the sums appropriated in fiscal year 1984 for the nonstatutorily mandated programs within the Discretionary Fund, $4,890,000 was not "recommended" or otherwise "directed" for particular program expenditures by language in Appropriations Committees' reports. (Inference from H.R.Rep. No. 422, 98th Cong. 1st Sess. 21 (1983); S.Rep. No. 247, 98th Cong. 1st Sess. 129 (1983); H.R.Rep. No. 357, 98th Cong. 1st Sess. 109–110 (1983))

423. In fiscal year 1984 Congress appropriated $47,447,000 generally to the Special Programs and Populations account to finance the following subaccounts: Title IV; Follow Through; Territorial Teacher Training; Aid to the Virgin Islands; Women's Education Equity. (Stip. 304) Particular sums were not statutorily earmarked or allocated for any of those subaccounts. (P.L. 98–139, Title III, 97 Stat. 888; United States' Response to Board's Second Request to Admit No. 17; Christensen testimony)

424. Of the $47,447,000 appropriated in fiscal year 1984 for Title IV and the four subaccounts in the Special Programs and Populations account, $23,447,000 was allocated for those other subaccounts and $24 million was allocated for the Title IV subaccount. (Christensen testimony; Board Exs. 57 and 64)

425. Secretary could legally reprogram into the Title IV subaccount $13,100,000 of the $23,447,000 allocated to the other Special Programs and Populations subaccounts. After such a reprogramming, Secretary could allocate the balance of the appropriation to the other Special Programs subaccount as he would deem appropriate. That remaining balance would permit Secretary to fund each other Special Programs subaccount at a meaningful level. (Inference from Christensen testimony)

426. No statutes or administrative regulations address Secretary's authority to reprogram funds between subaccounts in an appropriation account. Secretary's reprogramming policies or practices derive from his relationship with congressional appropriations committees and guidelines issued by those committees. (Christensen testimony; Harrison Dep. 138–39)

427. It is Secretary's policy to receive the approval of both appropriations committees' chairmen before effecting a reprogramming of funds. Absent the consent of both chairmen, Secretary will not reprogram funds between subaccounts. (Christensen testimony)

428. Secretary acknowledges that, notwithstanding this policy, he has the legal authority to reprogram into the Title IV subaccount fiscal year 1984 funds from the other Special Programs and Populations subaccounts after notifying the chairmen of the two congressional appropriations committees of his intention to do so. (Christensen testimony; Harrison Dep. at 138–139; Board Exs. 68, 69). Most significantly for current purposes, however, whether or not Secretary has such legal authority (or whether he views the matter as controlled by practical considerations such as his relationships with Congress), Secretary has made no effort whatever to take steps to reprogram funds to honor the United States' obligations under Consent Decree § 15.1—either by application to Congress or on his own, and either before or since the Court of Appeals' decision "provide[d] the Department an opportunity to fashion its proposed remedy for past non-compliance, as well as a chance to show that it intends to comply in the future ...." 717 F.2d at 385.

429. From 1979 through the present, Secretary formally requested approval from congressional appropriations committees for sixteen reprogrammings of funds. Eleven of these reprogramming requests were approved and five were disapproved. One of those reprogrammings was de-

signed specifically to provide for a single program (PUSH–EXCEL), which would have been eliminated absent the reprogramming. During the same period Secretary also effected two reprogrammings without seeking congressional approval. (Christensen testimony; Board Exs. 68, 69)

430. As indicated in the grant contracts, all multi-year awards of funds from any of the Special Programs and Populations subaccounts are subject to Secretary's regulations at 34 C.F.R. § 75.253, which state that continuation of these grants is contingent upon Secretary's findings that program funds are available and that it is in the best interest of the United States to make such continuation awards. (Board Ex. 107, exemplary grant contracts)

431. All the $23,447,000 allocated to the four Special Programs and Populations subaccounts (not including Title IV) is currently unobligated. Secretary has notified all applicants for (and his selected recipients of) those funds that their availability for grant awards is contingent upon the outcome of the present litigation. (See e.g., 48 Fed.Reg. 53149, November 25, 1983; 48 Fed.Reg. 55898, December 16, 1983)

432. Fiscal year 1982 funds not used by fiscal year 1982 Follow Through and Title IV grantees ("carryover funds") aggregated $1,087,555, consisting of $440,300 in Follow Through funds and 647,255 in Title IV funds. (United States Answer to Board's Second Set of Interrogatories, No. 11) Secretary had the authority to allow the grantees to expend those funds in fiscal year 1983, or to require that grantees return those funds to the United States. However, pursuant to Opinion II, those "carryover" funds were applied by the original grantees to fiscal year 1983 programs. Accordingly an equal amount of fiscal year 1983 funds has been set aside in the Department of Education's accounts. (Stip. 318) That $1,087,555 in carry-over funds is available for expenditure in fiscal year 1984.

433. Board Ex. 88 was prepared by the United States. (United States Answer to Board's Second Set of Interrogatories, No. 9) It sets forth the amount of funds from Department of Education appropriations that lapsed in fiscal year 1981 and 1982. It also shows that $21,188,206 of non-desegregation funds from various Department of Education appropriations would have lapsed in fiscal year 1983, except that those funds were escrowed by this Court. (Stip. 315)

434. "Lapsed funds" are funds appropriated to various nondesegregation programs of the Department of Education that have not been obligated at the end of the fiscal year and that therefore revert to the United States Treasury. Legislation would be required to reallocate lapsing funds and make such funds legally available for and provide them to Board. Secretary may not provide such lapsed funds to any grantee without congressional authorization. Such funds could be allocated to Board for its desegregation activities through a congressional reappropriation. (Stip. 314; Christensen testimony)

435. As represented in the Appendix to the President's Budget for fiscal year 1985, it is estimated that at the end of fiscal year 1984 the following amounts of funds appropriated to the Department of Education will remain unobligated and otherwise lapse:

Bilingual Education . . . . . . . . . . . . . . . $30,000,000
Higher Education . . . . . . . . . . . . . . . . . $ 1,920,000.

(Board Ex. 57)

436. Department of Education's Office for Civil Rights enters into contracts with various organizations to provide technical assistance to local educational agencies. That program is intended to assist local educational agencies in complying fully with Title VI requirements. (S.Rep. No. 247, 98th Cong. 1st Sess. 163–64 (1983)). It was created by the Office for Civil Rights pursuant to its authority to make any payments necessary to carry out its compliance and enforcement functions. (20 U.S.C. § 3413(c)(3); P.L. 98–139, Title III, 97 Stat. 894)

437. With funds appropriated to the Department of Education's Salaries and Ex-

pense subaccount, Secretary has financed program administration activities, including policy analyses, special projects, advisory committee operations and program evaluation contracts. (Board Ex. 57, Appendix to the Budget for Fiscal Year 1985, at I–I22)

438. This Court has not been advised by the United States as to the amount, in funds or other property, currently within Secretary's Salary and Expense subaccount, Office for Civil rights subaccount or Secretary's Gift and Bequest account.

### Actions by the United States Affecting the Availability of Funds

439. As the following specific Findings in this section reflect, since the entry of Opinion II nearly a year ago—June 30, 1983—the United States has taken no action to provide presently available funds to Board. Rather it has engaged in conduct designed to render unavailable both existing funds and any future sources of funds that could be used for implementing Board's Desegregation Plan. For over nine months (since the Court of Appeals decided on September 9, 1983 the United States was in direct violation of its obligation under Consent Decree § 15.1) that course of conduct has been in direct contravention of the Court of Appeals' granting the United States "an opportunity to fashion its proposed remedy for past non-compliance, as well as a chance to show that it intends to comply in the future ...." 717 F.2d at 385.

440. Secretary has failed or refused to provide to Board any of the previously restrained 1983 funds that became available for distribution to grantees, including Board, pursuant to this Court's November 21, 1983 Order. (Motion of the United States to Modify the June 30 Order and Supporting Memorandum, filed February 2, 1984; Plan of the United States, filed November 10, 1983).

441. No request whatever for funding for Title IV of the Civil Rights Act of 1964 ("Title IV") was included in the Budget for the Department of Education submitted and proposed by the Executive Branch for federal fiscal year 1984 (the "President's Budget"). (A2–15) (Stip. 302; Board Ex. 57)

442. From the available fiscal year 1984 funds appropriated for the Title IV program, Secretary intends to provide no direct grants of Title IV funds to any local educational agency, including Board. (United States Response to Board's Second Request to Admit, No. 25; Stip. 310; Christensen testimony)

443. As represented in the President's Fiscal Year 1985 Budget, Secretary has requested Congress to appropriate no funds to provide desegregation assistance through Title IV in fiscal year 1985. (Board Exs. 56 (at 107–108) and 57)

444. No request for funding the Women's Educational Equity Program, the Follow Through Program, Aid to the Virgin Islands, and the Territorial Teacher Training Program (collectively "the other Special Programs") was included in the President's Budget for fiscal year 1984. (United States' Response to Board's Second Request to Admit, No. 16; Stip. 303) Those programs are the subaccounts currently subject to Opinion II. (Christensen testimony)

445. Secretary does not intend to reprogram to the Title IV subaccount any fiscal year 1984 funds appropriated for the Discretionary Fund or allocated to the other Special Programs. Section 309 of the ECIA (enacted in 1981) had the effect of limiting to $13,100,000 the amount of fiscal year 1984 funds the Secretary theoretically could reprogram to Title IV. There is no such limit for fiscal year 1985. (Stip. 313)

446. From the available fiscal year 1984 funds appropriated by Congress and allocated to the Special Programs and Populations subaccounts, Secretary has not reprogrammed and does not intend to reprogram moneys into the Title IV subaccount. (Stip. 313)

447. Finding 429 reflects Secretary's prior efforts toward reprogrammings of funds. Secretary has never sought or requested approval from congressional appropriations committees for a reprogram-

ming of funds to subaccounts from which desegregation assistance could be made available to Board. (Christensen testimony)

448. As represented in the President's fiscal year 1985 Budget, the Executive Branch has requested Congress to appropriate no funds in fiscal year 1985 to the Special Programs and Populations subaccounts currently subject to Opinion II. (Board Ex. 56 at 77)

449. Secretary does not intend to distribute fiscal year 1984 moneys from his Discretionary Fund to any local educational agency for direct operating costs of a desegregation plan. (Stip. 312)

450. Secretary does not intend to set aside federal fiscal year 1984 Discretionary Fund moneys specifically to fund a portion of Board's desegregation program costs. However, Board may submit a competitive application for a project that Secretary considers eligible under the Discretionary Fund. (United States' Response to Board's Second Request to Admit, No. 27) Should such an application be favorably considered by the Department, it is unlikely that Board would receive an award of more than $75,000 to $175,000. (Stip. 311)

451. Secretary intends in fiscal year 1984 to distribute all moneys appropriated to the Discretionary Fund only for the statutorily mandated programs specified at 20 U.S.C. § 3851(b) or to support projects or activities that Secretary determines will further a national educational priority or need. (Board Ex. 57; Justification of Appropriations Estimates for Fiscal Year 1984 at 50; United States' Answer to Board's Fifth Set of Interrogatories, No. 2; 49 Fed. Reg. 7546, February 29, 1984) Secretary will not provide from his Discretionary Fund a direct grant of financial assistance to a local educational agency, including Board, for the costs of implementing a desegregation plan. (United States' Answer to Board's Fifth Set of Interrogatories, No. 5; Christensen testimony)

452. On February 29, 1984 Secretary promulgated proposed regulations establishing eligibility criteria for local educational agency grants from the Discretionary Fund. (49 Fed.Reg. 7546, February 29, 1984) As described in those proposed regulations, Secretary's policy is not to provide discretionary funds to meet "local needs." Secretary defines a program that meets a "local need" for purposes of awarding Discretionary Fund moneys as any program that is also authorized for financing under ECIA Chapter 2, 20 U.S.C. § 3821. Those regulations also describe Secretary's policy to distribute Discretionary Fund moneys pursuant to 20 U.S.C. § 3851(a)(4) only to provide technical assistance to a local educational agency. Applying that regulatory policy, Secretary would find that the programs and program elements making up Board's educational components do not qualify for Discretionary Funds in fiscal year 1984 and in future fiscal years. (United States' Answer to Board's Fifth Set of Interrogatories, No. 5; Board Ex. 87)

453. Included in the President's fiscal year 1985 Budget is a requested appropriation of $43,224,000 for Secretary's Discretionary Fund for fiscal year 1985. (Board Ex. 56, Justifications of Appropriations Estimates for Fiscal Year 1985 at 77, 94; Board Ex. 57) Secretary intends to use $31,599,000 of that amount for the nonstatutorily mandated purposes or programs specified in 20 U.S.C. § 3851(a). His intended uses do not include financing Board's desegregation activities.

454. No fiscal year 1981, 1982 or 1983 lapsed funds have been provided by the United States to Board for the Plan. Nor has the United States sought, nor does it currently intend to seek, legislation to provide such funds to Board. (Stip. 316)

455. Secretary does not currently intend to take any steps to provide to Board, for the purpose of financing its desegregation activities, any fiscal year 1984 or later year funds that otherwise will lapse in such years. (Stip. 317)

456. In addition the United States has not provided any of the "carryover funds" identified in Finding 432 to Board for implementation of the Plan. Nor has the

United States taken, nor does it currently intend to take, steps to provide such funds to Board. (Motion of the United States to Modify the June 30 Order, and supporting memorandum, filed February 2, 1984; Stips. 318, 319)

457. Absent Opinion II, Secretary would have allowed the grantees to expend the 1982 "carryover funds" in 1983 without setting aside a corresponding amount of 1983 funds. (*Id.*)

458. In fiscal year 1984 the United States has not sought authorizing legislation or a specific appropriation to finance all or any part of Board's cost of implementing its desegregation plan. (Plan of the United States filed November 10, 1983: Report of the United States filed July 14, 1983)

459. In the President's fiscal year 1985 Budget, the Executive Branch did not propose authorizing legislation or a specific appropriation to finance all or any part of Board's cost of implementing its desegregation plan. To the contrary, in that budget the Executive Branch is seeking specific legislation to make all funds appropriated to the Department of Education unavailable for Board. (Board Ex. 57 at I–124 § 309). That proposed legislation is intended to make all funds, other than those specifically appropriated for that purpose, unavailable to Board for use in implementing its Desegregation Plan. Inclusion of that proposal within the 1985 Budget is consistent with the policy of the Executive Branch of the United States to deny funding to Board for desegregation implementation. (Christensen testimony)

460. Secretary can include, in the President's budget requests to Congress, budgetary line items that request Congress to provide funds for particular purposes, activities or programs that Secretary has not previously undertaken. Such a request for funds is known as a "nonauthorized line item" or a "nonauthorized program." It is Secretary's practice to transmit authorizing legislation for such a line item simultaneously with the appropriation request. If Congress appropriates funds for and authorizes the use of such a line item, Secretary is authorized to spend funds for that purpose. (Christenen testimony; United States General Accounting Office, *Principles of Federal Appropriations Law* at 2–11, 2–12, 2–26, 2–27 (1983)

461. There is currently a line item (but without any authorized amount) in the President's fiscal year 1985 Budget entitled "Chicago Desegregation Activities." As reflected in the President's fiscal year 1985 Budget, Secretary does not intend to request that Congress provide any funds to this line item in fiscal year 1985. (Board Ex. 57, Appendix to the Budget for fiscal year 1985 at I–I13; Board Ex. 64, 1985 President's Budget at 2; Christensen testimony)

462. In the President's budget requests to Congress, Secretary can include budgetary line items within grant programs or other types of accounts. Secretary may create such line items to indicate the basis for the appropriation amount requested and the manner in which he intends to allocate funds appropriated to the grant program or account. (Christensen testimony; Board Ex. 56 at 95–96; Board Ex. 58 at 48; Board Ex. 61 at 2, 3; Board Ex. 62 at 2; United States General Accounting Office, *Principles of Federal Appropriations Law* at 2–11, 2–12, 2–26, 2–27, (1983)

463. In the President's fiscal 1985 budget, Secretary has not included any such line item in his Title IV, Secretary's Discretionary Fund or Departmental Management subaccounts that would allow him to reserve appropriated funds for Board's desegregation activities. (Christensen testimony; Board Exs. 56, 57)

464. Federal fiscal year 1984 funds generally will not be expended until the summer of 1984 and, with some exceptions, are primarily for use in school year 1984–85. (Stip. 344)

465. In fiscal year 1984 there are minimal sources and amounts of funds available to the United States to provide desegregation assistance for Board. Those limitations upon the United States' available

resources result from its failure—perhaps more accurately, its refusal—to seek or make available sufficient funds to meet its Consent Decree obligations. As detailed in Findings 440–63, the United States through Secretary has failed, and most recently has refused, to request from Congress in fiscal years 1982 through 1985 sufficient funds to apply toward Board's desegregation needs. It has not sought to establish funding sources that specifically recognize its Consent Decree obligations and are in addition to those previously created by Congress for desegregation assistance. It did not request sufficient fiscal 1984 appropriations, and has not requested sufficient fiscal year 1985 appropriations, to enable it to meet its Consent Decree obligations, while simultaneously it has provided a significant amount of these funds to otherwise eligible applicants. On behalf of the United States, Secretary has deliberately reduced available funds and created competition between Board and other applicants for the funds from these pre-existing sources.

467. Such limited availability of fiscal year 1984 funds for provision to Board pursuant to the Consent Decree is a direct result of the failures and refusals of the Executive Branch to seek funds for financing the Plan and, even worse, its affirmative efforts to render existing funds unavailable to Board. Those actions, particularly since the Court of Appeals' affirmance of Opinion II's determination that the United States was in violation of Consent Decree § 15.1, constitute further willful violations of the Consent Decree by the United States.

### Actions with Respect to the Yates Bill and Weicker Amendment

501. As the following findings in this section reflect, from the first draft of the Yates Bill through the passage of the Weicker Amendment, the Executive Branch intentionally sought to secure passage of legislation that would have earmarked the funds restrained by Opinion II (a restraint upheld by the Court of Appeals, 717 F.2d at 385) to render them unavailable to Board.

502. On August 13, 1983 the President vetoed H.J.Res. 338, a bill sponsored by Representative Yates, the only substantive provision of which was a $20 million appropriation to enable Secretary to comply with the Consent Decree. (Stip. 320)

503. Both the message of the President accompanying that veto (Board Ex. 78) and the subsequent statement of Secretary of Education Terrel Bell (Board Ex. 79) express the official policy of the Executive Branch, including the Department of Education, to take actions designed specifically to render funds for desegregation assistance unavailable for Board. (Chambers Dep. 57–58, 69; Christensen testimony)

504. On or about September 21, 1983, during the mark-up in the House Appropriations Committee of H.J. Res. 367 (a continuing resolution designed to provide temporary funding in federal fiscal year 1984 for several federal departments), Representative Yates added Section 111 to the proposed legislation. During the same mark-up Representative Conte added Section 112 to the proposed legislation, a provision intended to "earmark" funds that had been previously restrained by order of this Court and to provide such funds could be received only by grantees other than Board. Representative Conte's amendment was adopted by the Appropriations Committee. (Stip. 321)

505. Representative Conte's "earmarking" proposal was supported by the Executive Branch. It was intended to render the funds previously restrained by this Court unavailable to Board. Representative Conte's amendment was not adopted by the full House. (Christensen testimony; Chambers Dep. testimony; Board Exs. 78–87 and 89.)

506. On or about September 22, 1983 the House leadership announced that H.J. Res. 367 was overburdened with amendments and would be redrafted. That redraft was H.J.Res. 368 (another continuing resolution), which contained Representative

Yates' Section 111 but did not contain Representative Conte's Section 112. (Stip. 322)

507. During Congressional consideration of H.J.Res. 368, Executive Branch officials prepared an alternative to Section 111 in an attempt to secure legislation that would release the restrained funds to grantees other than Board only under certain conditions. Their proposed substitute language (Board Ex. 80) was given by Executive Branch officials to staff members of the House and Senate Appropriations Committees for inclusion in H.J.Res. 368 as a substitute for Rep. Yates' Section 111. That proposed language would have established a contingency fund to satisfy any final court order against the United States resulting from this litigation and would have made all other fiscal year 1983 funds unavailable for this purpose. (Stip. 323; Chambers Dep. 49–50, 60–61) It was prepared by the Department on its own initiative and was given to the respective appropriations committees (after Rep. Conte's earmarking proposal was defeated) as the Department's "preferred" substitute for Representative Yates' Section 111. (Chambers Dep. 61–62)

508. On September 29, 1983 Secretary Bell testified before the Subcommittee on Education, Arts and the Humanities of the Senate Labor and Human Resources Committee. His testimony included a statement that the Office of Management and Budget had the day before cleared the substitute language referred to in Finding 507, thus indicating official Executive Branch approval of the substitute. (Stip. 324; Chambers Dep. 65–66, 69, 79–81, 131)

509. Before the Congress Executive Branch officials supported the Executive Branch alternative to the Yates Bill (Stip. 330) and officially opposed the enactment of the Yates Bill. (Chambers Dep. 62 *et seq.*)

510. On October 1, 1983 the President signed into law H.J.Res. 368 (which included Section 111, the "Yates Bill", appropriating $20 million to enable Secretary to comply with the Consent Decree). (P.L. 98–107) Unlike H.J.Res. 338, sponsored by Representative Yates, which had been a free-standing bill dealing only with funding Board's Plan to the extent of $20 million (so that the President could and did veto the measure without affecting other legislation), H.J.Res. 368 covered a host of temporary funding items of an emergency nature, so that a veto would have impacted the operations of many other federal departments. Consequently the President's signing of H.J.Res. 368 did not at all indicate the Executive Branch had altered its opposition to providing any funds to Board to honor the United States' obligations under the Consent Decree.

511. On the contrary, as the following Findings reflect, after the Yates Bill thus became law the Executive Branch continued its efforts to secure passage of a statute specifically designed to render unavailable to Board any funds other than those appropriated for it by the Yates Bill. Those efforts clearly represented a violation of the United States' duties under Section 15.1 as declared by the Court of Appeals.

512. H.R.3913, the Labor, Health and Human Services and Education Appropriations Bill for fiscal year 1984, was considered in the Senate October 4, 1983. During Senate consideration Senator Weicker proposed first his original and then his modified amendment (Sec. 308) to H.R.3913. On October 4, 1983, but sometime before the introduction of Senator Weicker's proposals, a staff member of the Senate Appropriations Committee requested technical assistance from the Department of Education in preparing legislative language to ensure that funds, other than those appropriated in Section 111 of P.L. 98–107, would not be available to fund the Consent Decree. In response to that request the Department of Education prepared and transmitted two alternatives to the staff member (Board Ex. 82), the second of which alternatives was proposed by Senator Weicker as amendment number 2277:

> No funds appropriated in any act to the Department of Education for fiscal years 1983 and 1984 other than those appropri-

ated by Section 111 of the Public Law 98–107 shall be available to fund the Consent Decree of 1980 between the United States and Board of Education of the City' of Chicago.

*Cong.Rec.*, S.13506. Although the Senate adopted that amendment, it was later withdrawn and the language of the first alternative (which became Section 309 of P.L. 98–139) was adopted by the Senate later the same day. As enacted, the Weicker Amendment reads:

No funds appropriated in any act to the Department of Education for fiscal years 1983 and 1984 shall be withheld from distribution to grantees because of the provision of the order entered by U.S. District Court for Northern District of Illinois on June 30, 1983: Provided, that the Court's decree entered on September 24, 1980 shall remain in full force and effect.

(Stip. 326; Chambers Dep. 66–69; Christensen testimony)

513. Also on October 4, 1983 Representative Conte presented an amendment to H.R.3959 that would have earmarked fiscal year 1983 funds in the "Special Programs" account. *Cong.Rec.* H7973. On October 5, 1983 Representative Conte described that amendment as being the one he had proposed in conjunction with H.J.Res. 367 but stated that he was not going to propose it "[B]ecause the Senate added an amendment dealing with this subject during their floor consideration of [H.R.3913] ..." (H8017). (Stip. 327)

514. As already found, the Department of Education (through Steven Winnick, Esq. of its Office of General Counsel, and its Director of Budget Services) prepared and conveyed the language originally proposed by Senator Weicker. (Chambers Dep. 66–69; Christensen testimony) It specifically designed that language to render all restrained fiscal year 1983 and 1984 funds unavailable to Board to finance its desegregation activities. (Chambers Dep. 69; Christensen testimony)

515. On or about October 13, 1983, in response to requests for technical assist-

ance from staff members of the House Appropriations Committee who were preparing for the conference committee on H.R.3913, the Department of Education prepared substitute bill language for Senator Weicker's Amendment number 2277, possible report language for inclusion in the Conference Committee Report and a paper entitled "Talking Points," and it transmitted all three items to members of the Conference Committee. (Board Exs. 83–85; Stip. 328; Chambers Dep. 72–73, 76, 84, 91–92)

516. All three items referred to in Finding 515 were specifically drafted and intended by the Department to render funds unavailable for implementing Board's Desegregation Plan. (Chambers Dep. 72–73, 76–79, 85–87) During the current hearings before this Court, representatives of the Department of Education sought to portray themselves as wholly passive respondents to requests from Congress for technical assistance, implicating no substantive or policy judgments by the Department. That may well be the usual function of the Department in connection with possible legislation, but in light of the foregoing Findings it is totally disingenuous in the present instance. This Court does not credit such testimony and finds it additional confirmation of the findings made elsewhere as to the bad faith of the United States.

517. In the October 20, 1983 Congressional Record there is an extension of remarks by Representative Conte concerning the modified Weicker Amendment (H8470). That statement was adapted by Representative Conte's staff from the materials supplied by the Department of Education referred to in Findings 514–16 and that constitute Board Exs. 83–85. (Stip. 329)

518. In taking the actions described in Findings 502 through 517, the Executive Branch and the Department of Education did not give heed to the United States' Consent Decree obligations, nor did they inform congressional staff of those obligations. (Chambers Dep. 59, 69, 72–79, 91, 107–08, 111–14, 147–48; Christensen testi-

mony) In taking those actions, the Executive Branch and the Department of Education actively supported and sought passage of legislation specifically designed to render funds unavailable to Board. It is a policy and priority of the Executive Branch and the Department of Education to make all funds appropriated to the Department unavailable to Board for implementing its Plan and to oppose specific congressional appropriations of funds to be used to comply with the Consent Decree. Moreover, it has been and continues to be the policy of the Executive Branch to deny funds to Chicago for desegregation implementation.

### The United States' Non-Compliance With Section 15.1

601. Since this Court issued Opinion II on June 30, 1983 and the Court of Appeals decided the appeal from Opinion II on September 9, 1983, it has been a policy of the Executive Branch of the United States, including the Department of Education, to disable itself from complying (a) with Opinion II and subsequent orders and (b) with the Court of Appeals' opinion, and to deny funding to Board for desegregation implementation. Those actions constitute more than a failure to "make every good faith effort" to meet the United States' Consent Decree obligation. Rather the United States has actively and willfully ignored the orders of this Court and the Court of Appeals and has continued its bad faith efforts to evade and undermine its obligations under Section 15.1, by engaging in conduct intended specifically to render existing and future sources of funds unavailable for desegregation assistance to Board. These findings are compelled by the earlier Findings and by the later Findings in this section.

602. As early as the filing of its July 15, 1983 Report, the United States clearly indicated that despite its previously adjudicated liability it had no intention of altering its prior course of bad faith conduct. That Report was supposed to discuss the specific steps to be included in the United States' program of compliance with Opinion II.

Instead the United States simply reiterated its prior position it would not treat any funds over which Secretary had control as "available," nor would it seek legislative or other action to render other funds available to Board. That Report alone reflected continuing bad faith on the part of the United States, as well as a willful violation of the Consent Decree and Orders of this Court.

603. Following the Court of Appeals' September 9, 1983 vacation of this Court's previously-ordered remedies, explicitly stated by the Court of Appeals as intended to give the United States an opportunity to "fashion its own proposed remedy," the United States submitted the "Plan of the United States for Supporting the Desegregation Plan of Board of Education of the City of Chicago." That Plan, filed November 10, 1983, sets forth all the actions the United States intends to take in school year 1983–84 and for the duration of the Consent Decree to comply with its obligations under Section 15.1. (Stip. 331–32) Although purporting to satisfy the Seventh Circuit's mandate, the Plan asserted the United States had no further obligations for fiscal year 1983, or for future fiscal years, beyond the $20 million that had been appropriated by Congress as part of a continuing joint resolution covering a number of needed funding appropriations (after the President had vetoed an earlier free-standing provision sponsored by Representative Yates that would have budgeted funds only for Board and its Plan). Indeed the United States' "Plan" contained no suggestions for remedying the United States' past violations or for meeting its present and future obligations under the Consent Decree, but instead it presented both old and new excuses for the failure to take such actions. It reiterated arguments that had previously been rejected by this Court and the Court of Appeals. Rather than the United States availing itself of the opportunity presented by the Court of Appeals or acting in good faith pursuant to the Consent Decree, its "Plan" and its actions taken (and not taken) pursuant to its provisions constitute bad faith conduct of the United States. Both the Plan and such action and inaction

also constitute willful violations of the Consent Decree and orders of this Court and the Court of Appeals.

604. Although the United States received the original version of Board Ex. 28 on or about September 16, 1983, that extensive document was not reviewed by any officials of the Department of Education, other than counsel, until approximately March 1, 1984—when these hearings forced such a review. (Stip. 301; Fagan testimony; Christensen testimony; Chambers Dep.)

605. All the conduct of the United States detailed under the caption "Actions by the United States Affecting the Availability of Funds" (Findings 439–67), including its promulgation of regulations and proposals of legislation intended to render funds unavailable to Board for use in implementing the Plan, together with its prior failure and present intention not to (a) provide Board with any of the presently or previously restrained funds, (b) seek reappropriation of any excess or "lapsing" funds, (c) seek to identify and provide any other available funds or (d) seek to render sufficient funds available through appropriation requests and other legislative activities, constitutes both bad faith conduct and willful violations of the Consent Decree and orders of this Court and the Court of Appeals.

606. All the conduct of the United States detailed under the caption "Actions with Respect to the Yates and Weicker Bills" (Findings 501–518), specifically designed to render presently available funds unavailable, also constitutes both bad faith and willful violations of the Consent Decree and orders of this Court and the Court of Appeals.

607. All the conduct of the United States referred to in Findings 401–606 was intentionally undertaken by, at the direction of, or with the knowledge of, Secretary of Education Terrel R. Bell, other policy level officials in the Department of Education (including Sally Christiansen, Gary Bauer, Hunter Harrison and Steven Winnick) and other Departments of the Executive Branch. Each of those officials was aware of the Consent Decree and orders of this Court and the Court of Appeals when engaging in that conduct.

608. In sum, despite prior findings and opinions of this Court and of the Seventh Circuit, the United States has shown no intention of complying with Section 15.1 of the Consent Decree. It has refused to make any serious effort to address its obligations and has persisted in its efforts to ensure that funds adequate for financing the Plan are unavailable to Board.

609. All the actions of the United States since Opinion II (and particularly since the Court of Appeals' September 9 opinion) wholly fail to meet its obligation to "make every good faith effort" and constitute affirmative bad faith conduct and willful violations of the Consent Decree and orders of this Court and the Court of Appeals.

610. Careful review of the entire record demonstrates that Board has proved the factual matters reflected in Findings 401 to 609 not only by the required preponderance of the evidence, but also by clear and convincing evidence.

CONCLUSIONS OF LAW ("Conclusions")

*Law of the Case*

1. "Law of the Case" has two aspects:

(a) Courts will not normally reexamine their own decisions made at prior stages of the same proceedings, absent special circumstances such as a change in the relevant law since the last decision, the development of new and compelling evidence or "manifest injustice." This aspect of the doctrine is a self-imposed (hence non-binding) prudential limitation. *See* 1B *Moore's Federal Practice* ¶ 0.404[4.–1].

(b) Lower courts must comply with the mandates, and apply the decisions, of reviewing courts on remand. *Gertz v. Robert Welch, Inc.*, 680 F.2d 527, 532 (7th Cir.1982). "Decisions" of a reviewing court include any issues decided by that court explicitly or by necessary inference, *Doe v. New York City Depart-*

*ment of Social Services,* 709 F.2d 782, 788 (2d Cir.1983); *E.E.O.C. v. International Longshoremen's Association,* 623 F.2d 1054, 1058 (5th Cir.1980).

■ 2. Where there are alternative factual or legal grounds for a District Court decision, and the Court of Appeals considers only one, the other grounds are not deemed "decided" (accepted or rejected by implication) for purposes of the second branch of law of the case. Those alternative grounds do remain the law of the case in the District Court under the first branch of the doctrine. *See, e.g., Munoz v. County of Imperial,* 667 F.2d 811, 817 (9th Cir. 1982); *Johnson v. Board of Education of the City of Chicago,* 664 F.2d 1069 (7th Cir.1981), *vacated,* 457 U.S. 52, 102 S.Ct. 2223, 72 L.Ed.2d 668 (1982); 1B *Moore's* ¶ 0.404[4.–3].

■ 3. Because the following propositions were finally and explicitly decided by our Court of Appeals, under the mandate aspect of the law of the case, they are not subject to reexamination by this Court:

(a) Section 15.1 imposes a substantial obligation on the United States to provide available funds to Board (717 F.2d at 383).

(b) The United States demonstrated a lack of good faith, violating its obligation to Board under Section 15.1, by failing to provide Board with funds it had available for use by Board (*id.* ).[15]

(c) Temporarily freezing the obligation or expenditure of available funds pending the outcome of these proceedings was necessary to protect Board's interest by preserving the status quo, and was not an abuse of discretion (*id.* at 385).

■ 4. This Court's finding that Board has made every good faith effort to find and provide every available form of financial resources was not challenged on appeal (*id.* at 380 n. 1) and also must be considered

conclusively decided. *Raxton Corp. v. Anania Associates, Inc.,* 668 F.2d 622, 624 (1st Cir.1982). Even were that not so, these Findings and Conclusions have reconfirmed Board's compliance.

5. Several other issues must be deemed conclusively decided by implication as a result of our Court of Appeals' decision:

(a) The Government argued extensively on appeal that the approximately $90 million it had provided to Board under Chapters I and II of the ECIA satisfied its obligation. By accepting that Board had made every good faith effort to find and provide funds for the Plan and nevertheless concluding that the United States had violated its obligation, the Court of Appeals implicitly rejected that argument.

(b) This Court's basic understanding and analysis of the obligations contained in Section 15.1 was at least implicitly approved when employed by the Court of Appeals. Both this Court and that Court undertook an examination of whether funds were available to the Executive Branch that could have been provided to Board had the United States used good faith efforts. Implicit in this examination was an understanding that the United States had an obligation that was not dependent on Board's having exhausted all of its available resources, and that was not dependent on Board's being unable to finance the Plan. By finding a Consent Decree violation while vacating conclusions concerning the cost of the Plan, Board's resources and its need for additional financing, the Court of Appeals necessarily concluded that the failure to provide available funds was a violation independently of whether additional financing was needed or whether Board could theoretically provide it.

These Findings and Conclusions have foreclosed that possibility.

---

**15.** This conclusion may have been subject to reexamination if this Court were unable to "verify" the availability of funds (*id.* at 383 n. 8).

■ 6. Opinion III contains no explicit or implicit determination or rejection of the propriety of this Court's detailed exposition (in Opinion II App.A Par. 1, 567 F.Supp. at 286–88) of the United States' obligations under Section 15.1, including, where necessary, legislative initiatives. Also none of the particular remedial obligations of the United States defined by this Court (*id.* Par. 2, 567 F.Supp. at 288) were rejected or considered by Opinion III other than as premature. Rather our Court of Appeals vacated the remedial portions of this Court's Order on the alternative and independent grounds that the United States should be given an opportunity voluntarily "to fashion its proposed remedy for past noncompliance, as well as a chance to show that it intends to comply in the future...." Through the United States has now been given ample opportunity, it has failed—really refused—to propose even a remotely acceptable "remedy" (Finding 603). To the extent the United States is now in a position identical to its earlier position, except for having been given an appropriate opportunity to comply voluntarily with its obligation and having failed and refused to do so, this Court's earlier conclusions as to the scope of the obligations contained in Section 15.1 and the nature of the United States' remedial obligations remain valid. To that extent, those conclusions are the law of the case.

7. In particular this Court has reviewed each of its Opinion II Findings of Fact and Conclusions of Law. That portion of Conclusion 4 that found Section 15.1 unambiguous was a "harmless error" (717 F.2d at 382), and this Court's Findings and Conclusions as to the amount adequate for implementation of the Plan and the remedial obligations of the United States were vacated as premature. With those exceptions, each of the Opinion II Findings and Conclusions remains the law of the case. Moreover, now that the remedial issues are no longer premature, the Conclusions concerning remedies are also law of the case.

8. Many of the Opinion II Findings and Conclusions are first-branch (prudential) law of the case. Thus this Court is not barred from re-examining such earlier determinations, particularly those with regard to the scope of the obligations contained in Section 15.1 and the nature of the United States' remedial obligations. Considering the importance of the issues presented in this case, the presentation of further extensive evidence and certain legislative developments discussed below, this Court has re-examined each of its Opinion II Findings and Conclusions, as well as its contemporaneous Order. Upon examination of the additional evidence and legislative developments, this Court concludes there are no compelling circumstances requiring such reconsideration. Nonetheless, in the interest of generating a self-contained document, new Findings and Conclusions concerning many of the same issues have been presented in this opinion. That does not mean any failure to restate all the prior Findings and Conclusions should be taken as a disavowal. To the contrary, each prior Finding and Conclusion, except to the extent inconsistent with these Findings and Conclusions, remains the opinion of this Court.

9. Two primary issues were not previously decided and were the focus of the hearings beginning March 19, 1984:

(a) "the level of funding adequate for full implementation of the Plan" (Order ¶ 6, 567 F.Supp. at 290); and

(b) the present remedial obligations of the United States (*see* 717 F.2d at 385 n. 12).

*Standards for Determining the Amount of Funding "Adequate for Implementation of the Plan"*

10. Much of the ground traveled by courts attempting to determine and allocate the total cost of desegregation plans in more typical desegregation cases has already been covered by the parties and this Court in this case. In particular, the following critical conclusions have previously been established:

(a) Board's obligation is explicitly defined by the Consent Decree: to de-

velop and implement a system-wide plan to remedy the effects of past segregation (Consent Decree § 1).

(b) Thereafter the Consent Decree explicitly describes the nature of the Plan, and particularly the Educational Components, necessary to meet that obligation.

(c) Board's Plan has already been approved by this Court (Opinion I, 554 F.Supp. 912)) and enthusiastically endorsed by the United States.

(d) As discussed throughout these Conclusions, the Consent Decree itself explicitly allocates the funding responsibilities of the parties.

■ 11. In any determination and allocation of the appropriate level of funding for a desegregation plan, the costs of programs that "materially aid the success of the overall desegregation effort" are properly included. *Arthur v. Nyquist,* 712 F.2d 809, 813 (2d Cir.1983), *cert. denied sub nom. Griffin v. Board of Education,* — U.S. ——, 104 S.Ct. 1907, 80 L.Ed.2d 456 (1984); *Liddell v. Missouri,* 731 F.2d 1294, 1316 (8th Cir.1984) ("Liddell III"). That involves drawing a line that excludes the mere discharge of a school board's "general educational responsibilities," a line that "inevitably blurs," *Arthur,* 712 F.2d at 813. In striking a balance, a district court should give "considerable deference to the good faith representations of the school authorities." *Id.; Liddell III,* 731 F.2d at 1316. Such discretion normally afforded a local board is particularly appropriate in the circumstances presented in this case because:

(a) Section 3.1 provides Board shall have substantial discretion in the development of the Plan, particularly the Educational Components.

(b) Board has consistently demonstrated its good faith throughout the past four years of litigation, Plan development and implementation (Opinion II Findings 2, 3, 567 F.Supp. at 274).

■ 12. It is of course proper for the United States to seek to assure that Board does not abuse its discretion by including in the Plan any educational programs that are not properly linked to desegregation (as *Arthur,* 712 F.2d at 813 put it, they are "a means of upgrading an educational system in ways only remotely related to desegregation"). In the circumstances of this case, *Arthur* and *Liddell* teach the proper standard for determining whether the cost of any given program is appropriately included in the amount "adequate for implementation of the Plan" is whether the program is a reasonable exercise of Board's discretion to adopt programs that materially aid the implementation of the Plan developed pursuant to the Consent Decree and approved by the United States and this Court. Absolute dollar precision is not required when determining the costs of a desegregation plan, particularly when (as here) the local board has been acting in good faith. *Arthur,* 712 F.2d at 814–15.

13. By its agreement in Section 15.1 to attempt to provide financial resources "adequate for implementation of the desegregation plan," the United States clearly agreed to help pay for the Plan that was required by, and has since been developed and implemented pursuant to, the Consent Decree. That agreement includes helping to pay for a plan (like the current one) that includes educational components in magnet schools (Section 4.12), in desegregated schools (Section 10.1 and 10.4) and particularly in racially isolated schools (Section 2), including the following items outlined in Section 7:

7.1 Remedial and compensatory educational programs.

7.2 Improved curricula and instructional and evaluative techniques (including the utilization of tests that validly measure student achievement) for academic, vocational and alternative educational studies,

7.3 Preservice and inservice instruction for administrators, principals, teachers and other school personnel.

7.4 Selection, and evaluation of the performance of, principals and supporting leadership staff.

7.5 Testing, counseling, guidance and student welfare.

7.6 Physical facilities, safety and security.

7.7 Supportive relationships between such schools and groups and institutions in the community and in government.

14. Section 15.3 states:

The parties recognize that financial cost of implementation does not excuse the failure to develop a desegregation plan consistent with the principles set forth in §§ 2–14, and is not a basis for postponement, cancellation or curtailment of implementation of the plan after it has been finally adopted, but is one legitimate consideration of practicability in meeting the objective stated in § 2.1.

That provision makes plain the financial responsibilities of the parties under Section 15.1 were to apply fully to the Educational Components described in various sections of the Consent Decree. As for the last clause, that specifically allows affordability to be considered in meeting the Student Assignment objective of the Consent Decree (Section 2.1). Indeed, its use of the singular form "objective" in referring to Section 2.1 reinforces the normal reading that the same clause does not apply to the other objectives stated in Section 2, including particularly Section 2.2 relating to the Educational Components. If any further confirmation were required, Section 7 of the Consent Decree contains a specific reference to "the objective [again used in the singular] stated in Sec. 2.2"—demonstrating once again the Consent Decree's draftsmen were meticulous in their distinctions and cross-references. Thus the Consent Decree's clear and unambiguous language requires no resort to extrinsic evidence on this score.

15. Section 15.3 therefore does not allow consideration of affordability as to development of a plan containing educational components consistent with the principles set forth in Section 2.2. Affordability is a legitimate consideration of practicability only with respect to Section 2.1, which re-

quires that the Plan seek to establish the greatest "practicable" number of stably desegregated schools. But that is really not critical. Even were it otherwise, to the extent affordability may realistically limit the type of plan that can be developed and implemented, it does not qualify the obligation of the United States any more than it qualifies Board's obligation. Both are obligated by Section 15.1 to attempt to share the costs of programs that it is determined will materially aid in implementing the Plan.

16. In response to the *Arthur-Liddell* analysis, the United States offers far more crabbed approaches:

(a) One is a "but for" test, which would exclude programs from a desegregation remedy unless such programs are so unique to desegregation that they would never otherwise have been adopted. Such a test not only conflicts with the "materially aid" standard but would place an unfair and unrealistic burden on the Board. *Liddell III*, 731 F.2d at 1315; *Arthur*, 712 F.2d at 813. Such a "but for" principle would fail to recognize the wide-ranging list of both student assignment and educational programs and methods agreed to in Sections 4 and 7. It would ignore the reality of Board's careful desegregation planning, through which the programs constituting the Plan were formulated, and the United States' wholehearted approval of the Plan.

(b) As a second line of defense the United States urges an "incremental cost" test, which would exclude programs from a desegregation remedy merely because they are desegregation programs initially adopted by Board before the Consent Decree. That would be an insupportable and artificial limitation. Such programs (Finding 304(a)) are generally voluntary transfer programs and magnet schools and programs—basic elements of the Student Assignment Plan. It would be illogical for Board

to be required to discontinue these programs or not to count them as part of Board's desegregation expenditures. Had the parties wished to exclude pre-existing desegregation programs from the desegregation plan referred to in the Consent Decree, they could have easily done so. They did not.

This Court finds the United States' proposals unacceptable and adheres to the *Arthur-Liddell* standards.

*Standards for Determining the Share the United States Is Obligated To Attempt To Provide of the Amount "Adequate for Implementation of the Plan"*

17. Section 15.1 by its terms is addressed equally to both parties and creates a mutual obligation to attempt to find and provide the total amount of financing adequate for the Plan. It says "each party" is to address the search and provision of funds "adequate for implementation of the desegregation plan," a phrase that applies to the total amount of financing necessary—not some severable proportion of that total amount.

18. Circumstances surrounding entry of the Consent Decree further demonstrate a mutual obligation, not a divisible one, was contemplated. Its history reveals the parties had a common and overriding goal of assuring that an effective desegregation plan was developed and implemented in Chicago (see Findings 104, 108–10 and extrinsic evidence discussed in Opinion II Conclusion 4, 567 F.Supp. at 282). That joint purpose was reflected in Section 15.1, where each party agreed to do everything possible to find the necessary financing. As stated in Finding 108, the Decree "represents the only instance in which a major urban school system has agreed, without any litigation or determination of liability issues, to develop and implement a system-wide desegregation plan under court supervision". That Decree contemplated, and the Plan has manifested, the extensive use of expensive compensatory educational remedies to alleviate the effects of past

discrimination. In 1980, as now, Board was faced with massive financial deficits, and the joint funding provision of the Consent Decree also reflected recognition that Board's finances were such that it could not voluntarily agree to develop, or successfully implement, an effective desegregation plan of this type unless the federal government agreed to share the financial burdens.

19. Because they are in fact contracts (with the added imprimatur of court approval), consent decrees are construed according to precepts of contract construction. Opinion III, 717 F.2d at 382 and cases cited. Board engages in extensive legal analysis to urge on this Court the applicability of contract principles, based on the law of joint and several obligations or the law of joint ventures. Those concepts are of course born of somewhat different relationships than are involved here, though the United States does not really counter Board's arguments with cogent analysis. But it is not necessary to decide the questions here as though they involved strict joint and several liability or a joint venture in the classic sense. As Finding 110 makes plain, whether Section 15.1 is looked at in its literal terms—which do not specifically limit the amount of the United States' financial commitment—or whether some notion of reasonable expectations is applied to that commitment, there can be no question the United States' undertaking is broad enough to embrace the amount represented by Board's current request (as modified by this opinion).

20. Some light is also cast by the equitable principles that guide the fashioning and effectuating of desegregation decrees. *Milliken v. Bradley*, 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977). In that respect, allocating the costs of a desegregation plan is part of the remedial power of a district court, *United States v. Board of School Commissioners of Indianapolis*, 677 F.2d 1185, 1186 (7th Cir.), cert. denied, 459 U.S. 1086, 103 S.Ct. 568, 74 L.Ed.2d 931 (1982) ("*Indianapolis School Board*"). Courts have frequently

allocated such costs equally between two responsible parties. *Bradley v. Milliken,* 402 F.Supp. 1096 (E.D.Mich.1975), *aff'd,* 540 F.2d 229 (6th Cir.1976), *aff'd,* 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977) (*"Milliken II"*); *Indianapolis School Board,* 677 F.2d at 1188. And courts have frequently considered the ability of the parties to provide financing for the plans. *Milliken II,* 540 F.2d at 246; *Liddell v. Board of Education of the City of St. Louis,* 491 F.Supp. 351, 357 (E.D.Mo.1980), *aff'd and remanded,* 667 F.2d 643 (8th Cir.), *cert. denied,* 454 U.S. 1081, 1091, 102 S.Ct. 634, 656, 70 L.Ed.2d 614, 629 (1981).

21. Though the parallel is of course not complete, those equitable approaches tend to fortify the determination reached in Conclusion 19:

(a) In those cases as in this one, the parties share responsibility for financing the Plan, although the present case rests on a contractual obligation rather than (as in those cases) one arising in tort law.

(b) Similar equitable factors, such as ability to pay, are present in this case as in those.

(c) This Court's equitable remedial powers are invoked by the need to remedy the United States' persistent violations of its financial obligations.

### Consideration of Funding Contentions of the United States

22. Extrinsic evidence as to the events that led to the inclusion of Section 15.1 in the Consent Decree (Findings 103–10) demonstrates the United States' obligation was not limited or qualified by the prior existence or funding levels of ESAA. Instead Section 15.1 established a general obligation on the part of *both* parties, to be "interpreted and applied as appropriate in whatever future circumstances might arise" (Finding 110).

23. This is the first occasion on which the parties and this Court have addressed the amount "adequate for implementation of the Desegregation Plan" (Section 15.1). As already stated, that determination is whether the programs under consideration materially aid the success of the Plan. There is no estoppel against Board arising from any earlier statements predicated on the limited funds then currently available to it.

24. Board is not required to exhaust all its available resources for implementation of the Plan before the United States becomes obligated to find and provide resources for the Plan (Opinion II Conclusion 7, 567 F.Supp. at 283). Although Board has substantial general revenues (from local taxes and from general state aid, including State Title I aid), and those funds are not precluded by State law from being used for desegregation expenses, Board is not obligated to destroy the basic educational function of the school system by diverting funds needed and used for such purposes. Nor is Board required, as the United States suggests, always to divert any further increment of such general revenues from other educational programs to pay Plan costs. Such a standard—forcing the robbing of Peter to pay Paul—would render the United States' financial obligations meaningless.

25. United States argues if a program is "necessary" for the Plan, then Board has an obligation to shift funds from its general resources to pay for the program, and if Board does not do so, then by definition the program has been shown not to be "necessary." In either event, the asserted result is that the United States does not have to pay for the item. Like others of the United States' contentions, that one is legally bankrupt. Of course, a program may materially aid success of the Plan, or be necessary for the Plan, even though Board has not had funds available to be diverted from its basic educational system to pay for the program.

26. Board is not "master of its own fate" and depends on substantial general state and federal revenues to meet *all* its obligations. Requiring Board to consider all general state and federal revenues received by it as "available" for funding the

Plan must be rejected, for it would require Board to superimpose a financed Plan on a devastated school system. *See, Milliken II,* 540 F.2d at 245–51. Any successful desegregation program, especially one containing educational components, presupposes a functioning basic educational system. Courts that have apportioned costs between local and state defendants have taken care to ensure there is no diminution in the quality of education or in the allocation of existing state revenues—even state revenues that are for compensatory education. *Berry v. School District of the City of Benton Harbor,* 515 F.Supp. 344, 386–88 (W.D.Mich.1981), *aff'd and remanded,* 698 F.2d 813 (6th Cir.), *cert. denied,* —— U.S. ——, ——, 104 S.Ct. 235, 236, 78 L.Ed.2d 227 (1983).

27. General funds received from either the State of Illinois or the federal government must be considered part of Board's general revenues. Any expenditure of such funds for implementation of the Plan must be considered part of Board's contribution to financing the Plan. *See Liddell v. Board of Education of the City of St. Louis,* 677 F.2d 626, 631 (8th Cir.), *cert. denied,* 459 U.S. 877, 103 S.Ct. 172, 74 L.Ed.2d 142 (1982).

28. Board received federal assistance before the Consent Decree, and continues to receive such assistance today, under various federal funding programs unrelated to desegregation. Together those encompass the categorical federal educational assistance that is available to all school districts in the United States, including Board, for essential educational programs, not for funding the incremental costs of desegregation plans. Those funds have been and continue to be received by Board on the basis of criteria that are unrelated to and do not take into account either the Consent Decree or the costs of implementing the Plan.

29. Increases in general federal funding since September 1980, received by Board for purposes other than desegregation, neither eliminate nor derogate from the United States' obligation under Section 15.1.

Neither party contemplated at the time of the Decree that federal ECIA Chapter I funds would be used to fulfill the Section 15.1 obligations of the United States (Finding 357). Moreover, Board certainly did not agree to develop and implement a costly plan in exchange for the same level of federal funding it would have received even had it not entered into the Consent Decree or implemented a desegregation plan. Finally, the Court of Appeals has already implicitly rejected such a contention (Conclusion 5(a)).

30. Other United States contentions that its obligations under Section 15.1 are somehow satisfied or eliminated by other federal funding are equally untenable. It is unnecessary (as Board has done in its proposed Conclusions of Law) to dwell on the subject at length, for Findings 350–68, Addendum A to Findings 301–76 and the application of ordinary common sense demonstrate conclusively the poverty of the United States' position.

31. Section 15.1 imposes the same "good faith" standard on both Board and the United States. Board has been complying with that standard while the United States has not. That total disparity of performance reflects the height of irony in light of the fact Board and the United States have such differing abilities to find and provide funds and such differing competing obligations.

32. In Section 15.1 the United States made a firm commitment—it signed a contract—to make "every good faith effort to find and provide every available form of financial resources adequate for implementation of the Plan." No "intended grantee" has a comparable claim to action on the part of the United States. No number or form of Executive Branch "policy" decisions, "representations" or subsequent "commitments" can undo, override or diminish this contractual promise to Board—a promise that has the extra force of embodiment in a consent decree.

33. In a sense the United States' various agreements as to funding, dealt with in the foregoing conclusions, are variants on

its most fundamental one: Its Section 15.1 promise is meaningless and unenforceable, because it can define "every available form of financial resources" as wholly empty by deliberately making *all* financial resources *un*available. No court is required to accept that distortion of contract law from any contracting party, whether sovereign or private litigant.

34. Had the United States not so ignored and subverted its obligation under the Consent Decree, it would have retained substantially greater discretion within the bounds of its commitment than it now portrays itself as possessing. Section 15.1 contemplated both (a) that the United States would have discretion as to "how" it would meet its obligation and (b) that it was not required to go beyond "every good faith effort," even if the full result desired was not obtained through such efforts. *See, Western Geophysical Co. v. Bolt Associates, Inc.,* 584 F.2d 1164, 1171 (2d Cir. 1978).

35. Though the United States complains it is not being treated equally, it is in fact only now beginning to be treated equally. To the extent the United States' present obligations may appear to be different than Board's, it is not because the standard being applied to the United States is any different from that applicable to Board. Rather it is because (a) the United States has so egregiously violated that standard and (b) the very nature and identity of the parties makes their respective abilities "to find and provide every available form of financial resources" so very different.

*Propriety of the Programs Proposed by Board for Implementation of the Plan, and Summary as to the Amount of United States' Obligation*

36. Most of the programs for which Board now seeks funding are designed to implement the Educational Components portion of the Plan. In circumstances like those present in Chicago (*see* Findings 145–61), educational components are a critical part of a constitutional desegregation plan. *Milliken II; Liddell III.*

Detrimental effects of years of segregation are not cured merely by busing students to create integrated schools, *Milliken II,* 433 U.S. at 283, 97 S.Ct. at 2758. Instead a desegregation plan must include the additional programs necessary to provide equal educational opportunity to all students. *See, Kelley v. Metropolitan County Board,* 492 F.Supp. 167, 188 (M.D.Tenn. 1980); *Tasby v. Estes,* 412 F.Supp. 1192, 1195, 1210–11 (N.D.Tex.1976), *rev'd and remanded on other grounds,* 572 F.2d 1010 (5th Cir.1978).

37. Courts have repeatedly considered and approved the same types of educational components contemplated by the Consent Decree, and the same types of implementation programs for which Board now seeks funding:

(a) Effective Schools Project. *See, Liddell III,* 731 F.2d at 1314; *Berry,* 515 F.Supp. at 369; *Kelley v. Metropolitan County Board,* 511 F.Supp. 1363, 1368–70 (M.D.Tenn.1981), *aff'd in part, rev'd in part on other grounds,* 687 F.2d 814 (6th Cir.1982), *cert. denied,* 459 U.S. 1183, 103 S.Ct. 834, 74 L.Ed.2d 1027 (1983); *Indianapolis School Board,* 506 F.Supp. [657] at 673; *Tasby,* 412 F.Supp. at 1217; *Milliken II,* 402 F.Supp. at 1143–44; *United States v. Texas,* 342 F.Supp. 24, 30, 33–34 (E.D.Tex.1971), *aff'd,* 466 F.2d 518 (5th Cir.1972).

(b) Trainers Institute/Staff Development, *See, Evans v. Buchanan,* 582 F.2d 750, 770–71 (3d Cir.1978) (en banc), *cert. denied,* 446 U.S. 923, 100 S.Ct. 1862, 64 L.Ed.2d 278 (1980); *Kelley,* 511 F.Supp. at 1371; *Indianapolis School Board,* 506 F.Supp. at 672; *Tasby,* 412 F.Supp. at 1207, 1220; *Milliken II,* 402 F.Supp. at 1139; *United States v. Texas,* 342 F.Supp. at 34–35.

(c) Management Information System/Equity Compliance. *See, Liddell III,* 731 F.2d at 1317; *Milliken II,* 402 F.Supp. at 1119, 1145; *Berry,* 515 F.Supp. at 382–84; *Indianapolis School Board,* 506 F.Supp. at 673;

*Tasby,* 412 F.Supp. at 1206, 1220–21; *Morgan v. Kerrigan,* 401 F.Supp. 216, 248–49, 268–69 (D.Mass.1975), *aff'd,* 530 F.2d 401 (1st Cir.), *cert. denied,* 426 U.S. 935, 96 S.Ct. 2648, 49 L.Ed.2d 386 (1976).

(d) Affirmative Action. *See, Berry,* 515 F.Supp. at 376; *Tasby,* 412 F.Supp. at 1219–20; *United States v. Texas,* 342 F.Supp. at 30; *Redman v. Terrebonne Parish School Board,* 293 F.Supp. 376, 380 (E.D.La.1967); *Hill v. Lafourche Parish School Board,* 291 F.Supp. 819, 823 (E.D.La.1967).

(e) Within—School Segregation. *See, United States v. Texas,* 342 F.Supp. at 34. (See also Consent Decree, Part III)

(f) Magnet Schools. *See, Liddell III,* 731 F.2d at 1310; *Berry,* 515 F.Supp. at 365–66; *Kelley,* 511 F.Supp. at 1370; *Reed v. Rhodes,* 455 F.Supp. 569, 599–600 (N.D.Ohio 1978); *Milliken II,* 402 F.Supp. at 1146–47; *Morgan,* 401 F.Supp. at 235, 246–47.

(g) Special Education/Testing. *See, Tasby,* 412 F.Supp. at 1217; *Morgan,* 401 F.Supp. at 252; *United States v. Texas,* 342 F.Supp. at 36.

(h) Vocational/Technical Education. See, *Milliken II,* 402 F.Supp. at 1118, 1140–41; *Reed,* 455 F.Supp. at 599.

(i) Curriculum and Instruction. *See, Evans,* 582 F.2d at 771; *Berry,* 515 F.Supp. at 373–74; *Indianapolis School Board,* 506 F.Supp. at 672; *Morgan,* 401 F.Supp. at 234; *Milliken II,* 402 F.Supp. at 1118, 1143–44; *United States v. Texas,* 342 F.Supp. at 30–34.

(j) Student Discipline. *See, Evans,* 582 F.2d at 771–72; *Milliken II,* 540 F.2d at 250; *Berry,* 515 F.Supp. at 379–81; *Indianapolis School Board,* 506 F.Supp. at 672; *Reed,* 455 F.Supp. at 601–02; *Tasby,* 412 F.Supp. at 1219.

(k) Bilingual Education. *See, Milliken II,* 402 F.Supp. at 1144; *Tasby,* 412 F.Supp. at 1217; *Morgan,* 401 F.Supp. at 252; *United States v. Texas,* 342 F.Supp. at 30–34.

(*l*) Evaluation. *See, Liddell III,* 731 F.2d at 1317; *United States v. Texas,* 342 F.Supp. at 38.

38. In light of Findings 201–72 and the authorities cited in Conclusions 36 and 37, each of the programs Board proposes for implementing the Plan (except as stated in Findings 243, 250 and 253) properly provides the desegregation remedy required by the Consent Decree, "materially aids the success of the overall desegregation effort," and indeed is necessary for full implementation of the Plan. Accordingly the cost of each such program is properly included in the total amount "adequate for implementation of the desegregation plan" within the meaning of Section 15.1. As reflected by Finding 265, the total amount adequate for implementation of the Plan for school year 1984–85 is thus $171.631 million, and the share of that amount the United States is obligated to make every good faith effort to find and provide pursuant to Section 15.1 is $103.858 million.

*Verification of the Current Availability of Funds*

Opinion III, 717 F.2d at 383 n. 8 directed this Court to verify the availability of certain funds, appropriated to the Department of Education, to be provided to Board for implementation of the Plan. This Court has now had the opportunity (see Opinion II, Conclusion 11, 567 F.Supp. at 284) to examine extensively the availability of both 1983 and 1984 appropriations (for which the relevant statutes and regulations are nearly identical) and to reconsider the contentions of the United States with respect to the availability of those funds. This Court hereby verifies the availability of funds in the following conclusions.[16]

---

**16.** It was clearly the United States' obligation to do all the spadework for this purpose, consistent with its duty "to find and provide" under Section 15.1. Here too the United States has

breached its commitment, so it has been Board that has from the outset scrutinized the relevant appropriations bills, statutes and regulations to identify available funds for the United States

39. Funds are "available" to the United States within the meaning of the Consent Decree where Congress has appropriated them to the Executive Branch for purposes consistent with financing Board's desegregation activities. To the extent Congress has given the Department of Education discretion to provide particular funds to Board, the Consent Decree requires that the Executive Branch consider these funds "available." Furthermore, to the extent consistent with its statutory authority, the Executive Branch is required to interpret and conform its existing program regulations to meet its financial obligation to the Board under Section 15.1. *Citizens for a Better Government v. Gorsuch*, 718 F.2d 1117 (D.C.Cir.1983); *Gautreaux v. Pierce*, 690 F.2d 616 (7th Cir.1982); *Ferrell v. Pierce*, 560 F.Supp. 1344 (N.D.Ill.1983).

40. As the following Conclusions reflect, fiscal year 1983 funds and fiscal year 1984 funds were and currently are available to the United States, within the meaning of Section 15.1, to assist Board in financing the Plan. This is wholly apart from, and in spite of, the efforts of the United States to render funds *un*available—a matter dealt with in later Conclusions.

41. In fiscal years 1983 and 1984 Secretary was authorized to distribute direct grants through Title IV of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000c, 2000c–4; Pub.L. 97–35, Title V, § 509, 95 Stat. 443 (1981). As stated in Finding 402, Secretary administratively allocated $24 million to the Title IV program in each of those years.

42. In fiscal years 1983 and 1984 Secretary was authorized to grant all or any part of those Title IV monies directly to local educational agencies to finance the desegregation activities specified in 42 U.S.C. § 2000c–4. In those years Board was implementing a court approved desegregation plan and qualified as a local educational agency eligible to receive direct Title IV race and national origin desegregation assistance. 42 U.S.C. § 2000c–4; 34 C.F.R. §§ 270.04, 270.06.

and that has now identified further available

43. Secretary is authorized by the Title IV enabling statute, and permitted under his Title IV regulations (34 C.F.R. § 270.-72), to provide Title IV assistance · for:

(a) training and advisory programs designed to provide, develop or disseminate the information and skills necessary effectively to implement a desegregation plan (including particularly the educational components of Board's Plan);

(b) any training, staff development or advisory programs that are related to and materially assist in implementing a desegregation plan; and

(c) inservice training and advisory programs in connection with special educational programs designed to raise minority pupils' academic achievement, where the educational programs are required remedial components in a court approved desegregation plan and are supplemental to preexisting compensatory educational or basic skills development services provided by a school district.

44. Inservice training and staff development components of the following programs designed to implement the Plan's Educational Components meet all applicable Title IV statutory and regulatory criteria and are activities eligible for direct Title IV race or national origin desegregation assistance:

(a) Effective Schools Program

(b) Racially Identifiable Schools Program

(c) Trainers Institute

(d) OEEO Systemwide Staff Development Program for Racially Identifiable Schools

(e) OEEO Systemwide Staff Development Program for Desegregated Schools

(f) Magnet Schools Expansion Program

(g) Magnet Schools Staff Development Program

(h) Special Education/Testing Program

(i) Vocational and Technical Education Program

(j) Curriculum and Instruction Program

funds as set forth below.

(k) Student Discipline Program

(*l*) Bilingual Education program

(m) Evaluation program

45. Consultant and advisory components of the following programs designed to implement the Plan's Educational Components also meet all applicable statutory and regulatory criteria and are activities eligible for direct Title IV race or national origin desegregation assistance:

(a) Effective Schools Program

(b) Racially Identifiable Schools Program

(c) Affirmative Action Program

(d) Equity Compliance Program

(e) Within-School Desegregation Program

(f) Magnet School Expansion Program

(g) Special Education/Testing Program

(h) Vocational and Technical Education Programs

(i) Curriculum and Instruction Program

(j) Student Discipline Program

(k) Bilingual Education Program

(*l*) Evaluation Program

46. Secretary's statutory authority to consider "such other factors as he finds relevant" in making Title IV grant awards permits him to formulate additional selection criteria and, pursuant to such criteria, to establish classifications or priorities for allocating available Title IV funds among otherwise eligible applicants, and to reserve or set aside Title IV funds for particular eligible applicants. Title IV's statutory provision that Secretary "consider" other applications for funds does not subsume his authority referred to in the preceding sentence to establish priorities and to reserve or set aside funds for particular applicants.

47. Secretary has deliberately flouted the United States' contractual obligations (one owed to no other eligible applicant for Title IV funds) "to find and provide every available form of financial resources" for implementation of the Plan. To honor that obligation as he should have, Secretary was and is required to interpret, apply and, if necessary, modify his existing Title IV and Educational Department General Administrative Regulations ("EDGAR") to enable him to comply fully with the United States' financial commitment to Board under Section 15.1.

48. Secretary's EDGAR provisions apply to the Title IV program to the extent not expressly prohibited by Title IV's implementing regulations. Those implementing regulations, which permit Secretary to make Title IV grants at any time and on an application-by-application basis, do not require that he award funds only after a "competition" among all eligible applicants for those funds. 34 C.F.R. § 270.74(a).

49. EDGAR provisions requiring a competition among all applications for a program's available funds, including awards based in part upon a rank ordering of all submitted applications, do not apply to grant awards through Title IV, which may be made by Secretary at any time. 34 C.F.R. §§ 270.02(c) and (e), 270.74(a). Secretary's authority to create preferences and priorities permits him to reserve Title IV funds for one applicant and to award them without regard to any competitive selection procedures otherwise specified in his Title IV or other regulations.

50. Secretary's existing Title IV implementing regulations, which permit him to consider as award criteria (a) the availability of financial resources to a school district and (b) the nature and gravity of a school district's desegregation problems, allow him to consider the Consent Decree in allocating Title IV funds among otherwise eligible applicants.

51. United States' legal obligation under Section 15.1, and the policy determinations the Consent Decree embodies, constitute "relevant factors" within the meaning of 42 U.S.C. § 2000c–4(b), the EDGAR provisions and the Title IV implementing regulations. Thus Secretary is authorized to reserve Title IV funds for Board, or otherwise to provide Title IV funds to Board, in preference to other eligible applicants for these funds.

■ 52. All fiscal year 1984 funds allocated to the Title IV program are currently unobligated. No potential applicant, other than Board, has any legal entitlement to those Title IV funds. To the extent (if any) such potential applicants could have asserted due process rights to "compete" under Secretary's regulations for available Title IV funds, Secretary could have obviated any such problem in fiscal years 1983 and 1984 by publishing a notice in the Federal Register of Secretary's prospective intention to reserve certain Title IV funds for Board pursuant to the United States' Consent Decree obligation. 20 U.S.C. § 1232(b)(2)(A) and (B), 5 U.S.C. § 553(d)(1) and (3). In any event, potential applicants for fiscal year 1984 Title IV funds have no due process right to "compete" for these funds in light of Secretary's announcement to all applicants in the Federal Register that any availability of those funds for a 1984 grant competition is contingent upon the outcome of the present litigation. 48 Fed.Reg. 56254, 86255 (Dec. 20, 1983).

53. In fiscal year 1983 Secretary was not legally obligated to provide continuation awards to particular grantees, other than Board, from the Title IV program. It was within Secretary's authority to decline to finance continuation projects on the ground that, as a result of his financial commitment to Board, there were no program funds "available" for continuation awards or that it was in the United States' "best interest" to provide those funds to Board rather than to continuation projects. 34 C.F.R. § 75.253(a). Secretary is not legally required to provide continuation awards of Title IV funds in fiscal year 1984.

54. Congress did not in fiscal year 1984 direct that Title IV funds could not be made available to provide grants to local educational agencies. Certain committee report language describes Secretary's administrative practice of providing Title IV grants to state educational agencies and desegregation assistance centers. That language does not expressly prohibit Secretary from providing Title IV grants directly to local educational agencies under the pro-

gram authorized at 42 U.S.C. § 2000c–4. It is insufficient to repeal Secretary's statutory authority to provide such grants to local educational agencies or to operate as congressional ratification of Secretary's prior funding practices. *TVA v. Hill*, 437 U.S. 153, 189–93, 98 S.Ct. 2279, 2299–2301, 57 L.Ed.2d 117 (1978); *SEC v. Sloan*, 436 U.S. 103, 117–19, 98 S.Ct. 1702, 1711–12, 56 L.Ed.2d 148 (1978); *Demby v. Schweicker*, 671 F.2d 507, 512–13 (D.C.Cir.1981). *See also* Conclusion 63.

55. In sum as to Title IV funds, there were in fiscal year 1983 and are in fiscal year 1984 no statutory, regulatory or other legal constraints that would preclude Secretary from providing all or part of the $24 million allocated to the Title IV subaccount to Board for implementing the programs identified as eligible for direct Title IV assistance in Conclusions 44 and 45. All remaining fiscal year 1983 Title IV funds and all fiscal year 1984 Title IV funds have been and currently are "available" to the United States within the meaning of Section 15.1.

56. In each of fiscal years 1983 and 1984 Congress appropriated $28,765,000 for the Secretary's Discretionary Fund, 20 U.S.C. § 3851. Secretary is required to use $10,725,000 of that amount annually to fund the statutorily mandated programs specified in 20 U.S.C. § 3851(b). Secretary was authorized in each year to spend the remaining $18,040,000 reserved for the Secretary's Discretionary Fund for any of the purposes or programs specified in 20 U.S.C. § 3851(a), including research and demonstration projects related to the purposes of ECIA. Those purposes include assisting local educational agencies in implementing desegregation plans, in meeting the needs of children in schools undergoing desegregation and in addressing educational problems caused by racial isolation in schools. 20 U.S.C. § 3851(a)(2); 20 U.S.C. § 3832(3) and (7).

57. All programs and program elements making up Board's educational components are related to the purposes of ECIA, 20

U.S.C. § 3832(3) and (7). Many of those programs could have been found by Secretary to qualify for discretionary funds under the plain meaning of 20 U.S.C. § 3851(a)(2) as demonstrating desegregation techniques or educational remedies of national or general significance.

58. Secretary is also authorized through the Discretionary Fund to provide grants to local educational agencies to assist them in implementing programs under ECIA Chapter 2, including programs to assist local educational agencies in implementing desegregation plans, in meeting the needs of children in schools undergoing desegregation and in addressing educational problems caused by racial isolation. 20 U.S.C. § 3851(a)(4); 20 U.S.C. § 3832(3) and (7). By its plain and unambiguous language, 20 U.S.C. § 3851(a)(4) authorizes Secretary to provide direct grants of discretionary funds to local educational agencies to supplement activities or programs also eligible for financial assistance through the ECIA Chapter 2 state block grants, including 20 U.S.C. § 3832(3) and (7). Nothing submitted by the United States has shown a clearly expressed legislative intent contrary to the plain statutory language. *American Tobacco Co. v. Patterson,* 456 U.S. 63, 75, 102 S.Ct. 1534, 1540, 71 L.Ed.2d 748 (1982); *Consumer Product Safety Commission v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1982); *Pullman Standard v. ICC,* 705 F.2d 875, 879 (7th Cir.1983).

59. All programs and program elements making up Board's educational components are authorized for funding under ECIA Chapter 2, 20 U.S.C. § 3832(3) and (7), and are eligible for financing through a direct grant of discretionary funds to Board under 20 U.S.C. § 3851(a)(4).

60. Secretary's proposed Discretionary Fund regulations, 49 Fed.Reg. 7546 (February 29, 1984), state (a) discretionary funds may not be used to meet "local needs" and (b) under 20 U.S.C. § 3851(a)(4) Secretary may only provide technical assistance to local educational agencies. Those are solely administrative constraints and do not implement statutorily imposed limitations on Secretary's use of discretionary funds. Given his statutory authority to provide discretionary funds to Board under 20 U.S.C. § 3851(a)(2) and (4), Secretary is required to modify his regulations to enable him to comply fully with the United States' financial commitment to Board under Section 15.1. *Gautreaux; Gorsuch; Ferrell.*

61. Secretary is authorized by statute to allocate discretionary funds among potential applicants for those funds. It is within Secretary's regulatory authority to establish program priorities for the uses of those funds, to establish absolute preferences that reserve all or part of the funds for a particular priority, and to establish competitive preferences for applications that meet a particular priority. 34 C.F.R. §§ 75.105(b)(1), (c)(2), (c)(3). Secretary may under those regulations establish priorities and competitive and absolute preferences for a broad range of purposes, including recognition of the United States' financial commitment to Board under the Consent Decree. Secretary is authorized to establish a priority and a competitive or absolute preference in Board's favor, and thus specifically reserve all or part of non-statutorily mandated Discretionary Fund monies for the Plan. *See, e.g.,* 48 Fed.Reg. 50919 (November 4, 1983).

62. Secretary's EDGAR provisions relating to the selection of projects for funding after a rank ordering of all submitted applications are usually used by Secretary to make grants from the Discretionary fund. However, Secretary makes the final selection of applications for funding, and he is permitted by his regulations to change the rank order in which applications would otherwise be selected for funding based upon any information in the application, any other information he deems relevant to the program criteria, and any priorities he has established that set aside or reserve discretionary funds. 34 C.F.R. § 75.217(d)–(e). Secretary's authority to create preferences and priorities subsumes the EDGAR "competitive" selection procedures. It permits him to reserve discre-

tionary monies for one applicant and to award them to that applicant without regard to the EDGAR competitive selection criteria. 34 C.F.R. § 75.105(c)(3).

 63. In its fiscal year 1983 and 1984 appropriation acts Congress did not earmark or allocate particular sums for the nonmandated programs within Secretary's Discretionary Fund. Secretary is not legally bound by program allocations or budgetary estimates not incorporated into the language of an appropriation act itself. *Matter of LTV Aerospace Corp.*, 55 Comp.Gen. 308, 319 (1975); *Matter of Financial Assistance to Intervenors*, 59 Comp.Gen. 228, 231 (1980); *see also, Blackhawk Heating & Plumbing Co. v. United States*, 622 F.2d 539, 547 n. 6, 224 Ct.Cl. 111 (1980); United States General Accounting Office, *Principles of Federal Appropriations Law* 5–94 to 5–103 (1982). Notwithstanding language in congressional committee reports recommending or directing certain uses for Secretary's Discretionary Funds, Secretary did in fiscal year 1983, and does in fiscal year 1984, have the authority to make such discretionary funds available to Board to finance its desegregation activities.

64. All fiscal year 1984 funds reserved for the programs or purposes specified in 20 U.S.C. § 3851(a) are currently obligated. No potential applicant, other than Board, has any legal entitlement to those Discretionary Fund monies. To the extent (if any) such potential applicants could have asserted due process rights to "compete" under Secretary's established priorities for the use of his discretionary funds, Secretary could have obviated any such problem in fiscal years 1983 and 1984 by publishing a notice in the Federal Register of his prospective intention to establish a priority or preference reserving certain discretionary funds for Board pursuant to the United States' Consent Decree obligation. 20 U.S.C. § 1232(b)(2)(A) and (B); 5 U.S.C. § 553(d)(1) and (3). In any event, potential applicants for fiscal year 1984 discretionary fund monies have no due process right to "compete" for those funds in light of Secretary's announcements in the Federal

Register that any availability of those funds for 1984 grant competitions is contingent upon the outcome of the present litigation. 49 Fed.Reg. 7551 (February 29, 1984); 49 Fed.Reg. 2462 (January 19, 1984); 48 Fed.Reg. 50919 (November 4, 1983).

65. In fiscal years 1983 and 1984 Secretary was not legally obligated to provide monies from his discretionary fund for continuation awards to particular applicants other than Board. It was within Secretary's authority to decline to finance continuation projects on the ground that, as a result of his financial commitment to Board, there were no program funds "available" for continuation awards or that it was in the United States' "best interest" to provide those funds to Board rather than to continuation projects. 34 C.F.R. § 75.-253(a).

66. In sum as to Discretionary Funds, there were in fiscal year 1983 and are in fiscal year 1984 no statutory, regulatory, or other legal constraints that would prevent Secretary from providing all or part of the nonstatutorily directed $18,040,000 appropriated to the Discretionary Fund to Board for financing the programs included in Board's educational components. All fiscal year 1984 funds have been and currently are "available" to the United States within the meaning of Section 15.1.

67. Secretary is authorized by the Joint Funding Simplification Act to modify his regulations where they impede financing a particular project for which assistance is available from more than one grant program. 31 U.S.C. §§ 7103(b)(3)–(4), 7103(c). Board has demonstrated it is eligible to receive desegregation assistance monies through the Title IV program and Secretary's Discretionary Fund. To the extent Secretary's regulations require "competition" for available Title IV or Discretionary Fund monies, if at all, Secretary is authorized to suspend those regulations to permit his providing assistance for Board's desegregation activities. Secretary's regulations promulgated pursuant to the Joint Funding Simplification Act also permit him to place in abeyance any applicable compet-

itive selection criteria where the project for which joint financing is sought is of the minimum quality to qualify for funds. (34 C.F.R. § 75.219(b)); 34 C.F.R. § 75.221(c)(3) and (5). Conclusions 44, 45 and 59 establish that Board's programs meet that minimum standard. Consistent with those joint funding regulations and notwithstanding any Title IV or Discretionary Fund regulations for selecting among applications for funds, Secretary is authorized to provide funds from both sources directly to Board to meet the United States' financial commitment under Section 15.1.

68. In fiscal years 1983 and 1984 Congress appropriated a lump sum amount to finance Title IV and five other programs within the Special Programs and Populations account, and did not designate or earmark particular sums for each program. H.J.Res. 631, Title III; P–L 98–139, Title III, 98 Stat. 888. In both fiscal years Secretary administratively allocated $24 million to the Title IV program, leaving $28,058,000 in fiscal year 1983 funds and $23,447,000 in fiscal year 1984 funds available within the other Special Programs subaccounts. *Id.*

■ 69. Where several programs are financed through a lump sump appropriation, an executive agency is authorized to "reprogram" or allocate the appropriations among the various programs as it deems appropriate, notwithstanding program allocations or budgetary estimates that appear in congressional reports accompanying the appropriations act. *LTV Aerospace Corp.,* 55 Comp.Gen. at 319; *Matter of Newport News Shipbuilding and Dry Dock Co.,* 55 Comp.Gen. 812, 819–20 (1976); *Blackhawk Heating & Plumbing Co.,* 622 F.2d at 547 n. 6; United States General Accounting Office, *Principles of Federal Appropriations Law* 5–94 to 5–103 (1982).

70. Secretary was authorized in fiscal year 1983 and is authorized in fiscal year 1984 to reprogram available funds from the other Special Programs subaccounts into the Title IV subaccount, to the extent the total amount distributed through the Title IV subaccount did not or does not exceed $37,100,000. P.L. 97–35, Title V § 509, 95 Stat. 443. Those reprogrammed Special Programs funds could thus be made available to Board to finance any of the Title IV authorized programs or program elements described in Conclusions 44 and 45.

71. Secretary is also authorized in fiscal year 1984 to reprogram the fiscal year 1983 Special Programs carryover funds into the Title IV subaccount. Those carryover funds are currently unobligated. They may be used by Secretary for any purposes for which they were originally appropriated, and may be reprogrammed. 20 U.S.C. § 1225. Those carryover funds were originally appropriated in fiscal year 1883 and are not subject to the $37,100,000 limitation on Title IV expenditures in fiscal year 1984.

■ 72. Funds capable of being reprogrammed are available to meet the United States' Consent Decree obligations notwithstanding congressional disapproval of a reprogramming request. *Blackhawk Heating; see Immigration and Naturalization Service v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983).

73. All fiscal year 1984 funds allocated to those other Special Programs subaccounts are currently unobligated. No potential applicant, other than Board, has any independent legal entitlement to those other Special Programs funds. To the extent (if any) such potential applicants could have asserted due process rights to "compete" under Secretary's regulations for available Special Programs funds, Secretary could have obviated any such problem in fiscal years 1983 and 1984 by publishing a notice in the Federal Register of Secretary's prospective intention to reprogram certain special Programs funds for Board pursuant to the United States' Consent Decree obligation. 20 U.S.C. § 1232(b)(2)(A) and (B); 5 U.S.C. § 553(d)(1) and (3). In any event, potential applicants for fiscal year 1984 Special Programs funds have no due process right to "compete" for those funds in light of Secretary's announcements in the Federal Register that any availability of those funds for 1984 grant competitions is contingent upon the outcome of the present

litigation. See, 48 Fed.Reg. 55900 (Dec. 16, 1983); 48 Fed.Reg. 53150 (Nov. 25, 1983).

74. In fiscal years 1983 and 1984 Secretary was not legally obligated to provide continuation awards to particular grantees, other than Board, from the Special Programs subaccounts. It was within Secretary's authority to decline to finance all continuation projects on the ground that, as a result of his financial commitment to Board, there were no program funds "available" for continuation awards or that it was in the United States' "best interest" to provide those funds to Board rather than to continuation projects. 34 C.F.R. § 75.-253(a).

75. In sum as to Special Programs funds and carryover funds, there were in fiscal year 1983 and are in fiscal year 1984 no statutory, regulatory, or other legal constraints preventing Secretary from reprogramming such funds into the Title IV subaccount. Those funds have been and currently are "available" to the United States within the meaning of Section 15.1.

76. To the extent fiscal year 1984 funds exist in the following accounts and subaccounts, have not been committed for other purposes and are not reasonably necessary for other Department of Education functions [17], they too are "available" to Secretary within the meaning of Section 15.1:

(a) Secretary is authorized to use funds appropriated to his Salaries and Expense subaccount for contracts, grants, or payments as he deems appropriate or necessary to carry out the functions of Secretary or of the Department of Education. 20 U.S.C. § 3475. Secretary has the authority to find that payments or grants to Board, deriving from a Title VI action instituted by Secretary, are appropriate to carry out an agency function. There are no statutory or regulatory constraints preventing Secretary from making those funds available to Board.

(b) Secretary is authorized to use funds appropriated to his Office for Civil Rights subaccount for payments necessary to carry out the compliance and enforcement actions of the office.[18] P–L 98–139, Title III, 97 Stat. 894; 20 U.S.C. § 3413(c)(3). Secretary has the authority to find the United States' financial commitment constitutes an expense necessary completely to achieve the purpose of the Title VI compliance action brought against Board by the Office for Civil Rights, which culminated in the Consent Decree. There are no statutory or regulatory constraints preventing Secretary from making those funds in his Office for Civil Rights available to Board.

(c) Secretary is authorized to use the property or funds in his Gift and Bequest account for aiding and facilitating the work of the Department. 20 U.S.C. § 3481. Secretary has the authority to find that meeting the United States' Consent Decree obligations

---

**17.** This Court recognizes that (a) most of those funds are appropriated by Congress primarily for various operational or similar costs necessary for the functioning of the Department of Education and (b) just as funds necessary for Board's basic operations and obligations are not available for the Plan (see Conclusion 26), those funds are not "available" to the extent reasonably necessary for the Department's operations. Thus this Conclusion's determination such funds are "available" is qualified by the condition that the Department may show that some (or perhaps even all) those funds are not available because they are necessary for Department operations. In any event, the identification of such funds by Board is a particularly apt illustration of Board's having performed a function the United States is obligated to perform under Section 15.1 and the prior orders of this Court: identifying every available form of financial resources.

**18.** Department of Education's Office for Civil Rights contracts with other organizations to provide technical assistance to local educational agencies to assist them in complying fully with Title VI requirements. S.Rep. No. 247, 98th Cong. 1st Sess. 163–64 (1983). That technical assistance program was created by the Office for Civil Rights pursuant to its authority to make any payments necessary to carry out its compliance and enforcement functions. 20 U.S.C. § 3413(c)(3); P.L. 98–139, Title III, 97 Stat. 895.

furthers the work of the Department. There are no statutory or regulatory constraints preventing Secretary from making funds or property in his Gift and Bequest account available to Board.

77. Of the fiscal year 1983 funds appropriated to or available in all non-desegregation Department of Education accounts, $21,188,206 was unobligated and, absent this Court's September 27, 1983 order, would have lapsed into the Treasury. Through a congressional reappropriation those funds could be made available to Board in fiscal year 1984 to meet the United States' Consent Decree obligation. 31 U.S.C. § 1301.

78. There are no statutory, regulatory or other legal constraints preventing the Executive Branch from including, in the President's budget requests to Congress, budgetary line items requesting that Congress provide funds for particular purposes, activities or programs that Secretary has not previously undertaken. If Congress appropriated funds for such a line item, Secretary would be authorized to spend funds for that purpose. 31 U.S.C. § 1301; United States General Accounting Office, *Principles of Federal Appropriations Law* at 2–11, 2–12, 2–26, 2–27 (1983). Secretary could include in his fiscal year 1985 budget proposal, and could have included in prior budget proposals, such a line item requesting that Congress appropriate funds for Board's desegregation activities.

79. There are no statutory, regulatory or other legal constraints preventing the Executive Branch from including in the President's budget request to Congress budgetary line items within grant programs or other types of accounts. Secretary is authorized to create such line items to indicate the basis for the appropriation amount requested and the manner in which he intends to allocate funds appropriated to the grant program or account. If Congress appropriated funds for such a line item, Secretary would be authorized to reserve program funds solely for the purpose

of that line item. 31 U.S.C. § 1301; United States General Accounting Office, *Principles of Federal Appropriations Law* at 2–11, 2–12, 2–26, 2–27 (1983). Secretary could include in his fiscal year 1985 budget proposal, and could have included in prior budget proposals, such a line item in the Title IV, Discretionary Fund or perhaps other subaccounts that would further allow Secretary to reserve funds for provision to Board.

*Meaning and Effect of the Yates Bill*

 80. Section 111 of Public Law 98–107, 97 Stat. 742 (1983) (the "Yates Bill") provides:

There is hereby appropriated $20,000,000 to be derived by transfer from funds available for obligation in fiscal year 1983 in the appropriation for "Guaranteed Student Loans," to remain available for obligation until September 30, 1984, to enable the Secretary of Education to comply with the Consent Decree entered in United States District Court in the case of the United States of America against Board of Education for the City of Chicago (80 C 5124) on September 24, 1980.

 81. All statutory interpretation begins with the plain language of the statute. *American Tobacco Co. v. Patterson*, 456 U.S. 63, 102 S.Ct. 1534, 71 L.Ed.2d 748 (1982); *Consumer Product Safety Commission v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980):

Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive.

82. In plain language, the Yates Bill reveals only a Congressional determination to appropriate $20 million to be provided to Board pursuant to the Consent Decree, prompting the Executive Branch to take the first step toward fulfilling its obligations under Section 15.1. It reflects no congressional determination as to the total extent of the Consent Decree obligations, the extent of past violations, the adequacy

of the $20 million to remedy past violations or the availability of other funds.

83. Legislative history of the Yates Bill supports that plain language interpretation and further refutes any notion Congress intended to render all other funds unavailable to Board. It was passed in its ultimate form only after alternatives that would have had such an effect had been rejected. Evidence of rejected amendments is an appropriate aid to a court considering questions of legislative intent. *Johnson v. Department of Treasury*, 700 F.2d 971, 974 (5th Cir.1983).

84. In connection with the first draft of the Yates Bill, Congressman Conte submitted an "earmarking" proposal that was intended to render the funds previously restrained by this Court unavailable to Board. Under the Conte Amendment each of the categories of restrained funds was to "be available only to carry out the programs and projects" authorized under the respective legislation creating the programs. H.J.Res. 367, § 112, Report No. 98–374, Part I (September 22, 1983). Although that amendment passed the Appropriations Committee, it was rejected by the full House. Executive Branch officials later prepared an alternative to Section 111 (the Yates Bill) of H.J.Res. 368 that would have released the restrained funds to grantees other than Board and would have provided funds to Board only under certain conditions. That alternative, which was submitted to staff members of the House and Senate Appropriations Committees, was also ultimately rejected.

85. In light of his opposition to the Yates Bill and his attempt to alter its effect, any remarks by Representative Conte are entitled to very little weight in construing the statute. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 203–04 n. 24, 96 S.Ct. 1375, 1386 n. 24, 47 L.Ed.2d 668 (1976). It is well established that statements of opponents to a measure are poor evidence of legislative intent. *United States v. International Union of Operating Engineers*, 638 F.2d 1161, 1168 (9th Cir.1979), *cert.*

*denied*, 444 U.S. 1077, 100 S.Ct. 1026, 62 L.Ed.2d 760 (1980).

86. Subsequent as well as contemporaneous congressional action also supports the plain meaning interpretation of the Yates Bill. In its original version the Weicker Amendment, if constitutional, would have expressly achieved the precise result the United States now contends the Yates Bill had already achieved. It must be presumed Congress was aware of its own prior laws, *United States v. Robinson*, 359 F.Supp. 52, 58 (D.C.Fla.1973), and Congress would not attempt to enact redundant and unnecessary legislation. *See, Jackson v. Kelly*, 557 F.2d 735, 740 (10th Cir.1977). Because the original version of the Weicker Amendment was introduced October 4, 1983, a day *before* this Court found the United States' motion based on the Yates Bill to be premature, and because the Weicker Amendment was passed *before* this Court ultimately considered the Government's interpretation, it can hardly be said the Weicker Amendment was a congressional "response" to this Court's interpretation of the Yates Bill. Thus the congressional intent underlying the Yates Bill is further confirmed by this subsequent legislative activity.

87. In addition to being contrary to the plain language and legislative history of the Yates Bill, the United States' proffered construction of that statute would also implicitly reverse the prior determinations of this Court and our Court of Appeals. Given the settled principle that a statute should be construed to avoid questions regarding its constitutionality, *Crowell v. Benson*, 285 U.S. 22, 62, 52 S.Ct. 285, 296, 76 L.Ed. 598 (1932), and because the United States' interpretation would force the confrontation and resolution of substantial constitutional questions, additional reasons for rejecting the United States' suggested reading of the Yates Bill are present.

88. There is no indication Congress intended the Yates Bill to limit the United States' obligation to Board to the arbitrarily-arrived-at sum of $20 million (there having been no congressional consideration of

any of the matters dealt with at such length and painstakingly in these Findings and Conclusions). This Court responded to the enactment of the Yates Bill by freeing up previously frozen funds pro tanto. By so doing it retained other funds as still "available" and thus lessened the degree of confrontation that would have been posed by a decision holding the United States liable for making *all* funds *un*available. Plain legislative language cannot be overridden by the Executive Branch's interpretation of the Yates Bill and its assertion of general principles of construction reflected in certain Comptroller General Opinions (which can only be aids to reasoning, not a substitute for it).

### Meaning and Effect of the Weicker Amendment

■ 89. Section 309 of P.L. 98–139, 97 Stat. 895 (1983) (the "Weicker Amendment") provides:

No funds appropriated in any act to the Department of Education for fiscal years 1983 and 1984 shall be withheld from distribution to grantees because of the provision of the order entered by U.S. District Court for Northern District of Illinois on June 30, 1983: Provided, that the Court's decree entered on September 24, 1980 shall remain in full force and effect.

90. As Conclusion 81 reflects, this Court must first examine the language of the legislation and ordinarily must regard that language as conclusive. On its face the language of the Weicker Amendment is not confusing or ambiguous. It is a simple declaration that no fiscal 1983 or 1984 funds appropriated to the Department of Education are to be restrained from distribution to grantees because of this Court's June 30 Order—in street language, it seeks to unfreeze previously frozen funds.[19] It does not at all address the availability of funds to be provided pursuant to Section 15.1. It does not purport to limit "grant-

ees" to some subset of persons or organizations eligible to receive Department funding. Importantly (and obviously because of concerns as to constitutionality) it does provide the Consent Decree is to remain in "full force and effect."

■ 91. When a party argues a statute has a meaning that transcends its explicit language, that party bears the burden of showing clear legislative intent that such a contrary meaning was intended. *Ford Motor Credit Co. v. Cenance,* 452 U.S. 155, 158 n. 3, 101 S.Ct. 2239, 2241 n. 3, 68 L.Ed.2d 744 (1981) (per curiam). Because the United States contends the Weicker Amendment has some meaning beyond the plain language of the statute, it bears that burden. And because the doctrine disfavoring repeals by implication has been held to apply "with full vigor" when a subsequent law is an appropriations measure, *Committee for Nuclear Responsibility, Inc. v. Seaborg,* 463 F.2d 783, 785 (D.C. 1971), the United States also faces that additional burden when arguing the Weicker Amendment was intended substantively to alter the statutory availability of funds to Board.

92. As the following Conclusions confirm, the legislative history of the Weicker Amendment does not conflict with the plain language interpretation reflected in Conclusion 90. Instead the legislative history reinforces that plain language, with its negation of any effort to alter the substantive rights as between the United States and Board.

93. On October 4, 1983 (after the Yates Bill had become law on October 1) Senator Weicker offered the following provision as an Amendment to the Fiscal Year ("FY") 1984 Labor, Health and Human Services and Education Appropriations Bill:

No funds appropriated in any act to the Department of Education for fiscal year 1983 and 1984 other than those appropriated by Section 111 of the Public Law 98–107 shall be available to fund the

---

**19.** This discussion does not address any questions of *validity* of such an enactment—only its *meaning.*

Consent Decree of 1980 between the United States and Board of Education of the City of Chicago. *Cong.Rec.*, S.13506.

94. That language, which would (if valid) have had an important impact on the rights that are at the core of this opinion, was never enacted into law. Instead Senator Weicker *withdrew* that language, and on October 4 the Senate passed the Weicker Amendment as quoted in Conclusion 89. Its sponsor, Senator Weicker, explicitly stated his proposal "would not release the Government from any further liability" and "if additional funds are required to satisfy this case . . ., we will certainly do whatever we can to provide these funds . . ." *Cong. Rec.*, S.13507, 13535, October 4, 1983. Both the plain language of the Weicker Amendment and its legislative history (Senator Weicker's own statement and the matters reflected in the following Conclusions) reflect (a) congressional ratification of the United States' Consent Decree obligation and (b) congressional recognition of this Court's power to determine the nature and scope of that obligation.

95. On October 4 Representative Conte presented an amendment to H.R.3959 that contained the extremely specific language required for earmarking. *Cong.Rec.*, H.7973. Representative Conte's proposed amendment, like the *original* version of the Weicker Amendment, clearly purported to render the restrained funds unavailable to Board. Then on October 8, *after* the Senate had rejected the original version of the Weicker Amendment (thus rejecting the equivalent of Congressman Conte's proposal) and had adopted the Weicker Amendment in its ultimate form, Representative Conte decided not to propose his earmarking amendment to the House.

96. On October 13 the FY 1983 Labor, Health and Human Services and Education Appropriations bill was considered in joint conference committee. Substitute bill language for the Weicker Amendment and possible report language for inclusion in the Conference Committee Report were circulated by Representative Conte to members of the Committee. In conjunction with those documents, a report called "Talking Points" was also transmitted to Committee members.

97. Those "Talking Points" urged that substitute language be inserted in the Weicker Amendment "because Section 308 literally only directs that the funds no longer be enjoined; it does not address whether the funds must be awarded to the recipients selected by the Department of Education or to Chicago." Indeed the same document said, "It is possible that the Court— consistent with the terms of Section 308 as currently written—could lift its injunction but then order all or part of the funds to be awarded to Chicago." To respond to those perceived "shortcomings" Representative Conte's proposed substitute statute read:

No funds appropriated in any act to the Department of Education for fiscal years 1983 and 1984 other than those appropriated by Section 111 of Public Law 98–107 shall be available to fund the 1980 Consent Decree between the United States and the Board of Education of the City of Chicago; *provided,* that such Consent Decree shall remain in full force and effect, and nothing in this provision shall be construed to preclude the appropriation of additional funds for the express purpose of funding such Consent Decree.

To precisely the same effect, Representative Conte's proposed language for insertion in the Committee report read:

Section 308 is designed to ensure that FY 1983 and 1984 funds enjoined by the Court in the litigation between the United States and the Chicago Board of Education are released for awards to the intended grantees and contractors selected by the Department of Education. These funds were appropriated for worthy projects throughout the country, not for the purpose of funding the Chicago degree [sic].

In the end, however, *neither* the substitute bill language nor the proposed report language was approved. Instead the Weicker Amendment passed the House in exactly

the same form that had been approved by the Senate.

98. Remarks of a single legislator are never given controlling weight in analyzing legislative history. *Chrysler Corp. v. Brown*, 441 U.S. 281, 311, 99 S.Ct. 1705, 1722, 60 L.Ed.2d 208 (1979). When a legislator is opposed to a measure, his remarks are entitled to very little weight. *See, Ernst & Ernst*, 425 U.S. at 203–04 n. 24, 96 S.Ct. 1386 n. 24; *International Union of Operating Engineers*, 638 F.2d at 1168. In view of Representative Conte's unsuccessful attempts to alter or oppose the Yates and Weicker Bills so as to render funds unavailable to Board, his remarks are especially poor evidence of legislative intent. By contrast, the *fact* of those unsuccessful attempts is persuasive confirmatory evidence of legislative intent contrary to the abortive efforts.

99. In particular, no significance should be attached to Representative Conte's October 20 statement of his "understanding" of the Weicker Amendment. *See, Cong. Rec.*, H.8740. That statement apparently was inserted into the Congressional Record by Representative Conte after the House had agreed to adopt the Senate's version of the Weicker Amendment. In view of that effort at revisionist history, coupled with the total failure of Representative Conte to obtain the modifications in Committee that would have implemented Representative Conte's "understanding," it would be especially inappropriate now to impute Representative Conte's "understanding" to other members of Congress.

100. Evidence of the evolution of an enactment, of "the effect of amendments—whether accepted or rejected," is an important tool for discerning legislative intent. *Rogers v. Frito Lay, Inc.*, 611 F.2d 1074, 1080 (5th Cir.), *cert. denied*, 449 U.S. 889, 101 S.Ct. 246, 66 L.Ed.2d 115 (1980). Thus the Senate's modification of the original October 4 version of the Weicker Amendment (which, if constitutional, would have rendered the restrained funds unavailable to Board), as well as the failure of the similar efforts, particularly by Representative Conte, to modify the Weicker Amendment as passed by the Senate, strongly confirm the statute as passed was *not* intended to render the restrained funds wholly unavailable to Board.

101. Nothing daunted, the United States essays its own attempt at revisionist history. It urges this Court to construe the Weicker Amendment as if it had passed with its original proposed language—or with language Representative Conte tried but failed to have enacted on several occasions. Because Congress did not accede to the United States proposals to render the restrained funds unavailable to Board, however, this Court will not circumvent the congressional rejection of these provisions, or permit the United States to do so, by interpreting the Weicker Amendment as if those proposals had succeeded rather than failed.

102. In summary, the plain language of the Weicker Amendment thus simply requires the Court to return control of the restrained funds to Secretary—to restore the pre-freeze status quo—but does not dictate how any distribution of the funds should occur thereafter. And the foregoing examination of the legislative history of the Weicker Amendment further supports this plain meaning interpretation of the statute. Essentially the Weicker Amendment reflects a legislative compromise in which Congress specifically rejected any attempt to determine the substantive entitlement of Board or any other potential grantee to the restrained funds, leaving the Consent Decree in "full force and effect" and recognizing the determination was one this Court would be making. In effect the statute thus represented a congressional "separation of powers" determination that the Executive Branch should regain control of the funds, after which the rights to ultimate distribution of the funds would simply be in accordance with law—not dictated by the statute itself.

103. In light of the preceding Conclusions as to the continued "availability" (in Section 15.1 terms) of the funds now covered by this Court's restraining order, this

Court has concluded the restraining order can be terminated. That renders moot any possible conflict between the Weicker Amendment (read properly in accordance with the foregoing Conclusions) and the Constitution. It also responds to the salutary principle that constitutional questions should not be decided in advance of the necessity to decide them. *Rescue Army v. Municipal Court*, 331 U.S. 549, 67 S.Ct. 1409, 91 L.Ed. 1666 (1947). But because of the sharply different interpretation of the Weicker Amendment urged by the United States (and the far more serious, substantial and complex questions of constitutionality that interpretation would raise), it remains important, for the reasons made plain in the following Conclusions, to identify and discuss the relevant constitutional questions and their significance for this opinion.

104. In general Congress has the authority to define by statute the substantive law courts are required to apply. Accordingly when there has been a change in the applicable statutory law after judgment in the lower court but before an appellate or other final decision, the court must dispose of the case according to law existing at the time of its decision. *United States v. Schooner Peggy*, 5 U.S. (1 Cranch) 103, 110, 2 L.Ed. 49 (1801). That rule however is subject to the exception that courts will refuse to apply the law in effect at the time a decision is rendered when to do so would result in "manifest injustice." *Bradley v. School Board of City of Richmond*, 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974). Among the considerations relevant to the potential for manifest injustice are "the nature and identity of the parties, ... the nature of their rights and ... the nature of the impact of the change in law upon those rights." *Id.* at 717, 94 S.Ct. at 2019.

105. Article III of the Constitution vests "the judicial power of the United States" in federal courts. While Congress is vested with broad legislative powers under Article I, it can neither "exceed the limit of its own authority" nor "assume a power which could only be properly exercised by [courts] because it [is] in its nature clearly judicial." *Kilbourn v. Thompson*, 103 U.S. 168, 192, 26 L.Ed. 377 (1880). Thus "the Constitution has invested Congress with no judicial powers; it cannot be doubted that a legislative direction to a court to find a judgment in a certain way would be little less than a judgment rendered directly by Congress." *Nock v. United States*, 2 Ct.Cl. 451, 457–58, (1867), quoted in *United States v. Sioux Nation of Indians*, 448 U.S. 371, 398, 100 S.Ct. 2716, 2732, 65 L.Ed.2d 844 (1980). When Congress regulates functions of the judiciary in a pending case, it walks a line between judicial and legislative authority and exceeds that line if it sets aside a judgment or orders retrial of a previously adjudicated issue. *Id.* at 427–30, 100 S.Ct. at 2746–48 (Rehnquist, J., dissenting). Consequently, legislation that "prescribed a rule of decision in a case pending before the courts, and did so in a manner that required the courts to decide the controversy in the Government's favor" would be unconstitutional. *Id.* at 404, 100 S.Ct. at 2735.

106. Separation of powers limits the exercise of judicial power by Congress and reflects the Framers' concern for maintaining the independence of the coordinate departments as a bulwark against tyranny. *United States v. Brown*, 381 U.S. 437, 442–43, 85 S.Ct. 1707, 1711–12, 14 L.Ed.2d 484 (1964); *The Federalist* Nos. 47 and 48 (J. Madison).

107. If Congress does not purport to alter the governing procedural and substantive law, Congress cannot force its interpretation of that law upon the federal courts in particular cases. L. Tribe, *American Constitutional Law* § 3–5, at 39 (1978). In terms of the separation of powers analysis recently applied by the Supreme Court, such conduct would be an act by one branch of government that "prevents [another branch] from accomplishing its constitutionally assigned functions." *Nixon v. Administrator of General Services*, 433 U.S. 425, 443, 97 S.Ct. 2777, 2790, 53 L.Ed.2d 867 (1977).

108. No congressional change in the law can retroactively effect a judicial determination brought to final judgment before that change. *Daylo v. Administrator of Veterans' Affairs*, 501 F.2d 811, 816 (D.C.Cir.1974). To permit otherwise would destroy the finality and independence of the judicial action. Even when a judgment is not final, "the separation of powers bar a federal court from giving operational weight to a pronouncement by Congress . . . that what had theretofore been judicially declared as law 'shall be deemed never to have had effect.'" *Cerro Metal Products v. Marshall*, 467 F.Supp. 869, 878 (E.D.Pa.1978), *aff'd*, 620 F.2d 964 (3d Cir. 1980). That principle also protects the integrity of judical action and prevents the manifest injustice that retroactive application can cause. *Id.* at 877–79; *See also, Coe v. Secretary of Health, Education and Welfare*, 502 F.2d 1337, 1340 (4th Cir. 1974).

109. In cases involving property rights against the United States, the doctrine of separation of powers (as well as principles of equity) forbids application of a substantive law passed by Congress, pending appeal, that would effectively require a federal court to reverse a judgment entered against the United States. *United States v. Klein*, 80 U.S. (13 Wall.) 128, 20 L.Ed. 519 (1872); *see, also Sioux Nation of Indians*.

110. Under the Fifth Amendment property may not be taken without the payment of just compensation. Rights that have become vested by judgment constitute property protected from legislative interference. *McCullough v. Virginia*, 172 U.S. 102, 123–24, 19 S.Ct. 134, 142, 43 L.Ed. 382 (1898); *Daylo*, 501 F.2d at 816. Moreover, contract rights against the United States constitute property protected by the Due Process Clause. *Lynch v. United States*, 292 U.S. 571, 579, 54 S.Ct. 840, 843, 78 L.Ed. 1434 (1934). Courts have carefully distinguished situations where congressional action impacts only on unvested statutory rights from those where vested contract rights are effected. *See, deRodulfa*

*v. United States*, 461 F.2d 1240, 1257 (D.C. Cir.), *cert. denied*, 409 U.S. 949, 93 S.Ct. 270, 34 L.Ed.2d 220 (1972); *Memorial Hospital v. Heckler*, 706 F.2d 1130, 1136–37 (11th Cir.1983).

111. Any vested cause of action, whether emanating from contract or common law principles, constitutes property beyond the power of the legislature to take away. *deRodulfa*, 441 F.2d at 1257. Similarly an attachment, mortgage or other lien entitling a creditor to resort to specific property for the satisfaction of a claim is a property right protected by the Fifth Amendment. *Armstrong v. United States*, 364 U.S. 40, 44–46, 80 S.Ct. 1563, 1566–67, 4 L.Ed.2d 1554 (1960); *Louisville Bank v. Radford*, 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593 (1935).

112. Under either the United States' or Board's interpretations of the Weicker Amendment, that statute purports to require this Court to dissolve its injunction, thus "reversing" a particular judicial order in a particular case. If required to decide this question, this Court might well be forced to conclude that aspect of the Weicker Amendment violates fundamental principles of separation of powers. *Sioux Nation of Indians; Nixon v. Administrator of General Services*. This Court's determination as reflected in Conclusion 103 avoids that problem.

113. However, the United States' strained interpretation of the Weicker Amendment presents serious due process issues that do not afflict Board's (and this Court's) reading. One aspect of those due process problems specifically regards the effect of the Weicker Amendment as interpreted by the United States on fiscal 1983 funds. When those funds were appropriated they became potentially "available" to Board within the meaning of Section 15.1. At the moment the funds so became available, the Executive Branch had an obligation "to make every good faith effort to seek to find and provide" those funds to Board. As such, the United States' Consent Decree duties—and Board's correla-

tive Consent Decree rights—with respect to those funds became fixed in legal terms. Even were it assumed Congress might later alter *statutory rights* as to the availability of those funds, Congress could not, consistent with due process, abrogate Board's *Consent Decree rights* that had already vested both by contract and by judgment. *See, Daylo; Cerro Metal Products; see also, Blackhawk Heating.*

114. Put in a slightly different way, at the time the Weicker Amendment was enacted it was no longer within Congress' power to affect the United States' duties under the Consent Decree as to the restrained fiscal year 1983 funds. Pursuant to this Court's September 27, 1983 order, the United States had recorded those funds as obligated, with Board as an alternative contingent obligee of the Executive Branch. 31 U.S.C. § 1501(a)(6). Availability of funds for a particular purpose is determined at the time of obligation. Once obligated, they were exempt from any later statutory alterations of availability.

115. From still another perspective, the United States' false reading of the Weicker Amendment also appears to run afoul of due process because it would destroy Board's right to satisfy its claim from the funds restrained by this Court. In that sense, the frozen funds are similar to an attachment or lien allowing one to resort to specific property for satisfaction of a claim. Such interests are property rights protected by the Fifth Amendment. *Armstrong.*

116. In addition to the substantial due process questions raised by the United States' interpretation, its view of the Weicker Amendment also poses additional separation of powers concerns not presented by this Court's reading. Under the United States' version, this Court would impermissibly have to give effect to a pronouncement by Congress that "what had theretofore been judicially declared as law shall be deemed never to have had effect." *Cerro Metal Products.* That would place Congress in the position of having crossed the delicate line between legislative and judicial functions by dictating the result in

a particular case. According to the United States the Weicker Amendment becomes a "substantive" determination applicable to only the Chicago Board of Education and this lawsuit. While Congress has broad power to legislate with regard to *classes* of cases, its power is far more limited with regard to *individual* cases. *See, Sioux Nation of Indians,* 448 U.S. at 430, 100 S.Ct. at 2748 (Rehnquist, J., dissenting). Relatedly, the United States' proposed reading also violates the principle that Congress cannot change the applicable law in a pending appeal to relieve the United States of an unfavorable judgment in a dispute involving property rights. *Klein; see also, Sioux Nation of Indians,* 448 U.S. at 404, 100 S.Ct. at 2735.

117. Finally, a retroactive application of the United States' position on the Weicker Amendment—creating the fiction that the funds had never been available, so that there had never been a violation—would also result in "manifest injustice" (see Conclusion 104). It would belatedly disrupt an agreed process for vindicating the constitutional rights of Chicago students and reward the contumacious actions of the Executive Branch. It would also redefine Board's mature rights under the Consent Decree and saddle Board with a substantially broader responsibility for financing the Plan. Under the circumstances, it would be wholly improper for this Court to adopt and apply retroactively the United States' skewed interpretation of the Weicker Amendment. *Bradley; Coe.*

118. In summary as to the Weicker Amendment, the United States' interpretation, under which the statute would be a congressional determination that the restrained funds are not now and never were available, is incorrect because (a) it conflicts with the plain language of the Amendment, (b) it conflicts with the legislative history of the Amendment and (c) it would render the Amendment plainly unconstitutional in a number of ways. By contrast the Board's interpretation—that the Weicker Amendment, if constitutional, requires this Court to vacate its restraining

order, but does not dictate who should receive the funds—is correct, reflecting the plain language and legislative history of the Amendment. While the Amendment might nonetheless pose constitutional problems, this Court need not reach that question because it is now prepared to lift its restraining order upon issuance of an appropriate order in conformity with this opinion, thereby avoiding any potential conflict with the Amendment.

119. Accordingly neither the Yates Bill nor the Weicker Amendment renders the restrained funds unavailable to be provided to Board. Furthermore, the $20 million provided to Board pursuant to the Yates Bill does not satisfy the United States' obligations under Section 15.1 nor fully remedy its past violations. That contention, initially made by the United States in its Motion To Dismiss filed immediately after passage of the Yates Bill, and repeatedly reasserted up to the present, is wholly untenable. One primary effect of the language and legislative histories of both the Yates Bill and Weicker Amendment is to reconfirm that the United States has a substantial obligation under Section 15.1, an obligation that has not yet been complied with and that is to be further considered and enforced by this Court.

*Additional United States Violations of Section 15.1 and Subsequent Court Orders, and Consequent Remedial Obligations*

120. All the following actions, taken by the Executive Branch in connection with Congressional consideration of the Yates Bill, constituted violations of Section 15.1 (see Findings 504–05, 507–09):

(a) In connection with the first draft of the Yates Bill, H.J.Res. 367, the Executive Branch supported Congressman Conte's "earmarking" proposal. That amendment was intended to render the funds previously restrained by this Court unavailable to Board. *See,* H.J.Res. 367, § 112, Report No. 98–374, Part I (September 22, 1983).

(b) During Congressional consideration of H.J.Res. 368, Executive Branch officials prepared an alternative to Section 111 in an attempt to secure legislation that would have released the restrained funds to grantees other than Board. That proposed substitute language would have established a $14,600,000 contingency fund to satisfy any final court order against the United States but would have made other fiscal year 1983 funds unavailable for that purpose.

121. All the following actions, taken by the Executive Branch in connection with Congressional consideration of the Weicker Amendment, also constituted violations of Section 15.1 (see Findings 512–18):

(a) On October 4, 1983 the Department of Education prepared the following amendment to the Fiscal Year 1984 Labor, Health and Human Services and Education Appropriations Bill:

No funds appropriated in any act to the Department of Education for fiscal year 1983 and 1984 other than those appropriated by Section 111 of the Public Law 98–107 shall be available to fund the Consent Decree of 1980 between the United States and the Board of Education of the City of Chicago. *Cong.Rec.,* S. 13506.

That language was proposed by Senator Weicker as amendment number 2277. If it had been enacted and found constitutional, that provision would have rendered the restrained 1983 and 1984 funds unavailable to Board.

(b) After a modified version of the Weicker Amendment that did *not* render the restrained funds unavailable to Board had passed the Senate, the Department of Education prepared and transmitted substitute bill language to conference committee members:

No funds appropriated in any act to the Department of Education for fiscal year 1983 and 1984 other than those appropriated by Section 111 of Public Law 98–107 shall be available to fund the 1980 Consent Decree between the United States and the Board of Education of the City of Chicago: *Provided,*

that such Consent Decree shall remain in full force and effect, and nothing in this provision shall be construed to preclude the appropriation of additional funds for the express purpose of funding such Consent Decree.

If adopted and found constitutional, that substitute language would also have rendered the restrained funds unavailable to Board.

(c) In addition the Department of Education submitted proposed language for insertion in the Committee Report that would have attempted to render the restrained funds unavailable to Board:

Section 108 is designed to ensure that FY 1983 and 1984 funds enjoined by the Court in the litigation between the United States and the Chicago Board of Education are released for awards to the intended grantees and contractors selected by the Department of Education. These funds were appropriated for worthy projects throughout the country, not for the purpose of funding the Chicago degree [sic].

(d) In conjunction with the substitute bill language and proposed Committee Report language, the Department of Education also prepared and submitted a paper entitled "Talking Points" to members of the Conference Committee. That paper urged adoption of those measures in order to render the restrained funds unavailable to Board.

122. On July 15, 1983 the United States filed with this Court a Report in purported compliance with its reporting obligations under Order ¶ 2, 567 F.Supp. at 288. That Report failed to present a discussion of specific steps to be included in the United States' program of compliance with the Order and was hence a willful and bad faith violation of the United States' reporting obligations.

123. In the same way, the alleged Plan of the United States for Supporting the Desegregation Plan of Board of Education of the City of Chicago, filed with this Court November 10, 1983, contained no adequate suggestions at all for remedying the United States' past Consent Decree violations or for providing further funding for the Plan. By submitting that so-called "Plan," the United States willfully and in bad faith violated this Court's October 28, 1983 order.

124. As part of the same ongoing pattern, the United States' activities with regard to the funds restrained by this Court constitute further willful, bad faith violations of Section 15.1 and subsequent Court orders. Among those violations are:

(a) Despite having preserved the "excess funds" from lapsing, pursuant to this Court's September 27, 1983 order, the United States failed to seek reappropriation of those funds (which do not have any other "intended uses") for provision to Board for implementation of the Plan.

(b) In a like show of obstructionism, the United States has continued to refuse to provide any of the "carry over" funds to Board, despite their clear availability and the absence of even remotely compelling competing needs for these funds.

(c) Similarly, the United States has failed to provide Board any of the previously restrained 1983 funds that became available for distribution to grantees, including Board, pursuant to this Court's November 21, 1983 order.

125. Perhaps even worse than such stonewalling, the United States continues deliberately to flout Section 15.1, the Consent Decree and subsequent court orders by engaging in a broad course of conduct designed to render *un*available funds that could be used, and would go part of the way toward being adequate, for implementation of the Plan. Those actions, which are a continuation of the conduct previously found by this Court to violate Section 15.1, constitute additional willful and bad faith violations and include:

(a) failure of the Executive Branch to request fiscal year 1984 or 1985 funding for Title IV of the Civil Rights Act of 1964;

(b) failure of the Executive Branch to seek fiscal year 1984 or 1985 appropriations for the Discretionary Fund sufficient to provide adequate local desegregation assistance;

(c) failure of the Executive Branch in fiscal years 1984 and 1985 to request any appropriations for the Special Programs and Populations subaccounts currently subject to the Order;

(d) Secretary's prior decision and current intention not to reprogram available funds, or formally to request congressional committee approval to reprogram such funds, into subaccounts from which desegregation assistance could be provided to Board;

(e) the decision of the Department of Education not to provide direct grants to local educational agencies with fiscal year 1984 or 1985 funds under Title IV of the Civil Rights Act of 1964;

(f) Secretary's prior decision and current intention not to set aside any fiscal year 1984 or 1985 funds, including available Discretionary Fund moneys, specifically for Board to support its desegregation program costs;

(g) the prior decision and current intention of the Executive Branch not to seek legislation in fiscal year 1984 or 1985 providing specific appropriations to fund all or any portion of Board's costs of implementing the Plan;

(h) the decision of the Department of Education and the Executive Branch to submit a fiscal year 1985 budget proposal to Congress for the Department that includes earmarking language to render all funds appropriated to the Department in fiscal year 1985 and future fiscal years *un*available to Board for use in implementing the Plan.

126. Most recently, the efforts of the Department of Education to promulgate new Regulations—apparently in direct response to this litigation—designed to render funds unavailable for provision to Board for implementation of the Plan constitute an additional and deliberate violation of Section 15.1 and subsequent court orders. Those proposed regulations, 49 Fed.Reg. 7546–51 (February 29, 1984), are designed to "interpret" statutory eligibility criteria for grants from Secretary's Discretionary Fund in a manner inconsistent with the intent of Congress. In any case they are an attempt to render already available funds unavailable for Board's use.

127. Such persistent violations of the Consent Decree and subsequent court orders by the United States may give rise to remedial obligations that go beyond the particular obligations initially contemplated by Section 15.1. It is a basic equitable principle that a court may devise a remedy that exceeds the terms of a prior agreement between the parties if necessary to make the injured party whole. *Walters v. Marathon Oil Co.*, 642 F.2d 1098, 1100 (7th Cir.1981). Thus a court may impose "additional consistent burdens" designed "to ensure implementation of the decree" when a party to a consent decree has failed to comply with his obligation. *Brewster v. Dukakis*, 675 F.2d 1, 4 (1st Cir.1982).

128. In like fashion a court, enforcing its order through contempt, may require a contemnor to perform affirmative acts not mandated by an underlying decree. *In re Arthur Treacher's Franchise Litigation*, 689 F.2d 1150, 1159 (3d Cir.1980); *NLRB v. J.P. Stevens & Company, Inc.*, 563 F.2d 8 (2d Cir.1977), *cert. denied*, 434 U.S. 1064, 98 S.Ct. 1240, 55 L.Ed.2d 765 (1978); *Franklin Mint Corp. v. Franklin Mint, Ltd.*, 360 F.Supp. 478 (E.D.Pa.1973). Equitable power of a court to direct such action, however, is not dependent on a finding of contempt or bad faith. *See, Alexander v. Hill*, 707 F.2d 780, 783 (D.C.Cir. 1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 206, 78 L.Ed.2d 183 (1983).

129. As indicated at the outset of this opinion, a consent decree has a double aspect—both as contract and as court order. From the former perspective, a party to an agreement may not flout its obligations or take actions that have the effect of destroying or injuring the right of

the other party to receive the benefits of the agreement. *Williston on Contracts* §§ 670, 1959 (3d ed. 1978). Though it is always important to ensure accountability, that importance is heightened in the present case, where it is the United States that has so persistently attempted to flout its obligations. *United States v. An Undetermined Quantity, etc.*, 583 F.2d 942, 949 (7th Cir.1978); *United States v. United Mine Workers*, 330 U.S. 258, 312, 67 S.Ct. 677, 705, 91 L.Ed. 884 (1947). Board, like any citizen, has the "right to expect fair dealing from [the] Government." *S & E Contractors v. United States*, 406 U.S. 1, 10, 92 S.Ct. 1411, 1417, 31 L.Ed.2d 658 (1972); *see also, United States v. 119.67 Acres of Land*, 663 F.2d 1328, 1333 (5th Cir.1981).

130. All the foregoing discussion creates still another double aspect of the United States' obligations. First, all the particular obligations of the United States detailed in these Conclusions are required as a matter of interpretation of the Consent Decree, viewed both alone and in light of the present circumstances. Second, even were that not the case the United States' violations and efforts to undermine its obligations ought to render performance of the same obligations mandatory as a purely remedial matter.

*Present Obligations of the United States*

131. This Court's Order ¶ 1(b) decided Section 15.1 of the Consent Decree then required the Executive Branch "to take every affirmative step within its legal authority to seek to 'find and provide' desegregation funding to Board, until funding adequate for full implementation of the Plan has been provided." Order ¶ 2 then prescribed detailed remedial steps to ensure fulfillment of this obligation. That remedial portion of the Order was vacated by the Court of Appeals to give the Executive Branch an opportunity "to fashion its proposed remedy." Except for the $20 million provided pursuant to the Yates Bill (over the opposition of the Executive Branch), the United States has not taken advantage of the opportunity provided, nor has it given the slightest indication it plans to fulfill its obligations under the Consent Decree.

132. Consistent with Section 15.1 and the parties' Joint Stipulation as to their intentions when they entered into that agreement, it is necessary and proper for this Court again to "interpret" and "apply" the "general obligation on the part of" the United States "as appropriate in [today's] circumstances" (see Finding 104). Under the present circumstances it is clear that, as a matter of construction of Section 15.1, the United States is bound to take every affirmative step within its legal authority to find and provide adequate financing for the Plan, including steps to provide available funds and steps to render funds available, as detailed in these Conclusions.

133. In another mischaracterization of the issues, the United States argues Section 15.1 could not reasonably be construed to dictate a substantial funding result. That contention wholly misapprehends the nature of the obligation contained in Section 15.1. Section 15.1 essentially directs that a *process* take place, rather than assuring any particular *result* of that process. It does not guarantee Board the United States will provide any sum certain. Instead it requires the United States to undertake the *process* of making every good faith effort to find and provide funds, while the *result* to be obtained is dependent on and limited by other circumstances—particularly the amount of funding that is or becomes available as a result of the process and the amount of funding necessary for adequate implementation of the Plan. While those circumstances limit the result to be obtained, they do not limit the nature of the process that the United States must undertake to attempt to achieve the result.

134. Under any circumstances, Section 15.1 imposes a serious and substantial obligation on the United States. *Geisser v. United States*, 513 F.2d 862, 869–71 (5th Cir.1975), *on remand*, 414 F.Supp. 49 (S.D. Fla.1976), *appeal after remand*, 627 F.2d

745 (5th Cir.1980), *cert. denied,* 450 U.S. 1031, 101 S.Ct. 1741, 68 L.Ed.2d 226 (1981). Courts have frequently set demanding standards for action by government officials who have entered into consent decrees containing "best efforts" or similar commitments. Such standards have included requiring the provision of available funds and prohibiting or requiring various lobbying activities. Courts have not interpreted such commitments to permit government officials to flout or evade their duties. *Brewster v. Dukakis,* 675 F.2d 1 (1st Cir. 1982); *Ricci v. Okin,* 537 F.Supp. 817 (D.C. Mass.1982). And it would be a travesty of justice to accept the United States' argument that such cases have less force because they involved outrageous conduct by state rather than (as here) federal officials. *See, An Undetermined Quantity,* 583 F.2d at 949.

135. There is another locution that equally illustrates the fallacy in the United States' position. Though the Executive Branch certainly does not retain discretion under Section 15.1 as to *whether* to meet its obligation, so that it may not directly renege on its promise or indirectly undermine it, the Executive Branch does retain broad discretion under Section 15.1 as to *how* to meet its obligation.

 136. As to the presently available funds, the Executive Branch has in the past totally distorted the concept of exercise of its discretion. It has persistently searched for ways *not* to meet its obligation to Board rather than for *how* to meet that obligation. As a consequence it has so reduced the availability of funds that sufficient funding to meet its obligation is no longer "available."[20] That there are now severely limited available funds, resulting in apparently severely limited remaining discretion, is the direct consequence of the Executive Branch's deliberate violations of Section 15.1. Nor can credence be given to the Executive Branch's contention that it continues to retain discretion to dispense

with those funds otherwise, based on the superficially appealing equitable argument that numerous applicants for those funds will otherwise be disappointed. Those applicants (even though they do not have any legal entitlement to the funds, unlike Board) may have a call on the court's equitable conscience, but the Executive Branch does not. It is the Executive Branch that has wrongfully created these circumstances, and it cannot in good conscience invoke the equities as surrogate for the innocent applicants. Nevertheless, under Section 15.1 the United States still generally retains its discretion as to how to meet its obligation, and it need not provide the now-available funds to Board if it renders *other* adequate funds available.

137. Unless the United States so renders other adequate funding available, Board is entitled under Section 15.1 to the available fiscal 1984 funds to the extent necessary adequately to implement its desegregation programs. This result is also required because the United States' past and continuing violations of the Consent Decree have eliminated all alternative sources of available funds and because it is necessary to redress those violations. At a minimum the Executive Branch has historically allocated Title IV and Discretionary Fund moneys disproportionately in favor of other applicants. In prior years other potential recipients of the fiscal year 1984 funds have benefitted from Secretary's violations of the Consent Decree, and the funds now remaining available are not even sufficient to correct that historical imbalance. Even apart from that, Secretary has not created any entitlement in other applicants to those funds in fiscal year 1984, and no number or form of Executive Branch "policy" decisions, "representations" or subsequent "commitments" can undo or override the United States' obligations to Board and indeed to this Court. *See, Geisser; Brewster; Ricci.*

**20.** Thus, with respect to available funds, the Executive Branch has not even afforded its obligation to Board equal status with its desires to

use the funds otherwise. It has not even tried to fund Board's needs in the same proportion as it funded other applicants.

138. Another aspect of the plain meaning of Section 15.1 makes clear the Executive Branch's obligation extends to *legislative* activities, to the extent necessary to insure resources for full implementation of the Plan. Section 15.1 employs the words "find" and "every available form of financial resources." If all that had been intended was to give Board access to *existing* funding sources, the verb "provide" would have done the job. "Find" imports something more: the *search* for funds. If the United States' obligation did not extend to activities such as seeking reappropriation or new legislation when other sources of available funds prove inadequate, the word "find" would be rendered meaningless. It is a cardinal principle of construction that each provision of an agreement should be given meaning if possible. *Hanley v. James McHugh Construction Co.,* 444 F.2d 1006, 1009 (7th Cir.1972). And the linked use of the phrase "every available form of financial resources" stresses a "universal search," which necessarily includes legislative initiatives as one aspect of the required effort.

139. Nor is Conclusion 138 speculative, though the language is clear enough. Examination of extrinsic evidence also confirms the Executive Branch's obligation under Section 15.1 extends to lobbying activities. Language proposed as a precursor to Section 15.1 in a June 19, 1980 letter from Assistant Attorney General Drew Days to Board (GX 1–20) shows that the word "available" cannot be read as a term of limitation and that legislative initiatives were contemplated.

140. Moreover, the broad circumstances (see Findings 108–09) surrounding entry of the Consent Decree also indicate the United States' obligation in Section 15.1 extends to lobbying activities. Its financial commitment in Section 15.1 was the principal *quid pro quo* for Board's willingness to forego litigation and develop the Plan. In return for its Section 15.1 commitment the United States secured the full result it sought (and might not otherwise have achieved) without the expense and delay of complex litigation.

141. It would be inequitable to construe the Consent Decree in a way that would mean Board undertook its binding and substantial obligations without any assurance the United States could not completely eviscerate its one obligation through lobbying activity or inactivity. It is a principle of contract construction that an agreement should not be interpreted in a manner that will place one party wholly at the will or mercy of another. *Padbloc Co. v. United States,* 161 Ct.Cl. 369, 376–77 (1963). It would distort that principle to hold that while Board is bound to its substantial obligations the Executive Branch is free completely to undermine its obligations through lobbying activity or inactivity. No such totally empty promise will be implied by this Court.

142. Viewed either alone or in the present circumstances, Section 15.1 (as a matter of construction) requires the Executive Branch promptly to undertake some combination of the following lobbying activities to the extent necessary to assure financing adequate for implementation of the Plan:

(a) reporting to Congress on the substance of this Court's decision and the need for funds to meet the United States obligation under Section 15.1;

(b) requesting reappropriation of excess 1983 funds, and, at the appropriate time, excess funds in 1984 and subsequent years;

(c) requesting reappropriation of Guaranteed Student Loan or other 1984 Department of Education Funds;

(d) requesting supplemental 1984 Department of Education appropriations for use in meeting its obligations to Board;

(e) seeking fiscal year 1985 appropriations;

(f) taking any other legislative initiatives that the Department, using "every good faith effort," can identify that might result in rendering funds available to Board; and

(g) opposing any legislative initiatives designed to render funds *un* available for provision to Board.

143. As for Conclusion 142(a), the Executive Branch and specifically the Department of Education are required by statute to submit reports to Congress conveying similar information. *See,* 20 U.S.C. § 3486; 31 U.S.C. §§ 1105, 1108. As for the remaining activities described in Conclusion 142, they represent the Executive Branch's minimum obligations with respect to legislative initiatives consistent with the terms of Section 15.1, either on its face or as interpreted in light of the present circumstances. Of course the Executive Branch retains discretion to choose among those potential legislative initiatives, so long as it exercises that discretion in a manner so as "to make every good faith effort" to "find" adequate financing.

*Separation of Powers: Judicial Consideration of Legislative Activities*

144. Separation of powers doctrine serves "to check the extent of power exercisable by any one branch of Government in order to protect the people from oppression," *Consumer Energy Council of America v. F.E.R.C.,* 673 F.2d 425, 471 (D.C.Cir.1982), *aff'd,* —— U.S. ——, ——, ——, 103 S.Ct. 3556, 77 L.Ed.2d 1402, 1403, 1413 (1983). That doctrine was adopted "not to promote efficiency but to preclude the exercise of arbitrary power." *Myers v. United States,* 272 U.S. 52, 292–93, 47 S.Ct. 21, 84–85, 71 L.Ed. 160 (1926) (Brandeis, J., dissenting). It does not require "three airtight departments of government." Rather the doctrine is flexible, and the measure of conformance to its principles is pragmatic. *Nixon v. Administrator of General Services,* 433 U.S. 425, 441–43, 97 S.Ct. 2777, 2789–90, 53 L.Ed.2d 867 (1977).

145. To determine whether an act of one branch of government disrupts the proper balance between the coordinate branches, the proper inquiry focuses on the extent to which the act prevents another branch from accomplishing its constitutionally assigned functions. Only if that

threshold inquiry reveals the potential for disruption will a court then examine whether that impact is justified by an overriding need to promote objectives within the constitutional authority of the first branch. *Id.* at 443, 97 S.Ct. at 2790.

146. Enforcement of the Consent Decree by foreclosing certain narrow legislative activities by the Executive Branch, and requiring certain others, involves no disruption of lawful Executive Branch activities. Nor does it disrupt the balance between coordinate branches, because the Executive Branch itself properly exercised its own constitutionally assigned power when it chose to enter into the Consent Decree. Enforcement of the Executive Branch's own voluntary decision is not an unwarranted "disruption" of the exercise of its powers. *See, id.; Citizens for a Better Environment v. Gorsuch,* 718 F.2d 1117, 1127–30 (D.C.Cir.1983); *Gautreaux v. Pierce,* 690 F.2d 616, 637–38 (7th Cir. 1982); *Alliance To End Repression v. City of Chicago,* 733 F.2d 1187 at 1191 (7th Cir.1984).

147. Enforcement of the full substance of the United States' commitment in Section 15.1 is further justified by the "overriding need" to protect the constitutional rights of Chicago students and the integrity of the Judicial Branch itself. *Nixon v. Administrator of General Services; see also, Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 163, 177, 2 L.Ed. 60 (1803); *An Undetermined Quantity, Etc.,* 583 F.2d at 949.

148. Nor do the legislative activities of the Executive Branch in the circumstances of this case present "political questions" that may not be considered by this Court. *Baker v. Carr,* 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962), defines the criteria for evaluating the applicability of the political question doctrine:

Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of

judicially discoverable and manageable standards for revolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of the government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

149. That doctrine's first strand—"textually demonstrable constitutional commitment"—has been carefully and narrowly applied. In many instances, the exercise of powers that initially appear to be committed to another branch by the Constitution have been found not so committed and subject to review by the courts. *See, Powell v. McCormack,* 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969); *Roudebush v. Hartke,* 405 U.S. 15, 92 S.Ct. 804, 31 L.Ed.2d 1 (1972).

150. Article II, Section 3 of the Constitution provides in part:

Section 3. He shall from time to time give to the Congress information of the State of the Union, and recommend to their Consideration such Measures as he shall judge necessary and expedient....

That provision establishes the duty of the President to recommend measures to Congress, thereby giving him a positive role in the legislative process. Its purpose is to "make it plain that it is not an officious intrusion upon the functions of the legislative branch, violative of the principle of separation of powers, when the President proposes a program of lawmaking ..." E. Dumbauld, *The Constitution of the United States* 311 (1964).

151. Article II, Section 3 addresses and clarifies a separation of powers issue not at all implicated in the present case. It establishes the Executive's duty and ability to recommend matters to Congress. It does not however address the accountability of the Executive Branch for its failure to meet an independent obligation to do so, nor does it excuse that failure. It assures only that fulfillment of an obligation such as that owed to Board does not violate the doctrine of separation of powers. Accordingly Article II, Section 3 does not constitute a "textual commitment" of Executive Branch legislative activity in these circumstances.

152. As Conclusions 138–43 make plain, the Executive Branch's Section 15.1 commitment to Board (and to this Court as well) effectively reflects a determination that if sufficient presently available funding could not be provided, it would become "necessary and expedient" to undertake legislative initiatives. That determination represented a proper exercise of the Executive Branch's discretion and a voluntary limitation on the future exercise of that discretion. *See, Citizens for a Better Environment v. Gorsuch; Covelo Indian Community v. Watt,* 551 F.Supp. 366, 378 & n. 9 (D.D.C.1982), *aff'd,* Docket Number 82–2377 (D.C.Cir. December 21, 1982), *vacated as moot,* Docket Number 82–2377 (D.C.Cir. February 1, 1983).

153. Such Executive Branch agreements to particular restrictions on the exercise of its "executive" powers are proper and can be enforced. *Gautreaux v. Pierce,* 690 F.2d at 637–38; *Alliance To End Repression,* at 141. Self-imposed restraints of this type do not impermissibly infringe upon Executive Branch discretion. *Citizens for a Better Environment v. Gorsuch.* Indeed the United States' ability to restrict itself and enter into binding commitments is a "competence attaching to sovereignty." *Perry v. United States,* 294 U.S. 330, 353, 55 S.Ct. 432, 436, 79 L.Ed. 912 (1935), rejecting the contention (much akin to that the United States seeks to advance here) "that the Government cannot by contract restrict the exercise of a sovereign power."

154. Board's rights against the United States are embodied in a consent decree, a judgment that can be fully enforced by this Court. *United States v. City of Miami,* 664 F.2d 435, 439–40 (5th Cir.1981) (per

curiam). Even were Section 15.1 viewed as a simple contract, the United States' promise would remain fully enforceable (though in that event enforcement might be relegated to the Claims Court, 28 U.S.C. § 1491(a)(1)). Litigation to enforce government contracts recognizes both (a) the general potential for contractual liability even when the United States exercises "sovereign" powers and (b) the specific "validity of a duty to obtain funds" when the United States contracts to do so. *Municipal Leasing Corp. v. United States*, 1 Cl.Ct. 771, 774 n. 2 (1983); *S.A. Healy Co. v. United States*, 576 F.2d 299, 306–07, 216 Ct.Cl. 172 (1978); *D & L Construction Co. and Associates v. United States*, 402 F.2d 990, 999, 187 Ct.Cl. 736 (1968) (per curiam); *Gerhardt F. Meyne Co. v. United States*, 76 F.Supp. 811, 815, 110 Ct.Cl. 527 (1948).

155. This and the next two Conclusions confirm that no other characteristics of a nonjusticiable political question are present in this case. There are "judicially discoverable and manageable" standards for evaluating the Executive Branch's legislative activities. *Baker v. Carr.* Its specific actions to meet its commitment to Board will be empirically verifiable, for terms such as "every good faith effort," which describes the Executive Branch's duty, are frequently used to describe legal obligations and are routinely enforced by courts. *See, United States v. McAndrew*, 480 F.Supp. 1189, 1193 (E.D.Va.1979) (order requiring "reasonable efforts" sufficient to support contempt finding).

156. Enforcement of the Executive Branch's duty to make legislative initiatives will not involve this Court "in policy decisions". *Baker v. Carr.* It was the Executive Branch itself that decided the then-contemplated litigation with Board should be settled immediately on the terms embodied in the Consent Decree. This Court's enforcement of that agreement does not involve it in evaluation of the policy judgments of the Executive Branch. *See, Citizens for a Better Environment v. Gorsuch.*

157. Finally in the "political question" analysis, judicial enforcement of the Executive Branch's commitment does not show any "lack of deference" to a coordinate branch of Government. *Baker v. Carr.* Quite the opposite is true. Throughout these proceedings, the considerable deference shown the Executive Branch by both this Court and Board has been consistently exploited by the United States' obstructionism. Under the circumstances, it is entirely proper for this Court to enforce the full substance of the United States' obligation.

*Means of Enforcement*

158. At this point the rights and duties of the parties have been defined. It remains to address the most appropriate means of enforcement. This opinion is not accompanied by an order for three reasons:

(a) to enable the parties to consider the full scope and implications of this opinion;

(b) to enable the United States (consistently with the forebearance this Court and the Court of Appeals have previously extended to it as a litigant) promptly to advise this Court and Board of its response to its obligations as defined in these Findings and Conclusions; and

(c) to enable the parties promptly thereafter to tender proposals for an appropriate order.

Nonetheless it makes good sense now to address some aspects of the enforcement issues.

159. Because the United States failed to provide available funds or adequate funding to Board for school year 1983–84, and because the United States otherwise failed to comply with its obligations for that school year under the Consent Decree and as determined by this Court and the Court of Appeals, the United States has not yet effectively begun to meet its funding obligations.

160. These Findings and Conclusions have often made reference to the Executive Branch. But the litigant here is the United States, and the Consent Decree is a binding

obligation of the United States as such, not of the Executive Branch (which is after all not a legal entity). As established in these Findings and Conclusions, the Executive Branch has persistently sought to render funds *un* available to Board, and it has succeeded in so limiting the current availability of funds that it has undermined the United States' ability to comply fully with the obligation contained in Section 15.1. Considering those violations, by which the Executive Branch has deliberately disabled itself from complying with Section 15.1, this Court now determines the current obligation of the United States remains one of providing Board with an amount adequate for implementation of the Plan in school year 1984–85. As Conclusion 158 indicates, considerations of comity and separation of powers dictate that this Court defer (briefly, to be sure) its determination as to the means necessary to ensure that the Executive Branch will attempt to meet that obligation.

161. To be entitled to permanent injunctive relief, a plaintiff not only must prevail on the merits of its claim but also must carry the burden of what "is often referred to as 'balancing the equities' or as drawing the 'balance of convenience.'" 7 *Moore's* ¶ 65.18[3], at 65–136. As the Supreme Court put it in *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506–07, 79 S.Ct. 948, 954–55, 3 L.Ed.2d 988 (1959):

> The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies.

*Moore's* explicitly, and *Beacon Theatres* implicitly, suggests the District Court considering a permanent injunction could well apply the same criteria our Court of Appeals has consistently announced as required for preliminary injunctive relief (*Godinez v. Lane*, 733 F.2d 1250 at 1257 (7th Cir. May 9, 1984)), of course substituting actual victory on the merits for a mere reasonable likelihood of success.

162. Application of those principles to the present case demonstrates Board has borne its burden with regard to each of those criteria:

(a) Board has prevailed on the merits of its claim and has established that the United States has violated and continues to violate its binding and enforceable obligations under the Consent Decree.

(b) Board has demonstrated the balance of equities weighs in favor of the grant of injunctive relief, inasmuch as:

(1) Board has no adequate remedy at law.

(2) Board faces irreparable injury in the absence of injunctive relief, because it will most likely be unable to meet its Consent Decree obligations absent such relief and because its Consent Decree obligations will be effectively varied and enlarged.

(3) No substantial hardship is imposed on the United States by the grant of permanent injunctive relief directing compliance with the Consent Decree to which it voluntarily agreed. Any hardship certainly does not outweigh the injury to be inflicted upon Board if such an injunction is not granted.

(4) Surely the public interest is best served by granting permanent injunctive relief. In particular, the public interest in assuring full and adequate implementation of the Plan, in preserving the integrity of the Consent Decree and in protecting the dignity and power of this Court would be served.

(c) There should be no difficulty in shaping a form of injunctive relief that is appropriate, narrowly tailored and adequate to protect Board's rights.

Accordingly, Board satisfies all of the requirements for permanent injunctive relief.